# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| RESPONSIBLE OFFSHORE DEVELOPMENT ALLIANCE, a D.C. nonprofit corporation, P.O. Box 66704, Washington, D.C. 20035, | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 22-237 |
| v. | ) ) | |
| UNITED STATES DEPARTMENT OF THE INTERIOR; 1849 C Street NW, Washington, DC 20240; DEB HAALAND, in her official capacity as the Secretary of the Interior, 1849 C Street NW, Washington, DC 20240; BUREAU OF OCEAN ENERGY MANAGEMENT, 1849 C Street NW, Washington, DC 20240; AMANDA LEFTON, in her official capacity as the Director of the Bureau of Ocean Energy Management, 1849 C Street NW, Washington, DC 20240; NATIONAL MARINE FISHERIES SERVICE, 1315 East-West Highway Silver Spring, MD 20910; RICHARD W. SPINRAD, in his official capacity as the Administrator of the National Oceanic and Atmospheric Administration, 1315 East-West Highway Silver Spring, MD 20910; UNITED STATES DEPARTMENT OF THE ARMY, 104 Army Pentagon Washington, DC 20310; CHRISTINE WORMUTH, in her official capacity as Secretary of the Army, 104 Army Pentagon Washington, DC 20310; UNITED STATES ARMY CORPS OF ENGINEERS, 441 G Street, NW, Washington, DC 20314; and JAMIE A. PINKHAM, in his official capacity as the Acting Assistant Secretary of the Army for Civil Works, 441 G Street, NW Washington, DC 20314; | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

In its haste to implement a massive new program to generate electrical energy by

constructing thousands of turbine towers offshore the eastern seaboard on the Atlantic Outer

Continental Shelf and laying hundreds of miles of high-tension electrical cables undersea, the

United States has shortcut the statutory and regulatory requirements that were enacted to protect our nation's environmental and natural resources, its industries, and its people.

On July 15, 2021, the Secretary of the Interior, acting through the Bureau of Ocean Energy Management (the "Bureau"), approved Vineyard Wind 1 LLC's ("Vineyard Wind") Construction and Operations Plan for an offshore renewable energy project off the coasts of Massachusetts and Rhode Island, authorizing the construction of up to 84 turbine towers covering 65,296 acres of seabed.[1] That same day, the Bureau also granted Vineyard Wind an easement to construct 23.3 miles of high-tension electrical cable to carry power from the turbines to an electrical substation to be constructed in Barnstable, Massachusetts; however, the cable corridor is actually 39.4 miles long.[1] The Project, in turn, is only the first of a score of enormous offshore wind energy facilities that the Government is permitting under its plan to produce 30,000 megawatts of wind energy by 2030, covering millions of acres of ocean.[8] Each of the thousands of turbines will stand at least 837 feet tall above the ocean surface, require up to 2,500 square meters of scour protection at each turbine foundation in the ocean's floor, and require additional materials with regard to cable protection, electrical substations, and more.

In authorizing this Project, Defendants failed to comply with numerous statutes and their implementing regulations—the Outer Continental Shelf Lands Act,[2] Clean Water Act,[3] Endangered Species Act ("ESA"),[4] National Environmental Policy Act ("NEPA"),[5] Marine

---

[1] U.S. Army Corps of Engineers, *Record of Decision Supplement* at 2 (Aug. 4, 2021), available at https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/USACE-ROD-Supplement-2021.pdf.
[2] 43 U.S.C. § 1349.
[3] 33 U.S.C. § 1311.
[4] 16 U.S.C. § 1536.
[5] 42 U.S.C. §§ 4321–4370h.

Mammal Protection Act,[6] Merchant Marine Act of 1920,[7] and Administrative Procedure Act.[8]

## PARTIES

1.     Plaintiff, Responsible Offshore Development Alliance (the "Alliance"), is a District of Columbia nonprofit corporation whose membership includes major Atlantic and Pacific fishing associations, dealers, seafood processors, and affiliated businesses, in addition to over 120 vessels across fourteen states operating in more than 30 different fisheries. The Alliance directly collaborates with relevant federal and state regulatory agencies (e.g., National Marine Fisheries Service, Bureau of Ocean Energy Management, U.S. Coast Guard, fishery management councils, and state agencies), offshore developers, science experts, and others to coordinate science and policy approaches to managing development of the Outer Continental Shelf in a way that minimizes conflicts with existing traditional and historical fishing. On March 25, 2019, the Alliance executed a ten-year Memorandum of Understanding with the National Marine Fisheries Service and the Bureau to collaborate on the science and process of offshore wind energy development on the Atlantic Outer Continental Shelf. The Alliance's mission is to:

- Provide a unified voice regarding issues of mutual interest to the commercial fishing industry, related to the siting and operations of new and proposed offshore developments, in order to promote seafood sustainability;
- Act as a bridge between developers and fishermen to mandate, design, and implement a fair, equitable, and effective fisheries mitigation framework addressing potential direct and indirect fisheries impacts;
- Coordinate among existing local, project-specific, and state advisory groups to streamline advice and minimize duplication of effort, and increase awareness of the need for improved interagency coordination on matters related to ocean planning and development;
- Work to achieve adequate funding for scientific research to inform leasing processes, support mitigation programs, and guide future offshore development planning; and

---

[6] 46 U.S.C. § 883.
[7] 16 U.S.C. § 1371.
[8] 5 U.S.C. §§ 701–706.

- Serve as a clearinghouse of scientific information and project updates for a better-informed industry and to communicate with Fishery Management Councils and others regarding industry needs and concerns.

2.      Defendant, United States Department of the Interior, is an agency of the federal government that plays a central role in how the United States stewards its public lands, increases environmental protections, and pursues environmental justice. The mission of the agency is to protect and manage the Nation's natural resources and provide scientific and other information about those resources. The Department of the Interior prioritizes investing in climate research and environmental innovation to incentivize the rapid deployment of clean energy solutions, while reviewing existing programs to restore balance on America's public lands and waters to benefit current and future generations. The Department of the Interior is authorized to grant a lease, easement, or right-of-way on the Outer Continental Shelf for activities that produce or support production of energy from oil, gas, and other sources.[9]

3.      Defendant, Bureau of Ocean Energy Management (the "Bureau"), is a federal agency within Interior established in 2010 to oversee development of the Outer Continental Shelf.  The Bureau's stated mission "is to manage development of U.S. Outer Continental Shelf energy and mineral resources in an environmentally and economically responsible way."[10] The Bureau evaluates the resources of the Outer Continental Shelf and leases portions of it. The Bureau also supervises and approves any oil, gas, or renewable energy projects conducted within Outer Continental Shelf leases.

4.      Defendant, Deb Haaland, is the Secretary of the United States Department of the Interior and is charged with overseeing the management of the nation's Outer Continental Shelf

---

[9] 43 U.S.C. § 1337(p)(1)(C).
[10] U.S. Department of the Interior: Bureau of Ocean Energy Management, About Us (last visited Jan. 5, 2022), available at https://www.boem.gov/about-boem.

lands and oceans, including those affected by the offshore wind projects. Secretary Haaland oversees the Bureau and is ultimately responsible for the decisions taken by the Bureau. Secretary Haaland is sued in her official capacity as Secretary of the Interior.

5.      Defendant, Amanda Lefton, is the Director of the Bureau. She issued the final agency decision challenged here—the approval of Vineyard Wind's Construction and Operations Plan. Director Lefton is sued in her official capacity as Director of the Bureau of Ocean Energy Management.

6.      Defendant, the National Marine Fisheries Service (the "Service"), is a federal agency founded in 1871 and placed within the National Oceanic and Atmospheric Administration (NOAA) in 1970. The Service oversees national marine resources and conserves fish species and manages fisheries, promoting sustainability and preventing overfishing, species decline, and habitat destruction. The Service implements and enforces the Endangered Species Act with regard to marine organisms and authorizes the incidental take and harassment of listed species.

7.      Defendant, Richard W. Spinrad, is the Administrator of NOAA. He oversees NOAA and is ultimately responsible for the decisions and actions taken by NOAA and its sub-agency, the National Marine Fisheries Service, including the Incidental Harassment Authorization challenged here. Administrator Spinrad is sued in his official capacity as Administrator of NOAA.

8.      Defendant, United States Department of the Army, is an agency of the federal government that oversees the United States Army Corps of Engineers and is responsible for permitting decisions regarding the Clean Water Act.

9.      Defendant, United States Army Corps of Engineers (the "Corps"), is a division of

the United States Department of the Army. The Corps' mission is to serve as combat engineers, oversee military construction, and construct civil works like canals and dams. Under the Clean Water Act, the Corps is charged with the issuance of permits to discharge and dredge fill material into the waters of the United States, including, the Outer Continental Shelf.

10.     Defendant, Christine Wormuth, is the Secretary of the Army. Secretary Wormuth oversees and is ultimately responsible for the actions taken by the Army and the Corps. Secretary Wormuth is sued in her official capacity as Secretary of the Army.

11.     Defendant, Jamie A. Pinkham, is the Acting Assistant Secretary of the Army for Civil Works and is responsible for all aspects of the Corps' Civil Works program, including programs for conservation and development of the nation's water and wetland resources, flood control, navigation, and aquatic ecosystem restoration. permitting decisions. Acting Assistant Secretary Pinkham is responsible for the Clean Water Act Section 404 permit that was issued and is being challenged in this case. Acting Assistant Secretary Pinkham is sued in his official capacity as Acting Assistant Secretary of the Army for Civil Works.

## JURISDICTION AND VENUE

12.     The United States has waived its sovereign immunity, and this Court has jurisdiction of this case under the Administrative Procedure Act,[11] Outer Continental Shelf Lands

---

[11] 5 U.S.C. §§ 701-706.

Act,[12] Endangered Species Act,[13] Clean Water Act,[14] Marine Mammal Protection Act,[15] National

Environmental Policy Act,[16] and Merchant Marine Act of 1920.[17]

13.     Under the citizen suit provisions of the Outer Continental Shelf Lands Act, ESA,

and Clean Water Act, on October 19, 2021, Plaintiff sent a sixty-day notice of intent to sue the

Federal Defendants over their respective failures to comply with Outer Continental Shelf Lands

Act, ESA, and Clean Water Act in reviewing and approving the Vineyard Wind Construction and

Operations Plan.[18] The notice was sent to all Federal Defendants and certain other addressees

required by statute on October 19, 2021 and was received by the last of them on October 21,

2021. Defendants did not respond to the Alliance's sixty-day notice, nor did they take any action

to cure the statutory and regulatory violations it details. More than sixty days has elapsed since

Defendants received this notice.

14.     The relief requested is authorized by 28 U.S.C. § 2201 (declaratory judgment); 28

U.S.C. § 2202 (injunctive relief); 5 U.S.C. § 702 (APA); 43 U.S.C. § 1349 (Outer Continental

Shelf Lands Act citizen suit provision); 16 U.S.C. § 1540(g) (ESA citizen suit provision); and 33

U.S.C. § 1365(b) (Clean Water Act citizen suit provision). This Court also has jurisdiction

pursuant to 28 U.S.C. § 1331, which grants the district courts "original jurisdiction of all civil

actions arising under the . . . laws . . . of the United States."

15.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(e)(2) because all

of the Federal Defendants reside in this district and a substantial part of the events or omissions

---

[12] 43 U.S.C. § 1349(a)(2)(A).
[13] 16 U.S.C. §§ 1540(g)(1)(A), (B).
[14] 33 U.S.C. § 1365(b).
[15] 16 U.S.C. § 1371.
[16] 42 U.S.C. §§ 4321-4370h.
[17] 46 U.S.C. § 883.
[18] Ex. 1.

giving rise to the claims occurred in this district. In addition, the 65,296 acres to be occupied by the Vineyard Wind Project lie entirely outside the boundaries of the State of Massachusetts or any other state, in waters exclusively under the sovereignty of the United States, except where an electrical transmission cable comes ashore and an electrical substation is to be built. The convenience of witnesses is not a factor in determining proper venue in this administrative procedure case because it will be determined entirely on the written administrative record, without witness testimony. Venue is also appropriate under 16 U.S.C. § 1540(g)(3)(A) because the violation occurred in this district. Venue is also appropriate under 5 U.S.C. § 703 because this action for judicial review is brought against "the agency by its official title, or the appropriate officer as defendant."[19]

16.     An actual, justiciable controversy exists between the parties within the meaning of Article III of the Constitution and 28 U.S.C. § 2201 because Defendants' approval of the Vineyard Wind Construction and Operations Plan, the issuance of the Clean Water Act permit, and the issuance of the Incidental Harassment Authorization are final agency actions under the Administrative Procedure Act.

17.     Plaintiffs have exhausted all administrative remedies, the agency actions are final and ripe for review, and Plaintiff has standing because they are injured in fact because of the Federal Defendants' actions or omissions and this court has the power to redress those injuries.

## STATEMENT OF FACTS

18.     In 2011, the Bureau revised its regulations applicable to offshore wind energy leasing.[20] This action was taken to implement an Obama Administration policy termed "Smart

---

[19] 5 U.S.C. § 703.
[20] 76 Fed. Reg. 28178 (May 16, 2011) (amending 30 C.F.R. § 285).

From The Start," which was announced on November 23, 2010 and designed to "speed offshore wind energy development off the Atlantic Coast" in the wake of the beleaguered Cape Wind project.[21]

19.     On February 6, 2012, the Bureau published a notice of intent to prepare an environmental assessment for siting several "Smart From The Start" wind energy leases located in federal waters off the coast of Massachusetts and Rhode Island.[22]

20.     On the same day, the Bureau published a call for information and nominations "for commercial leases" in that region.[23]

21.     The Bureau made limited efforts to review commercial fishing impacts as part of its siting decision for these "Smart From The Start" leases located off southern New England.[24] The limited effort that was made focused almost solely on impacts to the State of Massachusetts and on the scallop fishery, despite other fisheries being more active in the lease areas, among multiple other analytical errors.[25]

22.     On January 29, 2015, the Bureau held a competitive lease sale, or an auction, for 166,886 acres, titled Lease Area OCS-A 0501, located on the Outer Continental Shelf beginning

---

[21] U.S. Dept. of Interior, Press Release: *Salazar Launches 'Smart from the Start' Initiative to Speed Offshore Wind Energy Development off the Atlantic Coast* (Nov. 23, 2020), available at https://www.doi.gov/news/pressreleases/Salazar-Launches-Smart-from-the-Start-Initiative-to-Speed-Offshore-Wind-Energy-Development-off-the-Atlantic-Coast.

[22] *See* 77 Fed. Reg. 5830.

[23] 77 Fed. Reg. 5820 (Feb. 6, 2012).

[24] *See* Bureau of Ocean Energy Management, *Revised Environmental Assessment: Commercial Wind Lease Issuance and Site Assessment Activities on the Atlantic Outer Continental Shelf Offshore Massachusetts* (June 2014),  available at https://www.boem.gov/sites/default/files/renewable-energy-program/State-Activities/MA/Revised-MA-EA-2014.pdf.

[25] *Id.* at 209-16.

approximately twelve nautical miles south of Martha's Vineyard (now located between multiple leases issued later as shown):



23.    The winner of the Lease OCS-A 0501 auction was Offshore MW LLC, reported to be majority held by private equity firm Blackstone Group,[26] which was subsequently acquired by Copenhagen Infrastructure Partners and changed its name to Vineyard Wind LLC. Vineyard Wind is now jointly owned by Copenhagen Infrastructure Partners & Avangrid Renewables.

---

[26] *See* Chris Anderson, *Massachusetts Offshore Wind – The Winner Is ..*, 4C Offshore News (Jan. 29, 2015), https://www.4coffshore.com/news/massachusetts-offshore-wind---the-winner-is-..-nid1224.html.

24.     In 2016, Vineyard Wind began conducting undersea marine surveys in the lease area to gather geological and ecological information to inform project specifications and permitting reviews.[27]

25.     In December 2017, Vineyard Wind submitted a Construction and Operations Plan to the Bureau, which proposed the development of an offshore wind energy project for approximately 800 megawatts in a portion of the OCS-A 0501 lease area. The Project is only the first of a score of enormous offshore wind facilities that the Government is permitting under its plan to produce 30,000 megawatts of wind energy by 2030, covering millions of acres of ocean.[28] Each of the thousands of turbines will stand at least 837 feet tall above the ocean surface, and require up to 2,500 square meters of scour protection at each turbine foundation in the ocean's floor, and require additional materials with regard to cable protection, electric substations, and more.[29]

26.     On March 30, 2018, the Bureau published a notice of intent to prepare an environmental impact statement for the proposed project.

27.     On September 7, 2018, Vineyard Wind requested from the Service an incidental take permit, under the Marine Mammal Protection Act. On December 8, 2018, the Bureau made a Draft Environmental Impact Statement available.[30] And on December 12, 2018, Vineyard

---

[27] *Vineyard Wind to Undertake Third Round of Marine Surveys in Wind Farm Project Area Beginning in Early April* (last visited Jan. 28, 2022), available at https://www.vineyardwind.com/news-and-updates/2018/3/28/vineyard-wind-to-undertake-third-round-of-marine-surveys-in-wind-farm-project-area-beginning-in-early-april.

[28] *Tackling the Climate Crisis at Home and Abroad*, Exec. Order 14008, 86 Fed. Reg. 7619, 7624 (Jan. 27, 2021).

[29] *See* Vineyard Wind 1 Construction and Operations Plan, Section 3.0, available at https://www.boem.gov/renewable-energy/state-activities/vineyard-wind-construction-and-operations-plan-cop-volume-i.

[30] *Notice of Availability of a Draft Environmental Impact Statement for Vineyard Wind LLC's Proposed Wind Energy Facility Offshore Massachusetts*, 83 Fed. Reg. 63184 (Dec. 8, 2018)).

Wind submitted to the Corps an application for a Clean Water Act Section 404 permit, which

was made public on December 26, 2018.

28.     On March 15, 2019, the Service informed the Bureau that it did not concur with

the presentation in the Draft Environmental Impact Statement, raising numerous concerns

including impacts to science and research surveys and fisheries economics.[31]  But, on April 30,

2019, the Service published a proposed incidental harassment authorization.[32]

29.     On June 12, 2020, the Bureau issued a Supplemental Draft Environmental Impact

Statement, stating:

> This supplement analyzes reasonably foreseeable effects from an expanded
> cumulative activities scenario for offshore wind development, previously
> unavailable fishing data, a new transit lane alternative, and changes to the proposed
> Vineyard Wind 1 Project (proposed Project) since publication of the Draft
> [Environmental Impact Statement]. . . . [The Bureau] will incorporate the updated
> cumulative scenario and effects analysis from th[is supplement] into the Final
> [environmental impact statement] before publication, along with consideration of
> comments received during the [supplement environmental impact statement]
> comment period and comments received on the Draft [environmental impact
> statement].[33]

30.     On September 13, 2020, the Service issued a Biological Opinion for the Project,

concluding:

> [T]he proposed action is not likely to jeopardize the continued existence of fin, sei,
> sperm, or North Atlantic right whales or the Northwest Atlantic DPS of loggerhead
> sea turtles, North Atlantic DPS of green sea turtles, Kemp's ridley or leatherback
> sea turtles. We find that the proposed action is not likely to adversely affect blue
> whales, the Northeast Atlantic DPS of loggerhead sea turtles, or any DPS of
> Atlantic sturgeon; thus, it is also not likely to jeopardize the continued existence of

---

[31] Letter from Michael Pentony, Regional Administrator, Greater Atlantic Regional Field Office,
National Marine Fisheries Service to James Bennett, Chief, Office of Renewable Energy
Programs, Bureau of Ocean Energy Management (Mar. 15, 2019).
[32] 84 Fed. Reg. 18346 (Apr. 30, 2019).
[33] Bureau of Ocean Energy Management, *Vineyard Wind 1 Offshore Wind Energy Project
Supplement to the Draft Environmental Impact Statement* (June 12, 2018).

these species. We find that the proposed action will have no effect on critical habitat designated for the North Atlantic right whale.[34]

31.     On December 1, 2020, Vineyard Wind withdrew its Construction and Operations Plan from further consideration by the Bureau "to allow the project team to conduct a final technical review associated with the inclusion of General Electric Company's 13-14 MW Haliade-X into the final project design."[35] In response to Vineyard Wind's letter, the Bureau published a notice informing the public that it was terminating the environmental review:

> Since the COP has been withdrawn from review and decision-making, there is no longer a proposal for a major federal action awaiting technical and environmental review, nor is there a decision pending before BOEM. Thus, in light of Vineyard Wind's letter dated December 1, 2020, this notice advises the public that the preparation and completion of an EIS is no longer necessary, and the process is hereby terminated.[36]

32.     But on January 22, 2021, Vineyard Wind asked the Bureau to reinstate its environmental review. And on March 3, 2021, the Bureau notified the public that it resumed the NEPA process. Nine days later, the Bureau precipitously published the Final Environmental Impact Statement.[37]

33.     On May 7, 2021, the Bureau requested to reinitiate the Section 7 consultation with the Service:

---

[34] National Marine Fisheries Service, *Endangered Species Act Section 7 Consultation Biological Opinion* at 289 (Sept. 11, 2020), available at https://www.boem.gov/sites/default/files/documents/renewable-energy/Final%20Biological%20Opinion%20from%20NOAA%20Fisheries.pdf.

[35] *Statement on BOEM's Acknowledgement of Temporary COP Withdrawal*, Vineyard Wind (accessed Jan. 26, 2022), available at https://www.vineyardwind.com/pressreleases/2020/12/14/vineyard-wind-statement-on-boems-acknowledgement-of-temporary-copwithdrawal.

[36] *Vineyard Wind LLC's Proposed Wind Energy Facility Offshore Massachusetts*, 85 Fed. Reg. 81486 (December 16, 2020).

[37] Bureau of Ocean Energy Management, *Vineyard Wind 1 Offshore Wind Energy Project Final Environmental Impact Statement* (Mar. 12, 2021), available at https://www.boem.gov/vineyard-wind.

The Bureau . . . recently determined that the potential impacts from monitoring surveys to be conducted by Vineyard Wind if the Construction and Operations Plan . . . is approved were not fully assessed in . . . your subsequent September 11, 2020, Biological Opinion . . . for the construction and operation of the . . . project. In particular, in light of the recent proposed rulemaking by NMFS on Modification of the Atlantic Large Whale Take Reduction Plan (85 FR 86878, December 31, 2020), the potential impacts of using vertical mooring lines in the proposed Vineyard Wind 1 lobster trap survey deserve closer analysis.[38]

34.     Despite the request to reinitiate the consultation process, the Bureau, the Service, and the Corps published a joint Record of Decision for the Project on May 10, 2021 approving the Final Environmental Impact Statement.[39] The Bureau approved the Final Environmental Impact Statement and stated that its approval of the Construction and Operations Plan would be forthcoming. The Service approved the Final Environmental Impact Statement and stated the incidental harassment authorization would be forthcoming. In addition, the Corps approved the Final Environmental Impact Statement and issued a Section 404 Clean Water Act permit.[40]

35.     On May 27, 2021, the Service responded to the Bureau's request stating:

Reinitiation of consultation is required . . . [i]f the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion . . . . We anticipate that the result of reinitiation of this consultation will be a new Biological Opinion that will replace the September 11, 2020, Opinion. In this new Opinion, we will consider the changes to the proposed action (i.e., inclusion of surveys as outlined in your May 7, 2021, letter and BA), review any new information on listed species, including North Atlantic right whales, and will update the analysis as necessary. We will determine the effects of the newly identified surveys on ESA-listed species and any designated critical habitat in the action area, and will determine if any take of listed species is

---

[38] Ex. 2, Letter from Bureau of Ocean Energy Management to National Marine Fisheries Service (May 7, 2021).

[39] *Record of Decision Vineyard Wind 1 Offshore Wind Energy Project Construction and Operations Plan* (May 10, 2021), available at https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Final-Record-of-Decision-Vineyard-Wind-1.pdf.

[40] *See* Record of Decision at 30.

expected. As such, the new Biological Opinion may include a revised Incidental Take Statement.[41]

36.     In May 2021, after the Record of Decision was issued, the Bureau prepared a supplemental biological assessment for the Project addressing impacts the monitoring surveys, mentioned in the Decision, will have on protected species, which were not addressed in the Biological Opinion.[42] The Bureau concluded that vessel noise and traffic "may affect, but is not likely to adversely affect"[43] the protected species, despite the probability of injury or mortality.

37.     Despite the Section 7 consultation being reinitiated and that a new Biological Opinion would be forthcoming, the Incidental Harassment Authorization was issued on June 25, 2021.[44] The permit allows for the incidental take of the following species for one year:[45]

| Common name | Genus/Species | Authorized Takes by Level B harassment |
|---|---|---|
| Fin whale | Balaenoptera physalus | 8 |
| Humpback whale | Megaptera novaeangliae | 5 |
| Minke whale | Balaenoptera acutorostrata | 3 |
| North Atlantic right whale | Eubalaena glacialis | 10 |
| Sei whale | Balaenoptera borealis | 2 |
| Sperm whale | Physeter macrocephalus | 2 |
| Atlantic white sided dolphin | Lagenorhynchus acutus | 123 |
| Bottlenose dolphin | Tursiops truncatus | 222 |
| Long-finned pilot whale | Globicephala melas | 25 |
| Risso's dolphin | Grampus griseus | 8 |
| Short beaked common dolphin | Delphinus delphis | 3,484 |
| Harbor porpoise | Phocoena phocoena | 158 |
| Gray seal | Halichoerus grypus | 540 |
| Harbor seal | Phoca vitulina | 540 |

---

[41] Ex. 3, Letter from National Marine Fisheries Service to Bureau of Ocean Energy Management (May 27, 2021).

[42] Bureau of Ocean Energy Management, *Vineyard Wind Offshore Wind Energy Project Biological Assessment Supplement* (May 2021), available at https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Vineyard-Wind-NOAA-BA-Supplement.pdf

[43] *Id.* at 17-18.

[44] National Marine Fisheries Service, Incidental Harassment Authorization (June 25, 2021), available at https://www.fisheries.noaa.gov/action/incidental-take-authorization-vineyard-wind-1-llc-construction-vineyard-wind-offshore-wind.

[45] *Id.* at 14.

38.     Despite the Section 7 consultation being reinitiated and incomplete, on July 15,

2021, the Secretary of Interior, acting through the Bureau, approved Vineyard Wind's

Construction and Operations Plan for an offshore renewable energy project off the coasts of

Massachusetts and Rhode Island, authorizing the construction of the turbine towers, but not

specifying the amount of turbine towers that would  cover 65,296 acres of seabed.[46] Notably

absent from the approval, is any plan for the decommissioning phase of the Project.

39.     Based upon the analysis provided in the 2020 Biological Opinion, there are a total of

54,305 annual vessel trips through the wind development area, and "the proposed Project would result

in 4.7, 1.6, and 4.0 percent annual increases in vessel traffic during construction, operations, and

decommissioning, respectively."[47] "Vineyard Wind anticipates that [wind turbine generator and

electronic service platform] components, as well as offshore export cables, would be shipped from

overseas ports, either directly to the [wind development area] or through a U.S. port. A total of

approximately 122 vessel round trips, with approximately 5 round trips per month[.]"[48]

> During the proposed Project's most active construction period, Vineyard Wind
> estimates that a maximum of approximately 46 vessels could operate
> simultaneously within the [wind development area] or offshore export cable
> corridor. . . . The maximum number of vessels involved in the proposed Project at
> any one time is highly dependent on the Project's final schedule, the final design of
> the Project's components, and the logistics solution used to achieve compliance
> with the Jones Act.[49]

---

[46] Bureau of Ocean Energy Management Approval of Vineyard Wind 1 LLC Construction and
Operations Plan ("*Approval Letter*") (July 15, 2021), available at
https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/VW1-
COP-Project-Easement-Approval-Letter_0.pdf.
[47] Final Environmental Impact Statement at 3-94. But, a much smaller nearby project, South
Fork Wind, which would have only twelve turbines, estimates 2600 vessel trips over the lifetime
of the project. *See* South Fork Wind Farm Final Environmental Impact Statement at 3-70 (Aug.
2021), available at https://www.boem.gov/sites/default/files/documents/renewable-energy/state-
activities/SFWF%20FEIS.pdf.
[48] Final Environmental Impact Statement at 3-94.
[49] Final Environmental Impact Statement at 2-11.

40.   And "at the peak of project const-ruction from 2022 to 2023 up to 230 vessels associated with offshore wind development along the east coast may be operating in the geographic analysis area."[50]

41.   Cumulatively, there could be thousands of vessels a year for all the offshore wind projects on the East Coast.[51] Vineyard Wind stated that the components, as well as offshore export cables, would be shipped from overseas ports, either directly to the Project area or through a U.S. port.[52]

42.   The same day the Bureau approved the Construction and Operations Plan, the Bureau also granted Vineyard Wind an easement 3,592 acres in size to construct 23 miles of high-tension electrical cable to carry power from the turbines to an electrical substation to be constructed in Barnstable, Massachusetts.[53] The cost of the easement is $17,155, approximately $5/acre. The easement and corridor are pictured below:

---

[50] Final Environmental Impact Statement at 154.
[51] *See* U.S. Bureau of Ocean Energy Management, *Atlantic OCS Renewable Energy-Massachusetts to South Carolina* (Aug. 13, 2021), available at https://www.boem.gov/renewable-energy/mapping-and-data/renewable-energy-gis-data.
[52] *Final Environmental Impact Statement* at 3-94.
[53] *Id.*



43.     On August 4, 2021, the Corps issued a supplement to its portion of the opinion in the Record of Decision to address the fact that it had the wrong information when it made its decision to issue a Section 404 permit:

a.     The actual length of the export cable corridor to be authorized is 39.4 miles long, not 23.3 miles;

b.     17 acres of transmission-cable scour protection would require authorization under Section 404, not 2 acres; and

c.     35 acres of transmission-cable scour protection would require authorization under Section 10, not 15 acres[.][54]

---

[54] U.S. Army Corps of Engineers, *Record of Decision Supplement* at 2 (Aug. 4, 2021), available at https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/USACE-ROD-Supplement-2021.pdf.

44.     On October 18, 2021, the Service published a superseding Biological Opinion, concluding the same as it did in its September 13, 2020 Biological Opinion.[55]

45.     On January 14, 2022, the Corps again issued a supplement "clarifying" its decision regarding the effects on fisheries.[56]

46.     Throughout the process the Alliance has provided thoughtful analysis and suggestions to lessen the adverse impact of the Project on the fishing industry and the marine environment but these comments and proposals have gone mostly unacknowledged by the Government and agencies as they rush to approve the Project. Consequently, the Project, as approved, fails not only to protect the fishing industry and the environment, but also falls far short of the statutory and regulatory provisions enacted to protect these and related national interests.

47.     The Alliance contends that turbine tower and associated infrastructure construction should not take precedence over other ocean resources and activities—including commercial fishing, navigation, and the marine physical, biological, and ecological environment, which the law protects.

### FIRST CAUSE OF ACTION
**Violation of the Outer Continental Shelf Lands Act and Administrative Procedure Act
(Against the U.S. Department of the Interior, Secretary Haaland, Bureau of Ocean Energy
Management, and Director Lefton)**

48.     The Alliance realleges and incorporates by reference the allegations contained in Paragraphs 1 through 47 as though fully set forth herein.

---

[55] *See* National Marine Fisheries Service, *Endangered Species Act Section 7 Consultation Biological Opinion* at 289 (Sept. 11, 2020), available at
[56] U.S. Army Corps of Engineers, *Record of Decision Supplement* at 2 (Jan. 14, 2021), available at https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/USACE-ROD-Supplement.pdf.

49.     "The Outer Continental Shelf . . . is a vast underwater expanse nearly equal in size to the Australian continent. Beginning a few miles from the U.S. coast, where states' jurisdiction ends, the [Outer Continental Shelf] extends roughly two hundred miles into the ocean to the seaward limit of the international-law jurisdiction of the United States."[57]

50.     Congress enacted the Outer Continental Shelf Lands Act in August 1953, authorizing the Secretary of the Interior to oversee mineral exploration and development on the Outer Continental Shelf by granting oil and gas leases through a competitive bid process now managed by the Bureau.[58] Originally, the Act "establishe[d] a procedural framework under which Interior may lease areas of the [Outer Continental Shelf] for purposes of exploring and developing the oil and gas deposits of the [Outer Continental Shelf ]'s submerged lands."[59]

51.     The Energy Policy Act of 2005,[60] amended the Outer Continental Shelf Lands Act and transferred primary regulatory authority over offshore renewable energy projects to the Bureau of Ocean Energy Management, an agency within the Department of the Interior.[61]

52.     In the 2005 amendment, Congress declared the policy underlying the Act:

It is hereby declared to be the policy of the United States that . . . this subchapter shall be construed in such a manner that the character of the waters above the outer Continental Shelf as high seas and the right to navigation and fishing therein shall not be affected; . . . the outer Continental Shelf is a vital national resource reserve held by the Federal Government for the public, which should be made available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs; . . . since exploration, development, and production of the minerals of the outer Continental Shelf will have significant impacts on coastal and non-coastal areas of the coastal States, and on other affected States, and, in recognition of the

---

[57] *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 592 (D.C. Cir. 2015).
[58] 43 U.S.C. §§ 1331–1356.
[59] *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 472 (D.C. Cir. 2009).
[60] Pub. L. No. 109-58, § 388(a), 119 Stat. 594, 744.
[61] *See* § 1337(p)(1)(C); 76 Fed. Reg. 64,432, 64,434, 64,459 (Oct. 18, 2011).

national interest in the effective management of the marine, coastal, and human environments . . . .[62]

53.     The 2005 amendment added Section 1337(p)(4), a list of mandatory requirements the Secretary must ensure before approving any proposed Outer Continental Shelf offshore wind lease:

The Secretary shall ensure that any activity under this subsection is carried out in a manner that provides for—
(A)     safety;
(B)     protection of the environment;
(C)     prevention of waste;
(D)     conservation of the natural resources of the outer Continental Shelf;
(E)     coordination with relevant Federal agencies;
(F)     protection of national security interests of the United States;
(G)     protection of correlative rights in the outer Continental Shelf;
(H)     a fair return to the United States for any lease, easement, or right-of-way under this subsection;
(I)     prevention of interference with reasonable uses (as determined by the Secretary) of the exclusive economic zone, the high seas, and the territorial seas;
(J)     consideration of—
        i.   the location of, and any schedule relating to, a lease, easement, or right-of-way for an area of the outer Continental Shelf; and
        ii.  any other use of the sea or seabed, including use for a fishery, a sealane, a potential site of a deepwater port, or navigation;
(K)     public notice and comment on any proposal submitted for a lease, easement, or right-of-way under this subsection; and
(L)     oversight, inspection, research, monitoring, and enforcement relating to a lease, easement, or right-of-way under this subsection.[63]

54.     Since 2005, the Bureau has promulgated regulations governing the development of "renewable" energy production on the outer continental shelf.[64] The Bureau's regulations also ensure compliance with all applicable laws: "[The Bureau] will require compliance with all applicable laws, regulations, other requirements, and the terms of your lease or grant under this

---

[62] 43 U.S.C. § 1332.
[63] 43 U.S.C. § 1337(p).
[64] *See* 30 C.F.R. §§ 585.100–585.118 ("Renewable Energy and Alternate Uses of Existing Facilities on the Outer Continental Shelf").

part and approved plans. [The Bureau] will approve, disapprove, or approve with conditions any plans, applications, or other documents submitted . . . for approval under the provisions of this part."[65]

55.     In approving the Vineyard Wind Construction and Operations Plan on July 15, 2021, Defendants violated Section 1337(p)(4) of the Outer Continental Shelf Lands Act in numerous respects, as more fully described in the Alliance's 60-day letter.[66] Accordingly, this Court should vacate and set aside Defendants' approval as arbitrary, capricious, and otherwise not in accordance with law, in violation of the Administrative Procedure Act.

## 1.1    Failure to ensure safety on the Outer Continental Shelf

56.     Defendants have violated Section 1337(p)(4)(A), the safety requirement, by approving a design for the Vineyard Wind 1 Project that significantly imperils working fishermen and other vessels operating in the Project area. Contrary to the extensive comments and data submitted by the Alliance, the Construction and Operations Plan approved by Defendants allows construction of wind turbines on a one-mile-by-one-mile grid. For most fisheries and gear types used in the Project area, this 1x1 nautical mile spacing between turbines is too narrow to conduct safe fishing operations or to safely transit the lease area. In addition, the approved Plan violates the U.S. Coast Guard's own guidance for Closest Point of Approach for a fixed hazard[67] and the United Nations Convention on the Law of the Seas Safety Zone (of 500m) on each side of the "transit lane."[68]

---

[65] 30 C.F.R. § 585.102.

[66] *See* Ex. 1.

[67] *Id.*

[68] *Id.* There are also other errors identified in the Alliance's, Dr. Sproul's, and others' comments submitted on the draft Massachusetts and Rhode Island Port Access Route Study, and yet the agency's final version of the study failed to address any of those errors or provide an explanation as to why no corrections were made in the responses to comments section. *See id.*

57.     Because predominant wind patterns include summer winds tending to blow from the southwest and winter winds from the northwest, a drifting boat in need of rescue would likely need to be searched for along the diagonal.[69] Expanding the diagonal spacing to 1.0 nautical mile would require 1.41 nautical mile grid spacing.[70] The Coast Guard's search and rescue operations would be limited; that is, to conduct search and rescue operations safely the Coast Guard would be limited to the diagonal only in the straight east-west and north-south corridors.[71] In the most heavily transited direction, the Coast Guard would not have the straightaway needed for efficient and effective searches.[72]

58.     The narrow spacing of the Vineyard Wind turbines also creates a significant risk that ice buildup on the turbines in winter will be shed or thrown and hit vessels transiting the Project zone—a known risk of wind turbines operating in cold climates.[73] Layouts with minimal spacing between turbines increase the risk to transiting vessels from falling ice.[74] Although turbines can be designed and placed so as to reduce this risk, Defendants failed to ensure that recommended turbine spacing and design maintains a reasonable level of safety, abdicating its oversight role by only stating that "evaluat[ing] the potential for icing events and develop[ing] both predictive and operational strategies . . . is the basic responsibility of a prudent operator."[75]

---

[69] *Id.* Appendix 1, Thomas Sproul, Ph.D., *Comments on Draft Massachusetts and Rhode Island Port Access Route Study* (Mar. 16, 2020).

[70] *Id.* at 6.

[71] Final Environmental Impact Statement at ES-8 n. 6.

[72] Responsible Offshore Development Alliance, *Comments on Port Access Route Study: The Areas Offshore of Massachusetts and Rhode Island* at 6 (Mar. 16, 2020), available at https://rodafisheries.org/wp-content/uploads/2020/07/200727-RODA-VW-SEIS-w-appendices.pdf.

[73] *Id.*

[74] *Id.*

[75] Letter from A. Lefton to Responsible Offshore Development Alliance (Aug. 6, 2021), available at https://rodafisheries.org/wp-content/uploads/2021/08/RODA-Response-April-2021_Final_08092021-1.pdf.

## 1.2     Failure to protect the environment

59.     In approving the Vineyard Wind Construction and Operation Plan, Defendants violated Section 1337(p)(4)(B), the protection of the environment requirement, by failing to protect the North Atlantic Right Whale, fishery resources, and marine habitats. The construction of the Project includes pile driving, the installation of the large turbines, increased presence of vessels, and other activities all of which will injure the North Atlantic Right Whale, fishery resources, and habitat, including during the decommissioning phase of the Project.

60.     Pile driving during construction and wind turbine operation emit low frequency noise impacting the North Atlantic Right Whales and other species. Low frequency noise is known to induce behavioral changes and mortality in squid egg, larval, and adult life stages.[76] On a cumulative scale, there is scientific evidence to indicate that these impacts (along with other impact factors) could incur population level effects that the Government neither considered nor effectively mitigated. Additional impact producing factors that will go unmitigated include: lights, heat, electromagnetic forces, sedimentation, siltation, habitat conversion, crushing, shadowing, pressure changes, and wake effect, all of which will impact marine organisms and some will "impact oceanographic and atmospheric conditions including potential changes in ocean stratification."[77] Peak sound pressure from pile driving will kill several marine species and generally interfere with their anti-predator alarm responses, further disturbing the marine population in the Project area. This Project will change that environment to concrete, boulders, and electrified cables, making it uninhabitable by marine organisms such as squid and surfclams,

---

[76] Ian T. Jones et al., *Changes in feeding behavior of longfin squid (Doryteuthis pealeii) during laboratory exposure to pile driving noise*, 165 Marine Env't Rsch. 105250 (2021).
[77] NOAA Fisheries, North Atlantic Right Whale (last visited Sept. 24, 2021), available at https://www.fisheries.noaa.gov/species/north-atlantic-right-whale.

which require a sandy ocean bottom to grow to maturity. In addition to biological effects, this "conversion of soft sediment habitat to hard bottom via protective cover"[78] is likely to have the effect of "generally decreasing trawlable habitat."[79]

61.     Vessel strikes are a common source of injury or mortality to cetaceans. Vessel traffic associated with the Project has the potential to pose a high-frequency, high-exposure collision risk to marine mammals especially the North Atlantic Right Whale, other baleen whales, and calves that spend considerably more time at or near the ocean surface.[80] The agencies have overlooked the impact on the environment, including coastal habitats, benthic resources, finfish, invertebrates, essential fish habitat, sea turtles, and marine mammals, by concluding that the impacts are negligible to moderate or just moderate.

62.     However, "the proposed Project would result in 4.7, 1.6, and 4.0 percent annual increases in vessel traffic during construction, operations, and decommissioning, respectively [in the wind development area]."[81] And "Vineyard Wind anticipates that [wind turbine generator and electronic service platform] components, as well as offshore export cables, would be shipped from overseas ports, either directly to the [wind development area] or through a U.S. port. A total of approximately 122 vessel round trips, with approximately 5 round trips per month[.]"[82]

> During the proposed Project's most active construction period, Vineyard Wind estimates that a maximum of approximately 46 vessels could operate simultaneously within the [wind development area] or offshore export cable corridor. . . . The maximum number of vessels involved in the proposed Project at any one time is highly dependent on the Project's final schedule, the final design of the Project's components, and the logistics solution used to achieve compliance with the Jones Act."[83]

---

[78] Final Environmental Impact Statement at 3-219.
[79] *Id.*
[80] Final Environmental Impact Statement at 1-164 (March 2021).
[81] Final Environmental Impact Statement at 3-94.
[82] Final Environmental Impact Statement at 3-94.
[83] Final Environmental Impact Statement at 2-11.

63.     "[A]t the peak of project construction from 2022 to 2023 up to 230 vessels associated with offshore wind development along the east coast may be operating in the geographic analysis area."[84] And, cumulatively, there could be thousands of vessels a year for all the offshore wind projects on the East Coast.[85] Vineyard Wind stated that the components, as well as offshore export cables, would be shipped from overseas ports, either directly to the Project area or through a U.S. port.[86]

64.     Further, no offshore wind turbine that exists today can survive a Category 3 or greater Atlantic hurricane. Neither the Record of Decision nor the Final Environmental Impact Statement issued on March 12, 2021, examine any safety or engineering issues with respect to the new Haliade-X wind turbines. With all the government regulation in place to ensure the safety of virtually every other product and structure in the United States, here there is none. There is no evidence of engineering reports nor tests, and the Bureau did nothing to review the structural integrity and safety of the 84 Haliade-X wind turbines relative to the New England marine environment, each of which is nearly 300 feet taller than the Washington Monument. Instead, the Bureau's Final Environmental Impact Statement simply cites an assertion by Vineyard Wind that the turbines "would be designed to endure sustained wind speeds of up to 112 miles per hour."[87] Hurricane Bob, which occurred in 1991 near the Project site, was a Category 2 hurricane on the Saffir Sampson Scale (sustained winds 96-110 mph) when it made landfall, suggesting its wind speeds exceeded 112 mph as it passed through the Project area.

---

[84] Final Environmental Impact Statement at 3-84.
[85] *See* U.S. Bureau of Ocean Energy Management, *Atlantic OCS Renewable Energy-Massachusetts to South Carolina* (Aug. 13, 2021), available at https://www.boem.gov/renewable-energy/mapping-and-data/renewable-energy-gis-data.
[86] Final Environmental Impact Statement at 3-94.
[87] Final Environmental Impact Statement at 2-8.

65.     An adverse weather event of a Category 3 or greater hurricane could lead to a catastrophic release of the oil and contaminants from the wind turbine generators, thus causing the take, and possibly jeopardy, of multiple endangered species, and destroying the fishing grounds off the coast of Rhode Island and Massachusetts for generations. With more than 2,000 turbines forecasted for the Northeast and Mid-Atlantic Outer Continental Shelf, a Category 4 or 5 storm could result in an oil spill greater than that of the Exxon Valdez, which was 10 million gallons of oil.[88] The evidence is overwhelming that climate change will result in more frequent and more intense tropical storms in the Atlantic Ocean.[89]

66.     Also lacking from the Secretary of Interior's and the Bureau's approval are the effects decommissioning would have on the environment and any protection measures at the decommissioning phase.

**1.3     Failure to prevent waste**

67.     Defendants have violated Section 1337(p)(4)(C), the prevention of waste requirement, by not considering the decommissioning of the Project. Notably absent from the record is the decommissioning phase and what Vineyard Wind and the Government will do with these enormous turbines, their components, and the other project structures when the lease and easement run out, nor the cumulative impacts of decommissioning each of the projects planned in the geographic region.

68.     Defendants have also abrogated their duty to prevent waste by failing to adequately regulate the removal, relocation, and addition of naturally occurred and manmade

---

[88] *See e.g.*, U.S. Bureau of Ocean Energy Management, *Offshore Wind in the US Gulf of Mexico: Regional Economic Modeling and Site Specific Analyses*, at 15 (Feb. 2020), available at https://espis.boem.gov/final%20reports/BOEM_2020-018.pdf (noting hurricane survival issues).
[89] *See, e.g.*, Kerry Emanuel, *Evidence that hurricanes are getting stronger*, PNAS 117(24) 13194-13195 (June 16, 2020).

structures to the marine environment in the Project area and surrounding region, including boulders, concrete, and other materials.

## 1.4    Failure to conserve natural resources

69.    Defendants have violated Section 1337(p)(4)(D), the conservation of the natural resources of the Outer Continental Shelf requirement, by failing to take into account conservation measures necessary to protect the North Atlantic Right Whale, fisheries resources, and marine habitats. The construction of the Project includes pile driving, the installation of large turbines, cables, and protective materials, increased presence of vessels, and other activities all of which will injure protected resources, fisheries resources, and marine habitats.

## 1.5    Failure to protect national security interests

70.    Defendants have violated Section 1337(p)(4)(F), the protection of national security interests of the United States requirement, by approving the Project despite the substantial impact the turbines would cause on radars, critical to safety and national security.

71.    The approved plan arbitrarily ignores concerns associated with radar interference. The Department of Defense has repeatedly raised concerns that "radar clutter (i.e. false targets) from the wind turbine blades would seriously impair the agency's ability to detect, monitor, and safely conduct air operations."[90] These concerns were not addressed nor did the Bureau consider the dangers of terrorism or foreign vessels coming to the United States undetected due to radar interference.

---

[90] Responsible Offshore Development Alliance, *Comments on Draft Environmental Impact Statement*, at 15-16 (Feb. 22, 2019). Similar concerns have been expressed by the National Security Council and by several European countries with existing wind arrays. *See* Sandia National Laboratories, *IFT&E Industry Report: Wind Turbine-Radar Interference Test Summary*, SAND2014-19003 (Sept. 2014), available at https://www.energy.gov/sites/prod/files/2014/10/f18/IFTE%20Industry%20Report_FINAL.pdf).

72.     An entire interagency Memorandum of Understanding has created the Wind

Turbine Radar Interference Working Group dedicated to identifying mitigation strategies for

radar interference.[91] The Coast Guard has also compiled, studied, and documented a significant

amount of information demonstrating marine radar degradation from offshore wind turbines in

its review of the Cape Wind project as far back as over a decade ago.[92] Yet, no accommodations

were considered or made in the Project to protect against or mitigate this known risk.

**1.6     Failure to ensure a fair return**

73.     Defendants have violated Section 1337(p)(4)(H), the fair return requirement, and

Section 1337(p)(2)(A), which also requires a fair return in granting a lease, easement or right-of-

way for offshore wind energy production: "The Secretary shall establish royalties, fees, rentals,

bonuses, or other payments to ensure a fair return to the United States for any lease, easement, or

right-of-way granted under this subsection."[93]

74.     Defendants violated these provisions, by granting to Vineyard Wind a 65,296-acre

annual lease for only $195,888 ($3/acre).[94] The Secretary of Interior has also violated these

provisions by requiring only $17,155 for the Project easement that is 3,592 acres (approximately

$5/acre).[95] Simply put, Vineyard Wind will be allowed to generate up to 800 megawatts of

---

[91] Responsible Offshore Development Alliance, *Comments on Draft Environmental Impact Statement*, at 15 (Feb. 22, 2019).
[92] *Id.* The Alliance discussed the Coast Guard Study in its comments. *See* Letter from Responsible Offshore Development Alliance to U.S. Coast Guard (Mar. 16, 2020), available at https://rodafisheries.org/wp-content/uploads/2020/07/200727-RODA-VW-SEIS-w-appendices.pdf.
[93] 43 U.S.C. § 1337(p)(2)(a).
[94] U.S. Bureau of Ocean Energy Management Approval Letter at A-2.
[95] *Id.* at D-4.

electricity, which is a $2.3 billion project.[96] In the entire 30 years (the lifetime of the Project), the United States will have received less than $3.5 million for the Project, which is merely .15% of the $2.3 billion Project, despite the substantial public financial and environmental resources upon which it relies. To underscore the valuation of this resource, the Bureau itself estimates fisheries value in the lease area to average nearly $500,000 annually from 2007-2018[97]—revenue that will be lost during the 33-year Project lease term. In sharp contrast, in oil and gas leases, also subject to the Outer Continental Shelf Lands Act, the United States requires royalties be paid to it from the production of wells.[98] But, here, there is no such arrangement.

## 1.7    Failure to prevent unreasonable interference with and failure to consider fisheries' use of the Outer Continental Shelf

75.    Defendants have violated Sections 1337(p)(4)(I) and Section 1337(p)(4)(J) by failing to prevent interference with commercial fisheries' use of the Outer Continental Shelf and failing to consider fisheries. The impact on fisheries is major, as the Final Environmental Impact Statement and the Record of Decision acknowledge.[99] Because of the Project, fisheries will lose access to their fishing grounds and there will be increased costs and lost time harvesting due to the longer transits when the hazards of the Project area must be avoided to protect life and

---

[96] Nichola Groom, *Vineyard Wind secures $2.3 bln loan, allowing construction to start*, Thomson Reuters (Sept. 15, 2021), available at https://www.reuters.com/business/energy/vineyard-wind-secures-23-bln-loan-allowing-construction-start-2021-09-15/.
[97] Final Environmental Impact Statement at B-123.
[98] *See* U.S. Dep't of Interior, *Natural Resources Revenue Data* (last visited Oct. 5, 2021), available at https://revenuedata.doi.gov/how-revenue-works/offshore-oil-gas/; *see e.g.*, Thomson Reuters, *U.S. lawmakers ask Interior to cut offshore oil royalty rates due to market slump* (Mar. 20, 2020), available at https://www.reuters.com/article/us-global-oil-usa-royalties/u-s-lawmakers-ask-interior-to-cut-offshore-oil-royalty-rates-due-to-market-slump-idUSKBN2173GO ("There is a 12.5% royalty rate for leases in water depths of less than 200 meters and a royalty rate of 18.75% for all other leases.").
[99] *See* Record of Decision at 16; Final Environmental Impact Statement at ES-13.

property. The disruption in fishing grounds will increase operating costs for vessels, increase safety risk, and lower revenue.

76.     Offshore wind structures and hard coverage for cables would have long-term impacts on commercial fishing operations and support businesses such as seafood processing. The disruption from construction and cable installation may occur concurrently or sequentially, with similar impacts on commercial fishery resources.[100] Disruption may result in conflict over other fishing grounds, localized overfishing, increased operating costs for vessels, and lower revenue (e.g., if the substituted fishing area is less productive, supports less valuable species, poses greater challenges for minimizing bycatch, increases competition with or displacement of other harvesters, or risks increased interactions with protected resources).[101]

77.     The spacing between wind turbines as provided in the Construction and Operations Plan is insufficient to permit safe passage by bottom trawl and other fishing vessels that must transverse the area. "The location of the proposed infrastructure within the wind development area could impact transit corridors and access to preferred fishing locations."[102] Accordingly, "commercial and for-hire recreational fishing fleets may find it more challenging to safely transit to and from homeports as there may be less space for maneuverability and greater risk of allision or collision if there is a loss of steerage."[103]

78.     If vessels must cut a trip short, or if it takes extra time "on the clock" to navigate around the Project because it is unsafe to transit through, the vessel owner and crew will realize a direct financial loss. Once a trip has ended, vessels need to return to port as quickly as possible to

---

[100] Final Environmental Impact Statement at 3-126.
[101] *Id.*
[102] *Id.* at 3-214.
[103] *Id.*

sell the freshest product. In addition to safety considerations for personnel and vessels, these reasons limit a vessel's ability to ride out a storm at sea and are why a vessel operator prefers the most direct route to their port.

79.     If commercial harvesters experience decreased catches due to the inability to operate in the area or being unsuccessful in finding alternative fishing locations that provide comparable catch and fishing revenue, seafood processors and distributors will see lower volumes and/or quality of product. This will impact other businesses that supply the commercial fishing industry and seafood markets themselves including consumers.

80.     Unmitigated disruption of the National Marine Fisheries Service stock assessment surveys's use of the area will result in increased scientific uncertainty necessitating stock-wide reductions in allowable fisheries catch under the Magnuson Stevens Fishery Conservation and Management Act, with impacts far beyond the Project area. The resulting impacts to the ability to set sustainable fishing quotas also interfere with the uses of the area.

81.     Ultimately, fisheries will have to abandon the Project area, as the Corps recognized in the Record of Decision.[104] Despite the comments and data available regarding the significant losses fisheries will suffer and that these losses could have been mitigated, the Project was approved at the expense of fisheries.

## 1.8     Lack of opportunity for public comment

82.     Defendants have violated Section 1337(p)(4)(K) because absent from the administrative record is any meaningful opportunity for the public to comment on the 3,592 acre-easement the Bureau issued in conjunction with its approval dated July 15, 2021. "The project

---

[104] Record of Decision at 39 ("[D]ue to the placement of the turbines it is likely that the entire 75, 614 acre area will be abandoned by commercial fisheries due to difficulties with navigation.").

easement consists of the two portions of this corridor that fall within federal waters. Combined, these project easement portions extend approximately 17 statute miles and include approximately 3,592 acres."[105] Absent from the record was sufficient information or details as to the easement during the Draft Environmental Impact Statement and the Final Environmental Impact Statement.

## SECOND CAUSE OF ACTION
### Violation of the Clean Water Act and Administrative Procedure Act
### (Against U.S. Department of the Army, Secretary Wormuth, U.S. Army Corps of Engineers, and Acting Assistant Secretary Pinkham)

83.     Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 82 as though fully set forth herein.

84.     In 1972, Congress enacted the Clean Water Act, also known as the Federal Water Pollution Control Act,[106] "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."[107] The Clean Water Act provides that "the discharge of any pollutant by any person shall be unlawful"[108] except as in compliance with specifically enumerated Clean Water Act provisions, including Section 404.[109]

85.     Section 404(a) of the Clean Water Act authorizes the Secretary of the Army, acting through the Corps, to issue permits for the discharge of dredged or fill material into navigable waters "after notice and opportunity for public hearings."[110] In issuing the May 10, 2021 permit for the massive discharge of dredge and fill material into the ocean and onto the ocean floor over the 65,296 acre-project site, the Secretary of the Army, acting through the

---

[105] Approval Letter at D-1.
[106] 86 Stat. 816; 33 U.S.C. §§ 1251–.1387
[107] 33 U.S.C. § 1251.
[108] 33 U.S.C. § 1311(a).
[109] *Mingo Logan Coal Co. v. U.S. E.P.A.*, 714 F.3d 608, 609 (D.C. Cir. 2013).
[110] 33 U.S.C. § 1344(a).

Corps, has violated the Clean Water Act and its implementing regulations in multiple respects—a final agency action that is arbitrary, capricious, and not in accordance with law.

## 2.1     Unacceptable adverse impacts

86.     Applicable Clean Water Act regulations provide that "dredged or fill material should not be discharged into the aquatic ecosystem, unless it can be demonstrated that such a discharge will not have an unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern,"[111] and that significant adverse impacts to fisheries or shellfishing constitute unacceptable adverse impacts that preclude the issuance of a Section 404 permit:

> Unacceptable adverse effect means impact on an aquatic or wetland ecosystem which is likely to result in . . . significant loss of or damage to fisheries, shellfishing, or wildlife habitat or recreation areas. In evaluating the unacceptability of such impacts, consideration should be given to the relevant portions of the section 404(b)(1) guidelines.[112]

87.     The dredge and fill activities authorized by the May 10, 2021 Section 404 permit for the Vineyard Wind Project will have unacceptable, adverse impacts on fisheries, shellfishing and the aquatic ecosystem, in violation of Section 231.2(e) and Section 404 of the Clean Water Act. As the Corps acknowledged in the Record of Decision authorizing this discharge of pollutants into waters of the United States, "due to the placement of the turbines it is likely that the entire 75,614-acre area will be abandoned by commercial fisheries due to difficulties with navigation."[113]

---

[111] 40 C.F.R. § 230.1(c).
[112] *Id.* § 231.2(e).
[113] Record of Decision at 39.

88.     Further proving the impending damage to fisheries and shellfishing authorized by the May 10, 2021 permit, Vineyard Wind has created several compensation funds as part of its agreement with states to compensate fisheries for their losses and damages:

> No later than 1 year after the approval of the COP, the Lessee must establish the following compensation/mitigation funds to compensate commercial fishermen for losses directly related to the Project and mitigate other impacts:
>> Rhode Island Compensation Fund - $4,200,000 . . .
>> Massachusetts Compensation Fund - $19,185,016 . . .
>> Other States' Compensation Fund - $3,000,000 . . .
>> Rhode Island Fisherman's Future Viability Trust - $12,500,000 . . . ; and
>> Massachusetts Fisheries Innovation Fund - $1,750,000 . . . .[114]

## 2.2   Failure to analyze practicable alternatives

89.     Clean Water Act regulations prohibit the Secretary of the Army, acting through the Corps, from granting a Section 404 permit if there is a practicable alternative to the proposed activity: "[N]o discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences."[115] For purposes of this regulation, a "practicable alternative" is defined as "[a]ctivities which do not involve a discharge of dredged or fill material into the waters of the United States or ocean waters,"[116] and

> an alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes. If it is otherwise a practicable alternative, an area not presently owned by the applicant which could reasonably be obtained, utilized, expanded or managed in order to fulfill the basic purpose of the proposed activity may be considered.[117]

---

[114] Approval Letter at 72 § 6.3.1.

[115] *Id.* § 230.10(a).

[116] *Id.* § 230.10(a)(1)(i).

[117] *Id.* § 230.10(a)(2).

90.    On May 10, 2021, there were numerous practicable alternatives to the Vineyard Wind project that would have provided electric energy without the massive discharge of dredge or fill material into the aquatic ecosystem required by the construction and operation of the Vineyard Wind project. These practicable alternatives include not only traditional fossil fuel generating plants using natural gas, oil, or coal, but also nuclear energy power plants and other forms of renewable energy such as onshore wind turbines, solar panels, and improved energy efficiency. The Record of Decision shows that the Secretary of the Army, acting through the Corps, gave no consideration to any of the practicable alternatives to the proposed activity, none of which require discharge of pollutants into navigable waters.

## 2.3    Water-dependent activity

91.    Under Clean Water Act regulations, where an activity is not water dependent:

[P]racticable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise. In addition, where a discharge is proposed for a special aquatic site, all practicable alternatives to the proposed discharge which do not involve a discharge into a special aquatic site are presumed to have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise.[118]

92.    Since the production of electricity, renewable or otherwise, is not a water-dependent activity (e.g., land-based wind and solar projects), the Secretary of the Army and the Corps violated this regulatory requirement by failing to demonstrate that no practicable alternative exists for the production of electricity, renewable or otherwise, that did not require discharge of dredge or fill material into a special aquatic site.

## 2.4    Cumulative effects

---

[118] *Id.* § 230.10(a)(3).

93.     Clean Water Act regulations require that, before issuing a Section 404 permit, the Secretary of the Army and the Corps "shall collect information and solicit information from other sources about the cumulative impacts on the aquatic ecosystem. This information shall be documented and considered during the decision-making process concerning the evaluation of individual permit applications, the issuance of a General permit, and monitoring and enforcement of existing permits."[119]

94.     These Clean Water Act regulations require that the cumulative impacts analysis must include:

(1)     [T]he area in which the effects of the proposed project will be felt;
(2)     [T]he impacts that are expected in that area from the proposed project;
(3)     [O]ther actions - past, present, and reasonably foreseeable proposed - that have had or are expected to have impacts in the same area;
(4)     [T]he impacts or expected impacts from these actions; and
(5)     [T]he overall impact that can be expected if the individual impacts are allowed to accumulate.[120]

95.     In issuing the Section 404 permit for the Project, the Secretary of the Army and the Corps violated Clean Water Act regulations by failing to gather, document or consider information about the cumulative effects of the multiple other offshore wind projects that the Government plans to authorize along the East Coast of the United States. On March 29, 2021, the President of the United States announced:

The Departments of Interior (DOI), Energy (DOE), and Commerce (DOC) are announcing a shared goal to deploy 30 gigawatts (GW) of offshore wind in the United States by 2030, while protecting biodiversity and promoting ocean co-use. . . . It will also generate enough power to meet the demand of more than 10 million American homes for a year. . . . To position the domestic offshore wind industry to meet the 2030 target, DOI's Bureau of Ocean Energy Management (BOEM) plans to advance new lease sales and complete review of at least 16 Construction and

---

[119] *Id.* § 230.11(g).
[120] *Ga. River Network v. U.S. Army Corps of Eng'rs*, 334 F. Supp. 2d 1329, 1341 (S.D. Ga. Mar. 19, 2012), aff'd, 517 F. App'x 699 (11th Cir. 2013).

Operations Plans (COPs) by 2025, representing more than 19 GW of new clean energy for our nation. . . . Achieving this target also will unlock a pathway to 110 GW by 2050.[121]

96.     As of August 13, 2021, Defendant, Secretary of the Interior, acting through the Bureau of Ocean Energy Management, had approved eighteen offshore wind leases along the East Coast, 10 of which are located near the Project, totaling about 1.8 million acres.[122] Yet, in approving the Section 404 permit, the Secretary of the Army, acting through the Corps, failed to gather, document or consider the cumulative effects of thousands of giant turbines spread over hundreds of thousands of acres of ocean along the East Coast—violating Clean Water Act regulations.

**2.5     Significant degradation of the waters of the United States**

97.     Clean Water Act regulations flatly prohibit the issuance of a Section 404 permit that would result in significant degradation of the waters of the United States—"no discharge of dredged or fill material shall be permitted which will cause or contribute to significant degradation of the waters of the United States."[123] Significant degradation includes:

(1)     Significantly adverse effects of the discharge of pollutants on human health or welfare, including but not limited to effects on municipal water supplies, plankton, fish, shellfish, wildlife, and special aquatic sites;

(2)     Significantly adverse effects of the discharge of pollutants on life stages of aquatic life and other wildlife dependent on aquatic ecosystems, including the transfer, concentration, and spread of pollutants or their byproducts outside of the disposal site through biological, physical, and chemical processes;

---

[121] White House: Briefing Room, *Fact Sheet: Biden Administration Jumpstarts Offshore Wind Energy Projects to Create Jobs* (Mar. 29, 0221), available at https://www.whitehouse.gov/briefing-room/statements-releases/2021/03/29/fact-sheet-biden-administration-jumpstarts-offshore-wind-energy-projects-to-create-jobs/?utm_source=link.
[122] U.S. Bureau of Ocean Energy Management, *Atlantic OCS Renewable Energy- Massachusetts to South Carolina* (Aug. 13, 2021), available at https://www.boem.gov/renewable-energy/mapping-and-data/renewable-energy-gis-data.
[123] 40 C.F.R. § 230.1.

> (3)    Significantly adverse effects of the discharge of pollutants on aquatic ecosystem diversity, productivity, and stability. Such effects may include, but are not limited to, loss of fish and wildlife habitat or loss of the capacity of a wetland to assimilate nutrients, purify water, or reduce wave energy . . . .[124]

98.    The Secretary of the Army, acting through the Corps, violated Clean Water Act regulations by issuing the May 10, 2021 Section 404 permit for the Vineyard Wind Project, which allows discharges of dredge and fill material that will significantly degrade the waters of the United States by, among others, significantly and adversely impacting the fishing and shellfish grounds where the turbines, platforms, cables, and associated structures will be located—and these adverse effects will be multiplied as new offshore wind projects accumulate up and down the Atlantic Outer Continental Shelf.

## 2.6    No mitigation of injury to waters of the United States

99.    Clean Water Act regulations flatly prohibit the "discharge of dredged or fill material . . . unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem."[125]

100.    The Secretary of the Army, acting through the Corps, violated this regulatory requirement by failing to mitigate the impacts of the discharge on the aquatic ecosystem. Despite the Record of Decision's acknowledgement that the injuries to fisheries would be "major,"[126] the record lacks any discussion on any efforts to improve fisheries, mammals, or achieve no net loss.

---

[124] *Id.* § 230.11(c).
[125] *Id.* § 230.11(d).
[126] Final Environmental Impact Statement

## THIRD CAUSE OF ACTION
### Violation of the Endangered Species Act and Administrative Procedure Act
### (Against all Defendants)

101.    Plaintiff realleges and incorporates by reference the allegations contained in

Paragraphs 1 through 100 as though fully set forth herein.

102.    Congress enacted the ESA in 1973 "to provide a means whereby the ecosystems

upon which endangered species and threatened species depend may be conserved . . . [and] to

provide a program for the conservation of such endangered species and threatened species."[127]

"The plain intent of Congress in enacting this statute was to halt and reverse the trend toward

species extinction, whatever the cost."[128]

103.    Section 7 of the ESA requires that:

Each Federal agency shall, in consultation with and with the assistance of the
Secretary, insure that any action authorized, funded or carried out by such agency .
. . is not likely to jeopardize the continued existence of any endangered or
threatened species or result in the destruction or adverse modification of habitat of
such species . . . .[129]

104.    The implementing regulations for this section require the Secretary to complete

the consultation by issuing a formal Biological Opinion: "[T]he Secretary shall provide to the

Federal agency and the applicant, if any, a written statement setting forth the Secretary's opinion,

and a summary of the information on which the opinion is based, detailing how the agency

action affects the species or its critical habitat."[98]

105.    Defendants violated the ESA and its implementing regulations by issuing the May

10, 2021 pollutant discharge permit and the July 15, 2021 Plan approval without a valid

Biological Opinion. On May 7, 2021, the Bureau of Ocean Energy Management requested to

---

[127] 16 U.S.C. § 1531(b).
[128] *Id.* at 184.
[129] 16 U.S.C. § 1536(a).

reinitiate the Section 7 consultation for the Project because the 2020 Biological Opinion did not

fully assess "the potential impacts from monitoring surveys to be conducted by Vineyard Wind if

the Construction and Operations Plan . . . is approved[.]"[130] And on May 27, 2021, the Service

agreed that reinitiation was required, and withdrew its existing Biological Opinion, because the

"identified action is subsequently modified in a manner that causes an effect to the listed species

or critical habitat that was not considered in the biological opinion[.]"[131] The Service later issued

a revised Biological Opinion on September 11, 2021, long after the Pollutant Discharge Permit

and Construction and Operations Plan had been approved—without benefit of a Biological

Opinion or a completed consultation under Section 7 of the ESA.

106.    The North Atlantic Right Whale is the most iconic marine mammal on the eastern

seaboard of the United States. It is also one of the most imperiled species in the entire world,

with fewer than 400 individuals known to exist in the wild and on the verge of extinction.[132]

However, one of its safe havens, where there is ample food and protective areas for feeding and

mating, is the area immediately south-southwest of Nantucket Island—the exact place that the

Bureau has selected for purposes of constructing the largest offshore wind array ever assembled.

The United States has further announced its policy to establish wind projects along the entire

Atlantic shelf and has already granted leases for such projects, totaling almost 2 million acres.

This policy will interfere with much of the migration route the whales follow each year to their

calving grounds in the South Atlantic. Although the agencies are permitting development to

occur in areas important to the whales' life history, they have not considered the cumulative

effects to the whales' welfare.

---

[130] Ex. 2.
[131] Ex. 3.
[132]

107.    Approximately 100 North Atlantic Right Whales, comprising approximately 25% of worldwide population, have been recently sighted in the Vineyard Wind lease area. In addition, the Service released a study, after the Secretary of Interior approved the Construction and Operations Plan, that the whales' use of the wind energy areas in Southern New England has been increasing: "We found that right whale use of the region increased during the last decade, and since 2017 whales have been sighted there nearly every month, with large aggregations occurring during the winter and spring."[133]

108.    The North Atlantic Right Whale is one of the world's most endangered large whale species, with less than 400 individuals remaining, as the Service states:

> North Atlantic right whales primarily occur in Atlantic coastal waters on the continental shelf, although they also are known to travel far offshore, over deep water. Right whales migrate seasonally and may travel alone or in small groups. In the spring, summer, and into fall, many of these whales can be found in waters off New England and further north into Canadian waters, where they feed and mate. Each fall, some right whales travel more than 1,000 miles from these feeding grounds to the shallow, coastal waters of their calving grounds off of South Carolina, Georgia, and northeastern Florida, though migration patterns vary.[134]

109.    Associated increases in noise from pile driving, turbine operations, and vessels could contribute to the suite of ongoing stressors impacting the population. Noise has been found to interfere with North Atlantic Right Whale communication and increase their stress levels. In turn, "females that undergo energetic stress from reproduction may be more susceptible than males to dying from chronic injuries such as those from entanglement or vessel strikes."[111] Noise from human activities, such as that which would occur with the wind energy installation and

---

[133] NOAA Fisheries, *Right Whale Use of Southern New England Wind Energy Areas Increasing* (July 29, 2021), available at https://www.fisheries.noaa.gov/feature-story/right-whale-use-southern-new-england-wind-energy-areas-increasing.
[134] NOAA Fisheries, *North Atlantic Right Whale* (last visited Sept. 24, 2021), available at https://www.fisheries.noaa.gov/species/north-atlantic-right-whale.

operation of the proposed project, will disrupt normal behavior of right whales and further reduce their ability to identify physical surroundings, find food, navigate, and find mates.[112] Ship strikes are a major source of existing harm to endangered North Atlantic Right Whales, and this would be substantially exacerbated by the increased activities attendant to the construction, operation and decommissioning of the Project. Risk is especially increased due to the noise associated with pile driving for this Project and cumulatively with other offshore wind projects in the vicinity, which will persist for years throughout the whales' range, thereby having major impacts on this endangered species likely leading to takes.

110.    The Service utilizes aerial surveys to assess North Atlantic Right Whale population status to inform management and conservation activities and identify and respond to entanglement events. The Projects' construction and operations will prohibit the operation of these surveys "because the planned maximum-case scenario [turbine] blade tip height [] would exceed the survey altitude with current surveying methodologies"[135] and no solution to modify the surveys has been identified. Cessation of the aerial surveys will greatly increase management uncertainty and may result in an event, which  would have otherwise constituted a "harassment," becoming a mortality if entanglement response is delayed, hampered, or prevented.

111.    North Atlantic Right Whales are zooplanktivores, feeding primarily on calanoid copepods. *Calanus* distribution and abundance are strongly influenced by physical oceanographic conditions such as oscillations and turbidity, with at least some species strongly driven by changes in advective transport processes. Each of these physical oceanographic conditions will be affected by the Project and cumulative impact of proposed Atlantic offshore wind energy projects.

---

[135] Supplemental EIS at 3-127.

112.    The loss of physical space available to the North Atlantic Right Whale, resulting from the construction and operation of the Project, has not been adequately analyzed. Nor have the cumulative effects of the Project and the larger plan to develop commercial wind energy projects up and down the coast been evaluated.

113.    As described above, one of the primary threats to the North Atlantic Right Whale is vessel strikes due to its frequent use of near surface depths. Numerous vessels are expected to be involved in the construction of the Project, including but not limited to tugboats, barge cranes, and hopper scows, many of which would be substantially larger and faster than fishing vessels.

114.    To reduce the risk of ship strike, the Service has designated ten Seasonal Management Areas ("SMA") along the Atlantic Coast, in which vessels 65 feet or longer must travel at less than 10 knots. An additional Dynamic Management Area program requests the same restrictions outside the boundary of an active SMA for 15 days after a reported observation of right whale foraging aggregations of three or more individuals.[136]

115.    Despite the speed restrictions implemented by the Service, vessel strikes continue to affect North Atlantic Right Whale populations and Government and private sector whale scientists are contemplating a need to further expand speed restrictions in the Project area based on recent data.[137] The National Marine Fisheries Service also recently proposed to close the

---

[136] 73 Fed. Reg. 60,173 (Oct. 10, 2008).

[137] *See* Letter from Dr. Peter O. Thomas, Executive Director, Mammal Commission, to Dr. Caroline Good, National Marine Fisheries Service Office of Protected Resources (March 26, 2021), available at https://www.mmc.gov/wp-content/uploads/21-03-26-Good-NARW-Vessel-Speed-Rule-Assessment.pdf.; Oceana, *Speeding Toward Extinction: Vessel Strikes Threaten North Atlantic Right Whales* (July 2021), available at https://zenodo.org/record/5120727#.YfLjWf7MI2w.; Nathanael Green and Alison Chase, *Expert Blog: Offshore Wind Gets the Go-Ahead* (May 14, 2021), available at https://www.nrdc.org/experts/nathanael-greene/offshore-wind-gets-go-ahead.

Project area to fishing buoy lines from February through April to mitigate entanglement risk.[138]

116.    The occurrence of these whales in the area has increased since 2011. Since 2017, North Atlantic Right Whales have been present in the Project area nearly every month, with peak sighting between late winter and spring.[139]

117.    Temperatures in the area of wind projects are raised around one degree Celsius by the projects themselves, meaning the ocean around the location of various offshore wind farms proposed for New York, Connecticut, Massachusetts, and Rhode Island may be warming at a greater rate than would otherwise occur.[140]

118.    Notwithstanding this readily available best scientific and commercial data, the agencies did not account for the additional stress on the North Atlantic Right Whale caused by the localized increase in noise, vessel traffic, and temperatures attributable to the Project, including potential impacts on essential food supply for the North Atlantic Right Whale. They also did not account for the cumulative impacts of the Project coupled with those of similar wind power projects in the area.

119.    The Bureau has required Vineyard Wind to undertake only minimal, unproven measures to mitigate potential risk to North Atlantic Right Whales that are inconsistent with best available science. These include that vessel operators must generally travel at speeds less than 10 knots from November 1 through May 14 and carry a visual observer if traveling at speeds greater than 10 knots. However, crew transfer vessels are not speed-restricted at any time so long as they

---

[138] 86 Fed. Reg. 51,970 (Sept. 17, 2021).
[139] Ester Quintana-Rizzo et al., *Residency, demographics, and movement patterns of North Atlantic right whales Eubalaena glacialis in an offshore wind energy development area in southern New England, USA*, 45 Endangered Species Research (2021).
[140] Responsible Offshore Development Alliance, *Comments on Draft Environmental Impact Statement*, at 15-16 (Feb. 22, 2019).

carry a visual observer and no North Atlantic Right Whales have been detected. Pile driving is authorized during daylight hours between May 1 and November 30 unless the Bureau grants permission for such activity in December. Vineyard Wind must further conduct "soft starts" and achieve 6 dB re 1 µPa noise attenuation. Right whale presence is determined by Passive Acoustic Monitoring and visual observation.[141]

120.    The agencies arbitrarily and capriciously concluded these mitigation measures would result in no take of endangered North Atlantic Right Whales associated with the proposed Project activities although significant shortcomings in the proposed monitoring methods, such as unreliability of Passive Acoustic Monitoring in poor weather and plain limitations of visual detection provide limited, if any, assurance that take will be avoided. Should unauthorized take occur, the agencies have identified no viable mitigation measures that could be implemented throughout the 33-year life of the project.

## FOURTH CAUSE OF ACTION
**Violation of the National Environmental Policy Act and Administrative Procedure Act (Against all Defendants)**

121.    Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 120 as though fully set forth herein.

122.    The National Environmental Policy Act ("NEPA") requires "the federal government to identify and assess in advance the likely environmental impact of its proposed actions, including its authorization or permitting of private actions."[142]

---

[141] Approval Letter at 39-63.
[142] *Sierra Club v. U.S. Army Corps of Engineers*, 803 F.3d 31, 36 (D.C. Cir. 2015).

123.    Congress enacted NEPA in 1969 to serve as our "basic national charter for the protection of the environment."[143] NEPA achieves its purpose by "action forcing procedures . . . requir[ing] that agencies take a hard look at environmental consequences."[144] This "hard look" means federal agencies must consider "any adverse environmental effects which cannot be avoided."[145]

124.    NEPA thus requires agencies to "identify and develop methods and procedures . . . which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decision-making along with economic and technical considerations."[146]

125.    Agencies must also consider "[b]oth short- and long-term effects . . . [b]oth beneficial and adverse effects . . . [e]ffects on public health and safety . . . [and e]ffects that would violate Federal . . . law protecting the environment"[147] when determining the degree of the action's effects.

126.    The statutory requirement that a federal agency contemplating a major action prepare such an environmental impact statement serves NEPA's "action-forcing" purpose in two important respects.[148] NEPA

---

[143] 40 C.F.R. § 1500.1(a).
[144] *Robertson v. Methow Valley Citizens Counsel*, 490 U.S. 332, 350 (1989).
[145] 42 U.S.C. § 4332(C)(ii).
[146] 42 U.S.C. § 4332(B).
[147] *Id.*
[148] *See Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 97 (1983); *Weinberger v. Catholic Action of Hawaii/Peace Education Project,* 454 U.S. 139, 143 (1981).

ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision.[149]

127.    Agencies fulfill these duties by preparing a "detailed statement [for all major agency actions] significantly affecting the quality of the human environment,"[150] known as an Environmental Impact Statement. For actions that are not likely to have significant effects or where the significance of the effects is unknown, agencies must prepare an Environmental Assessment to "analyze the potentially affected environment and consider "connected actions."[151]

128.    The March 3, 2021 Final Environmental Impact Statement Defendants prepared for the Vineyard Wind Project was incomplete, inaccurate, and failed to comply with multiple requirements of the NEPA.

129.    Defendants' issuance of the May 10, 2021 Section 404 permit and approval of the July 15, 2021 Construction and Operations Plan for the Vineyard Wind Project, without complying with NEPA, was arbitrary, capricious, and otherwise not in accordance with law.

## 4.1    Range of alternatives and mitigation

130.    NEPA requires that the Environmental Impact Statement provide a "detailed statement . . . on . . . alternatives to the proposed action . . . ."[152] and that the agency "(s)tudy, develop, and describe appropriate alternatives to recommend courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."[153]

---

[149] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).
[150] 42 U.S.C. § 4332(C).
[151] 40 C.F.R. § 1501.3(a)–(b).
[152] 42 U.S.C. § 4332(2)(C).
[153] *Id.* § 4332(2)(E).

131.    NEPA further requires consideration of "[a]lternatives, which include the no action alternative; other reasonable courses of action; and mitigation measures (not in the proposed action)"[154] in an agency's environmental review of an action under consideration." In considering alternatives for mitigation, agencies must follow a stepwise approach:

a.    Avoid[] the impact altogether by not taking a certain action or parts of an action.
b.    Minimiz[e] impacts by limiting the degree or magnitude of the action and its implementation.
c.    Rectify[] the impact by repairing, rehabilitating, or restoring the affected environment.
d.    Reduc[e] or eliminat[e] the impact over time by preservation and maintenance operations during the life of the action.
e.    Compensat[e] for the impact by replacing or providing substitute resources or environments.[155]

132.    In approving the May 10, 2021 Section 404 Permit and the July 15, 2021 Construction and Operations Plan for the Vineyard Wind Project, Defendants failed to study, develop, or describe reasonable alternatives to the proposed project outside and inside of the Project area that would avoid, minimize, reduce, and compensate for impacts.

133.    Reasonable alternatives to *avoid* impacts would have included options to meet the purpose and need of the action outside of the lease area the onshore production of electrical energy and alternative offshore locations for the wind energy project.

134.    The Final Environmental Impact Statement confirmed that the Vineyard Wind project would significantly harm the ecosystem, fishery resources, seafood harvesters, shoreside businesses, and other statutorily-protected interests such as scientific research and navigational activities. Harms identified in the EIS include:

---

[154] 40 C.F.R. § 1501.9(E)(2).
[155] 40 C.F.R § 1508.20.

a. The Vineyard Wind project will increase the risk of collision between marine vessels.[156]

b. The Project poses ecological risk, including possible oil spills, in the event of turbine failure due to hurricanes or other weather events.[157]

c. The project will cause mortality including "4 acres (4 km2 ) in which benthic resources would be exposed to potential mortality from pile-driving noise," a 0.52-acre area around each foundation "covered with scour protection that would have caused mortality," and induce behavioral impacts to fishery resources up to 5.7 miles around each pile.[158]

d. The project will likely permanently harm, displace, and disturb existing fish, sea turtle, and mammal populations.[159]

e. The proposed spacing between wind turbines will make it nearly impossible for commercial fishing trawl and dredge vessels to operate in the lease area, especially at night and in severe weather.[160]

f. The wind turbines will interfere with navigational radar.[161]

135. Despite these known impacts of approving the Project in the lease area, the Bureau, the Corps, and the Service impermissibly and summarily dismissed significant, concrete, well-justified, and reasonable alternatives to locating the Vineyard Wind project in the lease area offered during the comment process, without adequate explanation, including:

a. Concrete proposals to eliminate certain important fishery areas of the lease and cable route from the Construction and Operations Plan;

b. Alternative energy sources that would have fewer effects to ratepayers and Environmental Justice communities;

c. Options that would reduce the devastating impact the Vineyard Wind project would have on fisheries; and

d. Suggestions for alternatives related to the Project's weak job creation and the relative importance of fishing industry employment in affected coastal communities.

---

[156] *See* Final Environmental Impact Statement at 3-246.

[157] *See id.* at 3-81, 89, 219.

[158] *See id.* at 3-29.

[159] *See id.* at 3–43, 46, 75, 76, 103, 105.

[160] *See id.* at 3–96, 207, 214, 215.

[161] *See id.* at 3-214; *see also, e.g.*, Department of Defense Office of the Director of Defense and Research Engineering, *Report to the Congressional Defense Committees: The Effect of Windmill Farms on Military Readiness* at 4 (2006).

136.    In addition to these recommendations that would have *avoided* impacts by considering alternatives outside of the lease area, a wide range of reasonable alternative project layouts, structures, construction methods, and activities within the lease area would have minimized or reduced the Project's adverse environmental impacts.

137.    Of the dozens or hundreds of suggestions provided through the public comment process, two notable examples include: (1) the transit lanes proposed by Plaintiff for the Southern New England wind lease areas, including Vineyard Wind, to ensure safety and viability of commercial fishing operations;[162] and (2) additional requests clearly and explicitly provided to the Bureau in a letter signed by 1,665 commercial fishing industry members across the country when the Bureau announced its "reinitiation" of environmental review:[163]

    a.    Clarify whether approving an offshore wind project will usurp NOAA Fisheries mission and statutory authority to regulate U.S. fisheries, including disruption of NMFS stock assessment surveys critical to setting fishery management specifications;

    b.    Improve federal environmental review analysis and clearly identify scientific unknowns;

    c.    Monitor fisheries impacts for the life of projects and utilize adaptive management;

    d.    Prohibit turbines and cables in sensitive habitat including spawning areas, habitat areas of particular concern, and high-value fishing grounds;

    e.    Improve communications with fishermen in culturally appropriate formats;

    f.    Perform "micrositing" of turbines and cables with fishermen who know the ecosystem;

---

[162] Letter from the Alliance to United States Coast Guard, Bureau of Ocean Energy Management, and National Marine Fisheries Service regarding "Proposal for New England wind energy project layout with transit lanes for safe passage of vessels" (Jan. 3, 2020), available at https://rodafisheries.org/wp-content/uploads/2020/01/200103-MA_RI-layout-proposal.pdf.

[163] Responsible Offshore Development Alliance, *Fishing Communities' Letter on Offshore Wind Advancement* (April 2021), available at https://rodafisheries.org/wp-content/uploads/2021/04/Fishing-communities-letter-on-OSW-signatures.pdf.

    g.      Establish science-based, inclusive, and predictable plans for compensatory mitigation of all impacts to fishing communities while recognizing that compensation is a last resort and all impacts must be first avoided;

    h.      Standardize processes for gear loss claims across all phases of project development including site surveys;

    i.       Address interference from turbines to marine radar;

    j.       Require deicing technology and practices; and

    k.      Ensure that any economic benefits of offshore wind accrue to the U.S.

138.    The Bureau authorized compensation for impacts to the fishing industry before adequately evaluating alternatives to avoid, minimize, and reduce impacts, violating the stepwise approach required by the NEPA implementing regulations. The compensation authorization also discriminated against residents of different states by allowing differential valuation and procedures based on residence, despite the affected fishing permits being federally administered.

139.    The agencies issued the Record of Decision and Approval Letter despite the major impacts to at-sea and shoreside commercial fishing businesses and absence of effective mitigation measures.[164] Thus, the failure to consider alternatives outside or inside of the Project area that would avoid, minimize, and mitigate impacts—including those recommended during public comment—was arbitrary, capricious, an abuse of discretion, in excess of statutory authority, and without observance of procedure required by law.[165]

## 4.2    Cumulative impacts

---

[164] *See* Record of Decision at 39 (stating that "due to the placement of the turbines it is likely that the entire [lease] area will be abandoned by commercial fisheries due to difficulties with navigation").

[165] 5 U.S.C. § 706.

140.   NEPA requires that an Environmental Impact Statement include within its scope "[c]umulative actions [that] when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement"[166] and "[s]imilar actions [that] when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together."[167] This cumulative impact requirement ensures that agencies consider the collective effects of individually minor but related actions over time when examining environmental impact.[168]

141.   NEPA's implementing regulations detail actions an agency must take when there is "incomplete information relevant to reasonably foreseeable significant adverse impacts," including obtaining supplemental information if the costs of doing so are not exorbitant, statements identifying what information is unavailable, and performing theoretical evaluations.[169] The Bureau prepared the Supplemental Environmental Impact Statement in response to criticism from the National Marine Fisheries Service and others over the inadequate evaluation of cumulative impacts in the Draft EIS.  However, by focusing on the Vineyard Wind Project rather than a programmatic analysis of offshore wind energy across the geographic region, the Supplemental EIS did little to fill the many analytical gaps contained in the Draft EIS. It lacked analysis altogether or drew unfounded conclusions on a range of topics including:

    a.    Species-specific biological impacts associated with single and cumulative impact producing factors;

    b.    Fisheries socioeconomic impacts, including multiplier effects associated with the seafood supply chain and shoreside businesses, fishing culture and heritage;

---

[166] 40 C.F.R. § 1508.25(a)(2).
[167] 40 C.F.R. § 1508.25(a)(3).
[168] 40 C.F.R. § 1508.7.
[169] 40 C.F.R. §§ 1502.22(a)–(b).

c.      Changes in water flow or larval dispersion;
d.      Effects of wind energy removal to physical oceanographic processes and features, including impacts to the Mid-Atlantic Cold Pool, and dependent biological processes;
e.      The assumption that a "reef effect" will occur and be positive;
f.      Localized temperature changes;
g.      Impacts from electromagnetic fields, light, sound, sedimentation, and siltation;
h.      Cable burial depth and micrositing considerations;
i.      Consequences of scour and other benthic alterations;
j.      Energy, cost, and emissions analyses;
k.      Supply chain impacts;
l.      Physical environment and materials such as boulder relocation, toxin leeching, and crushing;
m.      Invasive species; and
n.      Habitat Areas of Particular Concern.[170]

142.    The Bureau did not take even readily available measures to obtain information that could have formed a baseline for evaluation of reasonably foreseeable impacts. In but one example, the Service informed the Bureau just six weeks before publication of the Record of Decision "the existing Bureau of Ocean Energy Management . . . benthic survey guidelines for collecting acoustic and benthic data across a lease area have not been applied consistently and are inadequate to ensure the collection of sufficient site-specific baseline data for our [Essential Fish Habitat] consultations."[171]

---

[170] *See* RODA Comments on Supplemental Environmental Impact Statement; Science Center for Marine Fisheries, *Review of "Vineyard Wind 1 Offshore Wind Energy Project Supplement to the Draft Environmental Impact Statement,"* (2020) available at https://scemfis.org/wp-content/uploads/2020/07/wind_report_final-1.pdf.
[171] Letter from Louis A. Chiarella, Assistant Regional Administrator for Habitat Conservation, Greater Atlantic Regional Fisheries Office to Michelle Morin, Chief, Environmental Branch Office of Renewable Energy Programs, Bureau of Ocean Energy Management (March 29, 2021), available at https://static1.squarespace.com/static/511cdc7fe4b00307a2628ac6/t/60637e9b0c5a2e0455ab49d5/1617133212147/March292021_NMFS_Habitat_Mapping_Recommendations.pdf.

143.    Nor do the Supplemental Environmental Impact Statement or Final Environmental Impact Statement account for the cumulative impacts of the Vineyard Wind Project itself throughout each of the Project phases (leasing, surveys, construction, operations, and decommissioning).

144.    This failure to account for reasonably foreseeable future actions when analyzing cumulative impact under NEPA is arbitrary, capricious, an abuse of discretion, in excess of statutory authority, or otherwise not in accordance with law.[172]

### 4.3    Reinitiation of the Project review after design change

145.    NEPA requires agencies to "prepare supplements to either draft or final environmental impact statements if . . . [t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns, or . . . [t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."[173]

146.    Vineyard Wind withdrew its Construction and Operations Plan from the Bureau's consideration on December 1, 2020, stating it needed to review the feasibility of utilizing the 13 megawatt General Electric Haliade-X Wind Turbine Generator instead of the previously proposed 9.5 megawatt MHI Vestas turbine model.

147.    In response, the Bureau issued a Notice plainly terminating the Project's environmental review.[174] Then, on January 22, 2021, Vineyard Wind announced that its internal review was complete and it determined that no changes to its Construction and Operations Plan were needed, without further explanation.

---

[172] 5 U.S.C. § 706.
[173] 40 C.F.R. § 1502.9(c)(1).
[174] 85 Fed. Reg. 81486 (Dec. 16, 2020).

148.    The Bureau, in turn, announced on March 3, 2020 that it had "resumed" preparation of an Environmental Impact Statement.[175] Nine days later, it published the Final Environmental Impact Statement.

## 4.4    Project description

149.    NEPA implementing regulations require that the agency "specify the underlying purpose and need for the proposed action."[176] An agency cannot circumvent its NEPA obligations "by adopting private interests to draft a narrow purpose and need statement that excludes alternatives that fail to meet specific private objectives" nor can it "craft a purpose and need statement so narrowly drawn as to foreordain approval of" a project proposed by a private party.[177]

150.    The Record of Decision states that the purpose of the federal action is to "meet New England's demand for renewable energy" and more specifically to contribute to Massachusetts' mandate that distribution companies jointly and competitively solicit proposals for offshore wind energy generation.[178] The need for the Bureau's decision is generally described as to carry out the agency's duties under the Outer Continental Shelf Lands Act.[179]

---

[175] 86 Fed. Reg. 12494 (March 3, 2021).
[176] 40 C.F.R. § 1502.13.
[177] *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt*., 606 F.3d 1058, 1072 (9th Cir. 2010).
[178] Record of Decision § 2.2.
[179] *Id.*

151.    This improperly framed purpose and need statement limits the Bureau's analysis and consideration of an appropriate range of alternatives, in violation of established principles that project contract or decisions made prior to NEPA review cannot limit the range of alternatives or analysis, which the Bureau itself has previously acknowledged.[180]

152.    Defendants violated NEPA by allowing existing private contracts to define the need for the project, thereby impermissibly predetermining the outcome of their review and acting in a manner that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.[181]

## 4.5   Public involvement and response to comments

153.    NEPA's implementing regulations require agencies to make "diligent efforts to involve the public in preparing and implementing their NEPA procedures."[182] An agency must ensure that the public is well informed and has adequate public comment opportunities under the law.[183]  In exercising its duty to ensure meaningful public input, "the quantitative level of participation should not be given greater priority than the quality and balance of participation."[184]

154.    The Bureau engaged the public, including affected fishing industry members, only through a minimal notice and comment process, instead deferring this critical duty to the private developer and certain states.

---

[180] *Fisheries Survival Fund v. Jewell*, 2018 WL 4705795 (D.D.C. Sept. 30, 2018) ("A developer's investment in a lease is "made with full awareness that its proposals for a wind energy facility may be rejected and that it may never construct or operate such a facility.").
[181] 5 U.S.C. § 706(2)(A), (C), (D).
[182] 40 C.F.R. § 1506.6.
[183] *See* 5 U.S.C. § 553(c).
[184] Cary Coglianese et al., *Transparency and Public Participation in the Rulemaking Process: A Nonpartisan Presidential Transition Task Force Report*, 4 (July 2008).

155.    In contrast, Vineyard Wind representatives were in near constant contact with the Bureau and other relevant agencies and enjoyed access to information not shared, or not timely shared, with the public. Indeed, the "Smart from the Start" regulations anticipate this iterative relationship between agency and developer.

156.    NEPA's implementing regulations require agencies to adequately cite "the sources, authorities, or reasons which support the agency's position . . . [and] indicate those circumstances which would trigger agency reappraisal or further response."[185] These regulations also require agencies to explain why certain comments "do not warrant further agency response."[186]

157.    The Bureau, United States Coast Guard, and other agencies charged with responding to public comments throughout the Project review process failed to provide sufficient rationale or citations to best available science in responding to comments or deciding that comments did not warrant response. These comments include several by Plaintiff regarding many of the concerns raised in this Complaint.

158.    Defendants' failure to respond to comments or incorporate those comments in its NEPA review is arbitrary, capricious, an abuse of discretion, without observance of procedure required by law, or otherwise not in accordance with law.[187]

## 4.6   Project segmentation and feasibility

---

[185] 40 C.F.R. § 1503.4(a)(5).
[186] *Id*.
[187] 5 U.S.C. § 706(2)(A), (C),(D).

159.    NEPA's implementing regulations require any action that "[i]s likely to have significant effects"[188] on the environment to include an environmental impact statement. Alternatively, any action that "is not likely to have significant effects or the significance of the effects is unknown" requires only an environmental assessment.[189]

160.    When considering whether effects are significant, agencies "analyze the potentially affected environment and the degree of the effects of the action," and consider connected actions as well.[190] When preparing an environmental assessment, an agency must give a hard look toward "connected actions" within the same environmental assessment, including actions that are "interdependent parts of a larger action and depend on the larger action for justification."[191]

161.    Agencies must also consider "[b]oth short- and long-term effects . . . [b]oth beneficial and adverse effects . . . [e]ffects on public health and safety . . . [and e]ffects that would violate Federal . . . law protecting the environment"[192] when determining the degree of the action's effects.

162.    When the Bureau issued the Vineyard Wind lease, it conducted an environmental assessment, but did not issue an Environmental Impact Statement. By failing to prepare an Environmental Impact Statement for Vineyard Wind prior to leasing, the Bureau did not consider a reasonable range of alternative locations for wind energy construction and therefore shirked its duty to "[e]valuate reasonable alternatives to the proposed action . . . ."[193]

---

[188] 40 C.F.R. § 1501.3(a).
[189] *Id.*
[190] 40 C.F.R. § 1501.3(b).
[191] *See* 40 C.F.R. § 1508.25.
[192] *Id.*
[193] 40 C.F.R. § 1502.14(a).

163.    In issuing only an environmental assessment at leasing, the only stage in the

Bureau's permitting process in which impacts to fisheries were fully analyzed occurred in the

Final EIS immediately prior to the Record of Decision. At that point—nearly a full decade after

the lease area was identified—several project details had already become immutable, including

but not limited to:

     a.     Finalization of the power procurement agreement with the State of
Massachusetts;

     b.     Evaluation of the Construction and Operations Plan for federal
consistency under the Coastal Zone Management Act by
participating states;

     c.     Expenditure of tens of millions of dollars, or more, on survey
activity, project design, and supply chain contracts;

     d.     Determination of project design parameters including layout,
materials selection, and other factors;

     e.     Execution of local permits and agreements for certain project
activities; and

     f.     Realized environmental impacts from site assessment,
characterization, and monitoring activities.

164.    The Bureau restricted its range of alternatives for evaluation in light of these

decisions made between the environmental assessment and the environmental impact statement,

rather than objective evaluation of the feasibility of a range of alternatives.

165.    During preparation of the Draft EIS, the Bureau further improperly relied on

Vineyard Wind's statements that modifications to project plans, such as alternative layouts,

would be economically unfeasible and therefore equivalent to the "no action" alternative,[194] even

when there was clear evidence to indicate such statements may have been erroneous.[195]

---

[194] Draft Environmental Impact Statement at 2-16.

[195] *See* Letter from Erich Stephens, Chief Development Officer, Vineyard Wind to Grover
Fugate, Executive Director, Rhode Island Coastal Resources Management Council at 18 (Nov.
19, 2018) (requesting federal consistency determination for a layout aligned northwest to
southeast and asserting "it is not possible to reorient the entire project in an east west direction"
as the State requested—later, Vineyard Wind changed its design to an east-west layout).

166.    Such reliance on Vineyard Wind's assertions of feasibility, even lacking rationale, resulted in the Bureau's sole consideration of mitigation measures that were voluntarily proposed by the developer, instead of objectively evaluating those raised in public comment. The Bureau thus improperly segmented its NEPA analysis by "divid[ing] connected, cumulative, or similar federal actions into separate projects and thereby fail[ing] to address the true scope and impact of the activities that should be under consideration."[196] In so doing, it failed to consider foreseeable impacts of the Project on protected resources, fisheries, habitat, and navigation before approving the Project.

167.    The Bureau's decision to segment its NEPA analysis is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, or without observance of procedure required by law.[197]

## 4.7    Application of outdated NEPA regulations

168.    In July 2020, the Council on Environmental Quality (CEQ) updated the NEPA implementing regulations for the first time in over forty years, and these revisions went into effect on September 14, 2020. Defendants nevertheless chose to prepare the Final Environmental Impact Statement and Record of Decision under NEPA regulations in effect prior to the revisions because "[the Bureau]'s NEPA review of the proposed Project began prior to . . . September 14, 2020."[198]

---

[196] *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014).
[197] 5 U.S.C. § 706(2)(A), (C), (D).
[198] Record of Decision at 3 n.1.

169.    Defendants "reinitiated" NEPA review in January 2021, then issued the Final Environmental Impact Statement in March 2021 and issued the Record of Decision in May 2021. Defendants did not refer to or use then-current NEPA regulations in the Final Environmental Impact Statement or Record of Decision, even after the review was terminated and re-started.

170.    On April 16, 2021 Secretary Haaland directed Department of Interior agencies: "Bureaus/Offices will not apply the 2020 Rule in a manner that would change the application or level of NEPA that would have been applied to a proposed action before the 2020 Rule went into effect on September 14, 2020."[199]

171.    The failure to follow governing NEPA regulations in conducting the Project's environmental review caused Defendants to arbitrarily limit not only the consideration of cumulative impacts but also their "reasoned choice among alternatives," and is therefore arbitrary, capricious, an abuse of discretion, in excess of statutory authority, without observance of procedure required by law, or otherwise not in accordance with law.[200]

## 4.8    Climate change

172.    The Final Environmental Impact Statement does not sufficiently evaluate the Project's impacts to greenhouse gas emissions and climate change. The analysis focuses on partial, project-specific climate impacts in the nearby geographic area but attempts to quantify only emissions offsets from the Project, with limited qualitative descriptions of emissions generated from construction.

---

[199] Secretarial Order No. 3399, "Department-Wide Approach to the Climate Crisis and Restoring Transparency and Integrity to the Decision-Making Process" (Apr. 16, 2021).
[200] 5 U.S.C. § 706.

173.    There is no evaluation at all of activities associated with the supply chain, such as minerals sourcing and component fabrication, which would not occur under the No Action Alternative and differ among other alternatives the Bureau did, or should have, considered.

174.    The Final Environmental Impact Statement further only presents a comparison of the Project's climate benefits compared with "fossil-fuel power generating stations"[201] but not alternative renewable energy sources or alternative project locations and design.

175.    Nor is there any cumulative-level analysis of climate impacts (positive or negative) associated with the proposed scale of offshore wind development beyond a sweeping and unsupported conclusion that "U.S. offshore wind projects would by themselves probably have a limited impact on global emissions and climate change, but they may be significant and beneficial as a component of many actions addressing climate change, and integral for fulfilling state plans regarding climate change."[202]

**FIFTH CAUSE OF ACTION**
**Violation of the Marine Mammal Protection Act and Administrative Procedure Act**
**(Against National Marine Fisheries Service and Administrator Spinrad)**

176.    Plaintiff realleges and incorporates by reference the allegations contained in Paragraphs 1 through 175 as though fully set forth herein.

177.    The Marine Mammal Protection Act was the first national legislation to mandate an ecosystem-based approach to marine resource management. Under the Marine Mammal Protection Act, Congress directed that the primary objective of marine mammal management should be to maintain the health and stability of the marine ecosystem and, when consistent with that primary objective, to obtain and maintain optimum sustainable populations of marine

---

[201] Final Environmental Impact Statement at A-62.
[202] Final Environmental Impact Statement at A-51.

mammals. The law includes a general moratorium on take and import of marine mammals, with certain exemptions.

178.    The Marine Mammal Protection Act allows the Service to authorize (for one year or less) "the incidental, but not intentional, taking by harassment of small numbers of marine mammals" if the Service finds that the harassment "will have a negligible impact on such species or stock . . . ."[203] It further requires the Secretary of Commerce to "give full consideration to all factors which may affect the extent to which such animals may be taken[,]"[204] including:

(1)    [E]xisting and future levels of marine mammal species and population stocks; . . .

(3)    [T]he marine ecosystem and related environmental considerations;

(4)    [T]he conservation, development, and utilization of fishery resources; and

(5)    [T]he economic and technological feasibility of implementation.[205]

179.    On July 21, 2021, the Service issued an Incidental Harassment Authorization for the Project authorizing incidental take by Level B harassment of several seal, dolphin, porpoise, and whale species. The Incidental Harassment Authorization authorized take of up to ten right whales and up to 3,484 short beaked common dolphins, among other species:

---

[203] 16 U.S.C. § 1371(a)(5)(D)(i).
[204] 16 U.S.C. § 1373(b).
[205] 16 U.S.C. § 1373(b)(1), (3)-(5).

| Common name | Genus/Species | Authorized Takes by Level B harassment |
|---|---|---|
| Fin whale | *Balaenoptera physalus* | 8 |
| Humpback whale | *Megaptera novaeangliae* | 5 |
| Minke whale | *Balaenoptera acutorostrata* | 3 |
| North Atlantic right whale | *Eubalaena glacialis* | 10 |
| Sei whale | *Balaenoptera borealis* | 2 |
| Sperm whale | *Physeter macrocephalus* | 2 |
| Atlantic white sided dolphin | *Lagenorhynchus acutus* | 123 |
| Bottlenose dolphin | *Tursiops truncatus* | 222 |
| Long-finned pilot whale | *Globicephala melas* | 25 |
| Risso's dolphin | *Grampus griseus* | 8 |
| Short beaked common dolphin | *Delphinus delphis* | 3,484 |
| Harbor porpoise | *Phocoena phocoena* | 158 |
| Gray seal | *Halichoerus grypus* | 540 |
| Harbor seal | *Phoca vitulina* | 540 |

.

180.     This authorization was issued based on the same limited information and analysis alleged under the second cause of action and therefore suffers the same deficiencies.

181.     Defendants' decision to allow the take of marine mammals, particularly North Atlantic Right Whales, in connection with the construction and operation of the Vineyard Wind Project is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.[206]

182.     Accordingly, Defendants' approval of the Pollutant Discharge Permit and the Construction and Operations Plan for the Vineyard Wind project, which will harass and take marine mammals, is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

---

[206] 5 U.S.C. § 706(2)(A), (C), (D).

## SIXTH CAUSE OF ACTION
### Violation of the Merchant Marine Act of 1920 and Administrative Procedure Act
### (Against All Defendants)

183.    Plaintiff realleges and incorporates by reference the allegations contained in

Paragraphs 1 through 182 as though fully set forth herein.

184.    The Merchant Marine Act, also called the Jones Act, is a cabotage statute that

prohibits any goods "transported by water, or by land and water . . . between points in the United

States . . . either directly or via a foreign port . . . [from being shipped,] for any part of the

transportation, in any other vessel than a vessel built in and documented under the laws of the

United States and owned by persons who are citizens of the United States."[207]

185.    Many of the Alliance's members are vessels "built in and documented under the

laws of the United States and owned by persons who are citizens of the United States." As Jones

Act qualified vessels, these members are entitled to transport goods between points in the United

States.

186.    Vineyard Wind, and other offshore wind energy developers, have been

conducting site characterization survey activities using non-Jones Act compliant vessels since at

least 2016 with the Bureau's knowledge. The Construction and Operations Plan for the Vineyard

Wind Project is informed by data gathered from those surveys.

187.    The Construction and Operations Plan that Defendants approved on July 15,

2021, authorizes the transport of goods from points in the United States to and within the

Vineyard Wind Project site, which also consists of points within the United States, despite

---

[207] 46 U.S.C. § 883.

Defendants' knowledge that no Jones Act qualified vessels exist to perform these activities[208]—thus violating the Jones Act.

188.     Defendants' approval of the Construction and Operations Plan for the Vineyard Wind Project, in violation of the Jones Act, is thus arbitrary, capricious, an abuse of discretion, and not in accordance with law.

### PRAYER FOR RELIEF

Plaintiff, Responsible Offshore Development Alliance, therefore, asks the Court for the following relief:

1.     An order holding unlawful, vacating, and setting aside Defendants' July 15, 2021 decision approving the Construction and Operations Plan for the Vineyard Wind Project, July 21, Incidental Harassment Authorization, and May 10, 2021 Section 404 permit as arbitrary, capricious, and otherwise not in accordance with law;

2.     Reasonable attorneys' fees and costs for bringing this suit; and

3.     Such other and further relief as the Court deems appropriate.


Dated: January 31, 2022                                        Respectfully submitted,

                                                     s/Nancie G. Marzulla
                                                     Nancie G. Marzulla
                                                     Marzulla Law, LLC
                                                     1150 Connecticut Ave NW,
                                                     Suite 1050
                                                     Washington, D.C. 20036
                                                     (202) 822-6760
                                                     nancie@marzulla.com
                                                     D.C. Bar No. 400985

                                                     Counsel for Plaintiff

---

[208] *See* United States Coast Guard, Offshore Wind Support Vessels (last visited Jan. 27, 2022), available at https://www.dco.uscg.mil/OCSNCOE/Renewable-Energy/Support-Vessels/.