## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| RESPONSIBLE OFFSHORE DEVELOPMENT ALLIANCE, | |
| Plaintiff, | Civil Action No. 1:22-cv-11172-IT |
| v. | Hon. Indira Talwani |
| THE UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*, | |
| Defendants, | |
| and | |
| VINEYARD WIND I, LLC, | |
| Intervenor Defendant. | |

## FEDERAL DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................. 1

ARGUMENT ........................................................................................................................ 2

    I.    RODA's claims of economic harm fall outside of NEPA's zone of interests ........ 2

    II.    BOEM complied with OCSLA ................................................................... 4

    III.    The Corps fully considered all aspects of the Project within its permitting authority ...................................................................................................... 8

        A.    RODA's claims against the Corps are waived.......................................... 8

        B.    The Corps' Review of the Impacts from Work on the Entire Cable Corridor was Adequate and is Unchallenged............................................... 9

        C.    The Corps Properly Considered Alternatives ........................................ 10

        D.    The Corps Properly Considered Cumulative Impacts ............................. 11

    IV.    Federal Defendants complied with the ESA ......................................... 11

    V.    Federal Defendants complied with NEPA by analyzing cumulative impacts ...... 17

    VI.    Federal Defendants are entitled to summary judgment on RODA's Jones Act claim ................................................................................................. 19

    VII.    If the Court finds a legal error, it should remand without vacatur ...................... 19

CONCLUSION..................................................................................................................... 20

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Am. Waterways Operators v. U.S. Coast Guard*,
  No. 18-cv-12070-DJC, 2020 WL 360493 (D. Mass. Jan. 22, 2020) ........................................ 2

*American Oceans Campaign v. Daley*,
  183 F. Supp. 2d 1 (D.D.C. 2000) ................................................................................. 3

*Center for Biological Diversity v. National Marine Fisheries Service*,
  977 F. Supp. 2d 55 (D.P.R. 2013) ............................................................................. 14

*Center for Biological Diversity v. U.S. Bureau of Land Management*,
  698 F.3d 1101 (9th Cir. 2012) .................................................................................... 14

*Central Me. Power Co.v. FERC*,
  252 F.3d 34 (1st Cir. 2001) ......................................................................................... 19

*Chevron, U.S.A. v. Nat. Res. Defense Council*,
  467 U.S. 837 (1984) ....................................................................................................... 6

*Defenders of Wildlife v. U.S. Environmental Protection Agency*,
  420 F.3d 946 (9th Cir. 2005) ...................................................................................... 14

*Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin.*,
  920 F.2d 960 (D.C.Cir.1990) ...................................................................................... 19

*Lemon v. Geren*,
  514 F.3d 1312 (D.C. Cir. 2008) .................................................................................... 3

*Massachusetts v. Andrus*,
  594 F.2d 872 (1st Cir. 1979) ..................................................................................... 4, 5

*Mountain States Legal Found. v. Glickman*,
  92 F.3d 1228 (D.C. Cir. 1996) ...................................................................................... 3

*National Ass'n of Home Builders v. Defenders of Wildlife*,
  551 U.S. 644 (2007) ...................................................................................................... 14

*NRDC v. Houston*,
  146 F.3d 1118 (9th Cir. 1998) ................................................................................ 14, 15

*Oceana, Inc. v. Evans*,
  No. 03-10570-GAO, 2004 WL 1730340, (D. Mass. July 30, 2004) ........................ 16

*Realty Income Trust v. Eckerd*,
  564 F.2d 447 (D.C. Cir. 1977) ................................................................................... 2, 3

*Transitional Hosp. Corp. of La., Inc. v. Shalala*,
  222 F.3d 1019 (D.C. Cir. 2000) .................................................................................... 6

*Trindade v. Grove Servs., Inc.*,
  No. 19-cv-10717-ABD, 2020 WL 6566509 (D. Mass. Nov. 9, 2020) ................................... 19

*United States v. DiBiase Salem Realty Trust*,
  No. 91-11028-MA, 1993 WL 729662 (D. Mass. Nov. 19, 1993) ........................................... 19

**Statutes**

16 U.S.C. § 1536 .............................................................................................................. 12, 13

43 U.S.C. § 1332 ...................................................................................................................... 4

43 U.S.C. § 1334 ...................................................................................................................... 5

43 U.S.C. § 1337(p) ............................................................................................................. 4, 6

**Regulations**

30 C.F.R. § 585.621 ................................................................................................................. 6

40 C.F.R. § 1502.14 .............................................................................................................. 18

40 C.F.R. § 1502.16 .............................................................................................................. 18

40 C.F.R. § 230.10 ................................................................................................................ 11

50 C.F.R. § 402.07 ................................................................................................................ 13

50 C.F.R. § 402.15 ................................................................................................................ 16

50 C.F.R. § 402.16 ................................................................................................................ 15

## TABLE OF ACRONYMS

| | |
|---|---|
| **BA** | Biological Assessment |
| **BiOp** | Biological Opinion |
| **BOEM** | U.S. Bureau of Ocean Energy Management |
| **COP** | Construction and Operations Plan |
| **Corps** | U.S. Army Corps of Engineers |
| **CEQ** | Council on Environmental Quality |
| **CWA** | Clean Water Act |
| **DEIS** | Draft Environmental Impact Statement |
| **ESA** | Endangered Species Act |
| **FEIS** | Final Environmental Impact Statement |
| **ITS** | Incidental Take Statement |
| **NEPA** | National Environmental Policy Act |
| **NMFS** | National Marine Fisheries Service |
| **NMFS/GAR** | NMFS Greater Atlantic Region Office |
| **NMFS/OPR** | NMFS Office of Protected Resources |
| **OCS** | Outer Continental Shelf |
| **OCSLA** | Outer Continental Shelf Lands Act |
| **RHA** | Rivers and Harbors Act |
| **ROD** | Record of Decision |
| **RODA** | Responsible Offshore Development Alliance |
| **SDEIS** | Supplemental Draft Environmental Impact Statement |

## INTRODUCTION

RODA's opposition brief confirms that Federal Defendants are entitled to summary judgment on all claims. The administrative record establishes that Federal Defendants engaged in nearly four years of environmental review before issuing the approvals challenged in this lawsuit. The record also establishes that, throughout that environmental review, Federal Defendants complied with their statutory and regulatory obligations. RODA has failed to show that Federal Defendants' actions were arbitrary or capricious, and RODA's claims should be rejected.

As an initial matter—and regardless of whether RODA has met its burden to establish that it has Article III standing—RODA's NEPA claims should be dismissed because RODA lacks prudential standing to bring them. RODA still has not demonstrated any non-economic injuries that would bring the alleged harms within NEPA's zone of interests.

RODA's claims also fail on the merits. As discussed below, BOEM complied with section 8(p)(4)(I) of OCSLA in approving Vineyard Wind's Construction and Operations Plan ("COP") by ensuring that the Vineyard Wind project (the "Project") would not unreasonably interfere with other uses of the Outer Continental Shelf, including fishing. RODA's claims against the Corps are waived. But even if the Court reaches the merits of those claims, the Corps fully considered all aspects of the Project within its permitting authority. Federal Defendants also complied with the ESA, including when BOEM approved Vineyard Wind's COP while reinitiated consultation with the National Marine Fisheries Service was ongoing. And Federal Defendants fully complied with NEPA and its regulations, including by analyzing the cumulative impacts of the Project in the Final Environmental Impact Statement ("FEIS"). Finally, RODA has abandoned its claims under the Jones Act.

Because each of RODA's arguments lack merit, the Court should enter judgment in favor

of Federal Defendants on all claims.

## ARGUMENT

**I.    RODA's claims of economic harm fall outside of NEPA's zone of interests.**

In our opening brief, we explained that RODA had not met its burden to establish standing based on injury to its members because RODA had not identified any members who had Article III standing. Doc. No. 60 at 12-13. Now that RODA has provided declarations identifying members who operate fishing vessels in the Vineyard Wind project area, Federal Defendants no longer challenge RODA's Article III standing to maintain suit on its members' behalf.[1]

RODA has not, however, established that the alleged economic injuries to it or its members fall within NEPA's zone of interests. *Am. Waterways Operators v. U.S. Coast Guard*, 2020 WL 360493, at *6 (D. Mass. Jan. 22, 2020). As explained in our opening brief, RODA has asserted solely economic injuries. Doc. No. 60 at 14. The same is true of RODA's opposition. Apart from aesthetic and recreational injuries alleged by an individual who is not a member of RODA and therefore cannot establish RODA's prudential standing (discussed further below), RODA's allegations of injury are still purely economic.

RODA argues that its alleged economic injuries are sufficient to bring it within NEPA's zone of interests "so long as there is some connection to the environment." Doc. No. 77 at 15. But the cases RODA cites do not support that proposition under the facts here. In *Realty Income Trust v. Eckerd*, 564 F.2d 447 (D.C. Cir. 1977), the D.C. Circuit confirmed that "an allegation of injury to monetary interest alone may not bring a party within the zone of environmental

---

[1] Because we now agree that RODA has Article III standing based on the standing of members, the Court need not address whether RODA has independent organizational standing based on its status as a nonprofit trade organization.

interests as contemplated by NEPA for purposes of standing." *Id.* at 452. True, the court held that a plaintiff alleging both environmental and economic injury is not disqualified from bringing a NEPA claim based on an argument that the plaintiff's true purpose—or the "impetus" behind its suit—is economic. *Id.* at 452-53. But, here, Federal Defendants are not asking the Court to disregard RODA's allegations of environmental harm based on the theory that its "real" interest is economic; rather, RODA, regardless of its real interest, has not alleged any non-economic, environmental injuries.

The remaining cases cited by RODA are similarly inapposite. *See* Doc. No. 77 at 15 n.58 (citing *Lemon v. Geren*, 514 F.3d 1312 (D.C. Cir. 2008), and *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228 (D.C. Cir. 1996)); *id.* at 16 n.63 (citing *American Oceans Campaign v. Daley*, 183 F. Supp. 2d 1 (D.D.C. 2000)). Neither *Lemon* nor *Daley* addressed NEPA's zone of interests at all. *See Lemon*, 514 U.S. at 1315 (observing that the plaintiffs would feel the "*environmental* effects" if the action went forward) (emphasis added); *Daley*, 183 F. Supp. 2d at 9 (discussing allegations of aesthetic, environmental, and recreational injury). And, in *Glickman*, the D.C. Circuit held that, although the plaintiffs' monetary interests were outside NEPA's zone of interests, plaintiffs also had applicable aesthetic and environmental interests because they hiked, camped, and fished in the land at issue in that case. 92 F.3d at 1236. It was those environmental and aesthetic interests—not the economic ones—that brought the plaintiffs within NEPA's zone of interests.

Here, by contrast, RODA's members are all commercial enterprises who allege purely economic injuries. *See* Doc. No. 77-1 (Second Declaration of Anne Hawkins) at ¶¶ 4 – 9. That is true despite RODA's citation to the declaration of David Aripotch, who is owner of the fishing company Old Squaw Fisheries, Inc. *See* Doc. No. 77 at 8; Decl. of D. Aripotch (*Seafreeze* Doc.

No. 66-1). While Old Squaw Fisheries—the corporate entity and commercial fishery—is a member of RODA, Mr. Aripotch is not. *See* Doc. No. 77-1 ¶ 4. Thus, RODA cannot rely on alleged aesthetic or recreational injuries to non-RODA member Mr. Aripotch to establish RODA's prudential standing. Because the only injuries alleged by RODA and its members are purely economic, RODA lacks prudential standing to bring suit under NEPA.

## II. BOEM complied with OCSLA.

In accordance with section 8(p)(4)(I) of OCSLA, in approving Vineyard Wind's COP, BOEM ensured that the Project would not unreasonably interfere with other uses of the Outer Continental Shelf, including fishing. *See* 43 U.S.C. § 1337(p)(4)(I); BOEM_0076940-48 (BOEM Compliance Memorandum). Federal Defendants and RODA essentially agree on the applicable standard, i.e., a project may reasonably interfere with fishing and still be authorized. The disagreement lies in the actual impacts of the Vineyard Wind project on commercial and recreational fishing. RODA claims that fishermen will be excluded from the Project area, thus creating an unreasonable interference. But the record simply does not support that claim, and instead supports BOEM's conclusion.

RODA begins with a discussion of section 3(2) of OCSLA, which contains a broad declaration of policy. 43 U.S.C. § 1332. The relevant language states that activities (which at the time of enactment of this section were limited to oil and gas activities) shall be conducted "in such a manner that the character of the waters above the Outer Continental Shelf as high seas and the right to navigation and fishing therein shall not be affected." *Id.* § 1332(2). In the *Andrus* decision, the First Circuit interpreted subsection 3(2) to mean that, in granting mineral leasing rights, Interior may not interfere with "the legal right to fish." *Massachusetts v. Andrus*, 594 F.2d 872, 889 (1st Cir. 1979). The court found this section to be of "questionable significance" to the issue of the Secretary's legal obligation to protect fisheries from the environmental impacts of oil

and gas development. *Id.* at 889.

But the First Circuit then proceeded to analyze the Secretary's obligations under the 1978 amendments and section 5(a) of OCSLA in particular. Considering these other provisions of OCSLA, the court rejected the notion that the statute obligated the Secretary to conduct oil and gas development "absolutely without harm to fisheries" and instead held that the Secretary has the discretion "to harmonize the interests of the various resources wherever they impinge upon one another." *Id.* at 888-89.

Section 8(p)(4) of OCSLA contains language that is similar to section 5(a). *See* 43 U.S.C. § 1334(a) (providing that the Secretary may issue regulations "to provide for the prevention of waste and conservation of the natural resources of the outer Continental Shelf"). Thus, *Andrus* supports Interior's view that it may balance competing interests under OCSLA section 8(p). RODA points to language in the *Andrus* opinion stating that the Secretary may not authorize an oil and gas operation if it "poses too great a threat to a fishery . . . [and] the concept of balance rules out a policy based on sacrificing one interest to the other." *Andrus*, 594 F.2d at 889. As discussed below, however, the record in this case shows that fishing will be able to coexist with renewable energy development in the Project area, and therefore BOEM appropriately balanced fishing interests with renewable energy development.

RODA also argues that BOEM has an obligation under section 8(p)(4) of OCSLA to ensure that activities relating to renewable energy projects are "carried out in a manner that provides for . . . prevention of interference with reasonable uses (as determined by the Secretary) of the exclusive economic zone, the high seas, and the territorial seas," including "use for a

fishery . . . or navigation." Doc. No. 77 at 18 (quoting 43 U.S.C. § 1337(p)(4)(I)).[2] But, as

discussed in more detail in Federal Defendants' reply in the *Seafreeze* case, by using the phrase

"as determined by the Secretary," Congress delegated to the Secretary the authority to define the

phrase "prevention of interference with reasonable uses." *See Transitional Hosp. Corp. of La.,*

*Inc. v. Shalala*, 222 F.3d 1019, 1026 (D.C. Cir. 2000) (Through the use of the phrase "as

determined by the Secretary . . . , Congress has provided 'an express delegation of authority to

the agency to elucidate a specific provision of the statute by regulation.'" (*quoting Chevron,*

*U.S.A. v. Nat. Res. Defense Council*, 467 U.S. 837, 843-44 (1984)). Interior interpreted

"prevention of interference with reasonable uses" to mean that a proposed project must "not

unreasonably interfere with other uses of the [Outer Continental Shelf]." 30 C.F.R. § 585.621(c).

RODA appears to agree with that interpretation. *See* Doc. No. 77 at 18 ("BOEM had the

statutory duty to prevent unreasonable interference with fishing and navigation . . . .").

Suggesting that the Project's interference with fishing would be unreasonable, RODA

argues, as it did in its opening brief, that the Project "will exclude fishermen from their

traditional fishing grounds." Doc. No. 77 at 18. That is wrong. BOEM did not exclude fishermen

from the area. BOEM_0076944 ("[T]he Proposed Project would not limit the right to navigate or

fish within the Project area."). Moreover, the notion that fisherman will not be able to fish within

the Project area is also false. *See, e.g.*, BOEM_0076942 ("The navigational risk assessment

prepared for the Project shows that it is technically feasible to navigate and maneuver fishing

vessels and mobile gear through the [Project area].").

---

[2] RODA asserts that Federal Defendants did not address 43 U.S.C. § 1337(p)(4), but Federal
Defendants incorporated by reference their brief filed in *Seafreeze Shoreside, Inc. v. U.S.*
*Department of the Interior*, No. 1:22-cv-11091, Doc. No. 90, which discussed that provision as
length.

In an attempt to shore up its assertion that fishermen will be excluded from the Project area, RODA cites various record documents, but to no avail. As *Seafreeze* does, RODA argues that the record shows that the Project area would be abandoned by commercial fishermen. *See* Doc. No. 77 at 18. But, as RODA is aware, the statement was not made by BOEM (the agency that approved the COP); rather, the statement was initially included in the Corps ROD. BOEM_0076837. The Corps clarified, however, that its statement in the ROD was "based solely upon comments of interested parties submitted to BOEM during the public comment period for the [DEIS]," not based on an independent analysis conducted by the Corps. USACE_AR_014374; *see also, e.g.*, BOEM_0069602 (RODA comments asserting that it would not be possible for commercial fishermen to operate within the turbine array).

Nor was the Corps' initial statement, without the subsequent clarification, consistent with the FEIS or the record as a whole. In its ROD, BOEM explained that it had selected an alternative based, in part, on the Coast Guard's recommendations regarding the spacing and orientation of turbines designed to reduce the impacts on marine navigation and fishing. BOEM_0076822-23. The FEIS found that fishing vessels would be able to navigate within the turbine array and that the alternative recommended by the Coast Guard would improve the ability of fishing vessels to maneuver within the project area and minimize the conflict between vessels using mobile and fixed gear. BOEM_0068718, 68730, 68743. RODA's argument that fishermen would abandon the Project area is simply not consistent with the record.

RODA cites a number of other documents, Doc. No. 77 at 18-19, but none of them support the argument that fishermen will be excluded from the Project area. Certainly, the FEIS shows that there would be moderate impacts to fishing, USACE_AR_008784, and that there will

be impacts to related businesses as well. USACE_AR_009702-03.[3] And there also may be

additional fuel costs. USACE_AR_008699. The FEIS also points out that fishing vessels may

not have access to some areas during construction. USACE_AR_008699. RODA, however, does

not cite any record support for the proposition that fishermen will be excluded from the Project

area. To the contrary, the record shows that interference with fishing and other uses of the Outer

Continental Shelf would be reasonable, and on that point Federal Defendants incorporate by

reference the arguments made in their reply brief in the *Seafreeze* case.

## III.   The Corps fully considered all aspects of the Project within its permitting authority.

### A.   RODA's claims against the Corps are waived.

RODA argues that its failure to comment on the Corps' proposed permit does not waive

its challenge to that permit because, when the Corps solicited public comments, its public notice

described a cable corridor of 23.3 miles, rather than the 39.4 mile corridor that the Corps

ultimately permitted. Doc. No. 77 at 20-22. First, RODA simply ignores the fact that, as Federal

Defendants explained, the full mileage covered by all Corps permits was fully described in the

draft EIS and other pre-permit and pre-public notice documents. Doc. No. 60 at 33 (citing those

documents). RODA had ample opportunity to comment on potential impacts from the full length

of the cable, yet it failed to submit any comments whatsoever on the impacts of the cable at any

length, either in response to the Corps' call for comments or in response to the DEIS or SEIS,

which set out and analyzed the full length of the cable corridor.

More importantly, as previously detailed – and as RODA confirms in its opposition (pp.

20-23) – RODA's claim with regard to the Corps is strictly limited to alleged violation of Section

404 of Clean Water Act ("CWA"), which covers only the first 23.3 miles of the cable, which is

---

[3] RODA cites to the Army Corps record in this portion of its opposition, and therefore Federal
Defendants do as well.

the portion within the territorial seas covered by the CWA. Doc. No. 60 at 7, 34-35. RODA continues to admonish the Corps because "Vineyard Wind's [CWA] Section 404 Permit Application explicitly describes the Project's cable mileage as 23.3. miles." Doc. No. 77 at 22. But that is because this is exactly the cable length approved by the Corps under Section 404 of the CWA, which is all RODA is challenging. The Corps need not assert that RODA waived its challenge to the Corps permit issued under Section 10 of the Rivers and Harbors Act ("RHA"), which covers the last 16.1 miles of the cable corridor, because RODA has not challenged the RHA permit in this case. RODA can hardly contend that it was not given the opportunity to comment, when it was expressly invited to comment on the Corps' analysis of impacts on the exact – and only – portion of the cable RODA is challenging in this action. Having failed to provide the Corps the opportunity during the administrative process to address its concerns with regard to the CWA permit RODA is now challenging, RODA's challenge to that permit is waived.

### B. The Corps' review of the impacts from work on the entire cable corridor was adequate and is unchallenged.

Although RODA does not challenge the Corps' issuance of the Section 10 RHA permit applicable to the balance of cable corridor beyond the territorial seas, RODA keeps insisting that the Corps did not consider the impacts from the rest of the cable corridor, citing to no authority for its allegation. Doc. No. 77 at 20, 21. As Federal Defendants detailed, the Corps did, in fact, analyze the impacts of work on the full cable length and related scour protection, and in fact reviewed potential impacts of a cable length 10 miles greater than that ultimately approved. Doc. No. 60 at 34-36 and n.22 (citing specific instances of the Corps' review of impacts along the entire cable corridor). Not only does RODA's reply brief fail to assert that these examples of the

Corps' consideration and review of such impacts are inadequate, RODA fails to address them at all.

### C.  The Corps properly considered alternatives.

As the Federal Defendants explained, RODA identified no alternatives that would, when compared with the approved Project, reduce impacts in the 23.3-mile corridor, the area that is the subject of RODA's claim that the CWA permit issued by the Corps should be vacated. Doc. No. 60 at 46-47. RODA's reply brief is similarly silent on this issue. Indeed, as explained, the only alternative proposed by either RODA or the Seafreeze plaintiffs, Alternative F, calls for a similar cable with similar impacts. *Id*. RODA makes no attempt to explain why the impacts from work on the cable under Alternative F are acceptable but such impacts from the work on the cable under the approved alternative are not acceptable.

Nevertheless, RODA resurrects its argument that the Corps failed to consider alternatives, while conceding that the Corps examined a land-based alternative, a no-action alternative, two off-site alternatives, and seven different on-site alternatives. Doc. No. 77 at 23. The Corps explained how many of these alternatives would have significantly greater impacts than the approved Project. Doc. No. 60 at 39, citing the record. RODA does not respond.

Instead, ignoring these findings, RODA simply reiterates its argument that the Corps unduly limited alternatives because it defined the purpose of the Project as providing renewable energy from wind turbines to provide power to homes and businesses in Massachusetts. Doc. No. 77 at 23-24. As the Corps explained, both applicable regulations and the case law make clear that the Corps is *required* to consider the permit applicant's objectives in assessing and considering alternatives, as well as those of the State. Doc. No. 60 at 40-41. RODA makes no attempt to address either the cited regulatory requirements or the cases setting forth this principle.

Finally, RODA continues to argue that the Corps may not issue a permit if there are any

10

practicable alternatives, doing nothing more than including a citation to 40 C.F.R. § 230.10. As previously explained, this provision presumes that there exists a practicable alternative with fewer impacts *only* where the project impacts a special aquatic site. Doc. No. 60 at 37-39. The Project at issue here does not involve cable work or scour protection in a special aquatic site and RODA's reply brief makes no claim that it does, rendering the presumption RODA relies upon inapplicable. Furthermore, although now having submitted several briefs, RODA identifies no alternative that both accomplishes the project's purpose and results in fewer impacts as it relates to the discharge of dredged or fill material in the territorial seas, which is the only matter to be considered in the issuance of a CWA § 404 permit.

> ### D. The Corps properly considered cumulative impacts.

As previously detailed, while the Corps relied on BOEM's analysis of cumulative impacts, it also independently considered cumulative impacts that other wind projects in the area would cause with regard to matters within its regulatory jurisdiction, effects from fill and scour protection. Doc. No. 60 at 41-43. Both the Corps and BOEM cited specific examples of how they considered cumulative impacts from other projects as they relate specifically to the effects of fill in the cable corridor. *Id.* Failing to respond to these examples, RODA's argument on this point clearly is unsupported.

## IV.   Federal Defendants complied with the ESA.

On May 7, 2021, BOEM requested reinitiation of consultation with NMFS/GAR to consider the potential impacts of monitoring surveys, which BOEM had proposed as conditions of COP approval. BOEM_0076721-22. As described in BOEM's letter reinitiating consultation and again in its Biological Assessment Supplement, the planned monitoring surveys include: a demersal trawl survey (finfish and squid); American Lobster, Black Sea Bass, Larval Lobster Abundance Survey, and Lobster Tagging study; optical benthic habitat survey; passive acoustic

monitoring studies; bottom profiling (cables and scour protection monitoring); plankton tows; and, underwater debris surveys. *See* NMFS 17188. RODA incorrectly asserts that "jeopardy to the endangered whale was unknown" when BOEM signed the Record of Decision ("ROD"). Doc. No. 77 at 30.

Before issuing the ROD, BOEM reviewed the existing 2020 "no jeopardy" BiOp. BOEM_0076935. And in its May 2021 Biological Assessment Supplement, BOEM concluded that the planned monitoring surveys to be analyzed as part of the reinitiated consultation with NMFS were not likely to adversely affect right whales. BOEM_0076723-49; *see also* BOEM_0208700-11 (Doc. No. 27-2) (BOEM memorandum documenting its conclusion that the project would not jeopardize listed species or destroy or adversely modify their habitat). BOEM reasonably determined—based on the record that existed at the time—that it could proceed with approving the Vineyard Wind COP without causing jeopardy to the right whale pursuant to ESA Sections 7(a)(2) and 7(d), 16 U.S.C. § 1536(a)(2), (d). BOEM made an express determination that approval of the COP with conditions would not jeopardize the continued existence of ESA-listed species nor destroy or adversely modify designated critical habitat. BOEM_0208700 (Doc. No. 27-2) (hereinafter "ESA 7(a)(2)/7(d) memorandum").

ESA Section 7(d) provides that, during the pendency of consultation, an action agency may not make "any irreversible or irretrievable commitment of resources" which would "foreclose[e]the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2) of this section" that might be developed during the consultation. 16 U.S.C. § 1536(d).[4] Here, BOEM made no such "irreversible or

---

[4] By referring to "reasonable and prudent alternative measures which would not violate subsection (a)(2) of this section," Congress was clearly referring to "reasonable and prudent alternatives" as defined in 16 U.S.C. § 1536(b)(3)(A). If the consulting agency concludes that the

irretrievable commitment of resources." Rather, BOEM's decision to issue the ROD prior to

conclusion of the reinitiated consultation was reasonable based on the proposed project activities

and corresponding schedule. No in-water construction work associated with the Project, such as

pile driving, was authorized to occur before the reinitiated consultation was complete.

BOEM_0077152 (Condition 1.2) ("This COP approval does not authorize the commencement of

Outer Continental Shelf (OCS) construction activities prior to June 1, 2022."). *See also*

BOEM_0208699 (High-level Construction Plan). BOEM also ensured that the planned fishery

monitoring surveys—which were the subject of reinitiated consultation—would not occur prior

to completion of the reinitiated consultation. BOEM_208709 (Doc. No. 27-2). *See also*

BOEM_077186 (COP approval letter) ("The surveys *must not commence* until BOEM has

notified the Lessee that all necessary ESA section 7 consultations addressing this action have

concluded.") (emphasis added). And BOEM expressly conditioned the COP approval on the

applicant's compliance with all terms and conditions of any biological opinion resulting from the

reinitiated consultation. BOEM_0077152 ("Activities authorized herein will be subject to any

terms and conditions and reasonable and prudent measures resulting from a BOEM-reinitiated

consultation for the Project's BiOp."). BOEM's determination was entirely consistent with ESA

Section 7(d) and simultaneously fulfilled the Corps' ESA responsibilities, because BOEM was

the lead agency for purposes of consultation with NMFS. *See* 50 C.F.R. § 402.07; USACE AR

---

proposed agency action would place the listed species in jeopardy or destroy or adversely modify
its critical habitat, "the Secretary shall suggest those reasonable and prudent alternatives which
he believes would not violate [section 7(a)(2)] and can be taken by the Federal agency . . . in
implementing the agency action." 16 U.S.C. § 1536(b)(3)(A). "Reasonable and prudent
measures" are provided by the consulting agency in an incidental take statement (ITS) where, as
here, the action is not likely to jeopardize the species, but will nonetheless result in the
"incidental take" of members of the species. 16 U.S.C. § 1536(b)(4)(ii); 50 C.F.R. §
402.14(i)(1)(i-v).

000019.

RODA's cited authorities do not support their assertion that BOEM's decision to approve the Vineyard Wind COP pending completion of the reinitiated consultation was "per se arbitrary and capricious." Doc. No. 77 at 31. *Defenders of Wildlife v. U.S. Environmental Protection Agency*, 420 F.3d 946, 976 (9th Cir. 2005), was reversed by the Supreme Court, which concluded that the agency action at issue was not itself a "discretionary" federal agency action subject to ESA consultation. *National Ass'n of Home Builders v. Defenders of Wildlife,* 551 U.S. 644, 673 (2007). In *Center for Biological Diversity v. National Marine Fisheries Service*, 977 F. Supp. 2d 55, 89 (D.P.R. 2013), the court reviewed the biological opinion concerning federal management of the reef fish fishery of Puerto Rico and the U.S. Virgin Islands and held that the incidental take statement ("ITS") lacked a meaningful trigger for reinitiation of consultation if the effects of the federal action exceed the level predicted by NMFS. The court further concluded that NMFS in its role as an action agency could not rely on a biological opinion and ITS had that been declared to be legally insufficient for purposes of defending against ESA citizen-suit claims. *See id* at 91. Similarly, in *Center for Biological Diversity v. U.S. Bureau of Land Management*, 698 F.3d 1101, 1128 (9th Cir. 2012), the court held that an action agency could not continue to rely on a vacated biological opinion to satisfy its substantive ESA obligation to avoid jeopardy. By contrast, here, neither the 2020 BiOp nor the 2021 BiOp has been declared legally insufficient for purposes of avoiding jeopardy to right whales.

In *NRDC v. Houston*, 146 F.3d 1118, 1125 (9th Cir. 1998), the court concluded that the discretionary act of executing 40-year contracts that did not permit a reduction in the quantity of water delivered under those contracts for conservation purposes prior to completion of consultation pursuant to ESA Section 7(a)(2) constituted an irretrievable and irreversible

14

commitment of resources in violation of ESA Section 7(d). *Id.* at 1128. Thus, the execution of water service contracts prior to completion of consultation in that case did not, by itself, trigger a violation of ESA Section 7(d). In contrast to the contracts at issue in *Houston*, here, there was no irretrievable and irreversible commitment of resources because "BOEM is not expending, and does not have to expend, any financial resources, enter into any binding agreements or commit other resources, and is not requiring any other party to do so, for fishery monitoring using ventless traps and trawls until consultation is complete under section 7 of the ESA." BOEM_208709 (Doc. No. 27-2).

None of RODA's cited cases addresses the situation presented here, where an action agency makes a determination pursuant to ESA Section 7(d) to proceed with an action pending completion of a reinitiated consultation. In its 7(d) determination, BOEM clearly explained that consultation was being reinitiated to consider effects of monitoring activities that were not considered in the 2020 BiOp. BOEM_208701 (Doc. No. 27-2). Contrary to RODA's suggestion, Doc. No. 77 at 41, reinitiation of ESA consultation under these circumstances is specifically provided for in the ESA regulations. 50 C.F.R. § 402.16(a)(3). RODA does not point to any purported inadequacy with respect to BOEM's determination in its ESA 7(a)(2)/7(d) memorandum, BOEM_0208700 (Doc. No. 27-2), based on: the existing 2020 BiOp; the BA Supplement; and the proposed COP conditions that would have precluded BOEM from approving the COP in reliance on the ESA 7(a)(2)/7(d) memorandum pending completion of a new BiOp addressing effects of the action including the monitoring activities.

However, RODA's 7(d) assertions suffer from a more fundamental flaw, as its argument is ultimately moot. Even if RODA could show that there was some conceivable error in BOEM signing the ROD and approving the COP during the pendency of the reinitiated consultation, any

15

such error is harmless in light of the fact that the reinitiated consultation *is now complete*. RODA's claims concerning BOEM's decision to approve the COP with conditions—in reliance on the NMFS's 2020 BiOp, its own Biological Assessment, and its own ESA Section 7(d) determination—have been rendered moot as a result of BOEM's decision to adopt the 2021 BiOp pursuant to 50 C.F.R. § 402.15(a).[5] BOEM_0077789 ("Because the activities authorized under BOEM's COP approval—including the monitoring surveys—are subject to the terms and conditions and reasonable and prudent measures found in the 2021 BiOp, no further action is required in order for Vineyard Wind to proceed with construction and operation of the Project."). In the 2021 BiOp, which RODA did not challenge in its Complaint, NMFS still found that the federal actions, including the monitoring surveys, were not likely to jeopardize the continued existence of listed species. NMFS 0017558 (2021 BiOp). Notwithstanding RODA's disagreement with BOEM's decision to approve the COP prior to issuance of the 2021 BiOp, the record before the Court confirms that BOEM has completed the required ESA consultation that culminated in the 2021 BiOp.[6]

---

[5] Likewise, to the extent that RODA's Fourth Cause of Action may be construed as challenging the merits of the 2020 BiOp, RODA concedes that NMFS published a "superseding Biological Opinion" on October 18, 2021. Doc. No. 1 at ¶ 44. No interest would be served by ruling on the merits of the 2020 BiOp (or BOEM's decision to rely on the 2020 BiOp for purposes of COP approval) now that it has been superseded by the 2021 BiOp. *Oceana, Inc. v. Evans*, No. 03-10570-GAO, 2004 WL 1730340, *3, (D. Mass. July 30, 2004).

[6] With respect to any claims concerning the merits of BOEM's decision to rely on the 2021 BiOp, we continue to incorporate by reference the ESA-related arguments set forth in Federal Defendants' summary judgment briefing in the *ACK Residents* case. *ACK Residents Against Turbines v. BOEM*, No. 1:21-cv-11390-IT, Doc. Nos. 96 & 114.

V.    **Federal Defendants complied with NEPA by analyzing cumulative impacts.**

RODA's opening brief asserted that Federal Defendants "failed to analyze the cumulative impacts the Government's expansive offshore wind program will have on the fishing industry." Doc. No. 53 at 38. In our opening brief, we explained that the FEIS contains an extensive analysis of cumulative impacts, including cumulative impacts to commercial and for-hire recreational fisheries. Doc. No. 60 at 16-17. In particular, Section 3.10.1.1 of the FEIS discusses potential impacts to fisheries from future offshore wind activities other than the Vineyard Wind project. *Id.* (citing BOEM_0068707-14). The FEIS then analyzes the additional cumulative impacts of each Vineyard Wind-related alternative. *See, e.g.*, BOEM_0068728 (discussing cumulative impacts of Alternative A); BOEM_0068729 (same for Alternative C); BOEM_0068731 (same for Alternative D); BOEM_0068731-32 (same for Alternative E); BOEM_0068733 (same for Alternative F). We further explained that Appendix A in Volume II of the FEIS set out BOEM's methodology for analyzing cumulative impacts. Doc. No. 60 at 17 (citing BOEM_0068796-0068975). And we pointed the Court to Section A.4 and Table A-4, which describe in depth the offshore wind projects and related assumptions that BOEM utilized in its cumulative impacts/planned action analysis. *Id.* (citing BOEM_0068808-16).

RODA does not offer a single criticism of BOEM's analysis, much less explain how it is arbitrary or capricious. Instead, RODA continues to ignore the record and assert that the analysis does not exist. *See* Doc. No. 77 at 35 ("The Court will look in vain for a discussion of the combined (cumulative) effects . . . ."). But, as Federal Defendants have already established, the FEIS itself proves that assertion to be false. Doc. No. 60 at 16-17. There can be no serious question that the FEIS analyzed cumulative impacts. RODA does not offer any basis on which the Court could find that analysis arbitrary or capricious.

RODA's next claim—that BOEM "discounts" its NEPA obligations by discussing the

17

funds that Vineyard Wind established to compensate fisherman—lacks any basis in law or fact. *See* Doc. No. 77 at 36. RODA argues that "monetary compensation does not reduce or mitigate environmental impacts." *Id.* That may be true as far as it goes, but it is irrelevant here for two reasons. First, as established in our opening brief, NEPA does not create any duty for agencies to mitigate adverse environmental effects. *See* Doc. No. 60 at 17. Instead, the applicable regulations require an agency to *discuss* potential mitigation. *Id.* (citing 40 C.F.R. §§ 1502.14(f) and 1502.16(h)). RODA does not challenge that legal standard in its opposition. It also does not (and cannot) establish that the FEIS fails to satisfy that standard. *Id.*

Second, RODA's argument fails because the compensation funds are not intended to compensate for *environmental* impacts; they are to compensate fishermen for *economic* impacts—namely, "damage to or loss of fishing gear due to collision with" project infrastructure, and "documented loss of income due to inability of fishing vessels to access previously fished locations within the [Wind Development Area] and temporary loss of use during cable maintenance." BOEM_0068720; *see also* BOEM_0068721 (discussing fishing gear, navigational equipment, insurance and other things that may be purchased with funds from the Rhode Island Fishermen's Future Viability Trust established by Vineyard Wind and the Rhode Island Coastal Resources Council pursuant to Rhode Island's coastal management law). The inclusion of compensation funds does not—and was never intended to—affect Federal Defendant's disclosure obligations under NEPA which, as discussed above, the FEIS satisfied.

Finally, RODA contends that Federal Defendants failed to respond to its argument that the FEIS "lacks an adequate no-action alternative." Doc. No. 77 at 37. But RODA does not explain why it thinks the no action alternative was inadequate, nor point to any such argument in its opening brief. *Id.* Federal Defendants could not locate any mention of the FEIS's no action

alternative in RODA's opening brief. Nevertheless, in each subsection of Chapter 3, the FEIS discusses the potential impacts of the No Action Alternative for each potentially affected resource. RODA offers no explanation of why this is insufficient, and its argument should therefore be rejected.

## VI.    Federal Defendants are entitled to summary judgment on RODA's Jones Act claim.

In our opening brief, we argued that RODA lacked standing to bring a Jones Act claim, and that its Jones Act claims also failed on the merits. Doc. No. 60 at 14-15, 48-49. Because RODA fails to respond to a single argument concerning the Jones Act—or even mention the Act—RODA has conceded those arguments. Federal Defendants are therefore entitled to summary judgment on RODA's Sixth Cause of Action, *see* Doc. No. 1 at 66. *See Trindade v. Grove Servs., Inc.*, 2020 WL 6566509, at *4 (D. Mass. Nov. 9, 2020) (plaintiff waived claim by failing to respond to defendants' motion in opposition brief); *see also United States v. DiBiase Salem Realty Trust*, 1993 WL 729662, at n.6 (D. Mass. Nov. 19, 1993) (because plaintiff failed to respond to United States' argument in brief opposing summary judgment, the court "consider[ed] the point conceded").

## VII.    If the Court finds a legal error, it should remand without vacatur.

As explained above, summary judgment should be granted in favor of Federal Defendants. If the Court were to find any legal deficiency, however, it should exercise its discretion to remand the agency decision(s) without vacatur. A court's decision to remand without vacatur "depends inter alia on the severity of the errors, the likelihood that they can be mended without altering the order, and on the balance of equities and public interest considerations." *Central Me. Power Co. v. FERC*, 252 F.3d 34, 48 (1st Cir. 2001) (citing *Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin.*, 920 F.2d 960, 966–67 (D.C. Cir.1990)). Here, even if RODA had demonstrated that the agencies committed any legal

errors, the errors RODA alleges to have occurred could be corrected without altering the ultimate

decision. The equities and public interest also would favor allowing this Project to proceed

during the course of any remand. To the extent there is any doubt on this score, Federal

Defendants request that the Court provide an opportunity for arguments as to any appropriate

remedy.

## CONCLUSION

Before issuing the approvals challenged in this lawsuit, Federal Defendants conducted an

extensive, multi-year environmental review. That process involved coordination among multiple

federal agencies and other state and local stakeholders. It included more than a dozen public

meetings and thousands of public comments, including numerous comments from RODA. The

record in this case confirms that, in carrying out their environmental review, Federal Defendants

fully complied with their statutory and regulatory obligations. For the foregoing reasons, and

those set out in our opening brief, Doc. No. 62, the Court should grant summary judgment on all

claims in favor of Federal Defendants.

Respectfully submitted,

DATED:  March 7, 2023

*Of Counsel:*

PEDRO MELENDEZ-ARREAGA
Lead Attorney-Advisor
Offshore Renewable Energy Team
Division of Mineral Resources
Office of the Solicitor
U.S. Department of the Interior
1849 C Street, NW
Washington, D.C. 20240
(202) 513-7759
pedro.melendez-arrea@sol.doi.gov

MATTHEW J. HARRIS
Assistant District Counsel
U.S. Army Corps of Engineers
New England District
696 Virginia Road
Concord, MA 01742
 (978) 318-8244
matthew.j.harris@usace.army.mil

Lea Tyhach
Attorney - Advisor
National Oceanic and Atmospheric
Administration
Office of General Counsel
Northeast Section
55 Great Republic Drive
Gloucester, MA 01930
(978) 281-9242
lea.tyhach@noaa.gov

TODD KIM
Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division

*/s/ Perry M. Rosen*
PERRY M. ROSEN
Environmental Defense Section
P.O. Box 7611
Washington, DC 20044-7611
Tel: (202) 353-7792
E-mail: perry.rosen@usdoj.gov

*/s/ Mark A. Brown*
MARK ARTHUR BROWN
Senior Trial Attorney
Wildlife and Marine Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Tel: (202) 305-0204
Fax: (202) 305-0275
E-mail: mark.brown@usdoj.gov

*/s/ Angela N. Ellis*
LUTHER L. HAJEK
ANGELA ELLIS
Trial Attorney
Natural Resources Section
999 18th St., South Terrace, Suite 370
Denver, CO 80202
Tel: (303) 844-1376
Fax: (303) 844-1350
E-mail: luke.hajek@usdoj.gov

*Attorneys for Federal Defendant*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of said filings to the attorneys of record for Plaintiff and all other parties, who have registered with the Court's CM/ECF system.

So certified this 7th day of March, 2023 by

<u>/s/ *Angela N. Ellis*    </u>
Angela N. Ellis
Counsel for Federal Defendants