UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SEAFREEZE SHORESIDE, INC., et al., | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Case No. 1:22-cv-11091-IT |
| | * | |
| THE UNITED STATES DEPARTMENT | * | |
| OF THE INTERIOR, et al., | * | |
| | * | |
| Defendants, | * | |
| | * | |
| and | * | |
| | * | |
| VINEYARD WIND 1, LLC, | * | |
| | * | |
| Intervenor-Defendant. | * | |

* * * * * * * * * * * * * * * * * * * * * * * * *

| | | |
|---|---|---|
| RESPONSIBLE OFFSHORE | * | |
| DEVELOPMENT ALLIANCE, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Case No. 1:22-cv-11172-IT |
| | * | |
| UNITED STATES DEPARTMENT | * | |
| OF THE INTERIOR, et al., | * | |
| | * | |
| Defendants, | * | |
| | * | |
| and | * | |
| | * | |
| VINEYARD WIND 1, LLC, | * | |
| | * | |
| Intervenor-Defendant. | * | |

MEMORANDUM & ORDER

October 12, 2023

TALWANI, D.J.

Plaintiffs Seafreeze Shoreside, Inc. ("Seafreeze Shoreside"), Long Island Commercial

Fishing Association, Inc. ("LICFA"), XIII Northeast Fishery Sector, Inc. ("Sector XIII"),

Heritage Fisheries, Inc. ("Heritage Fisheries"), Nat. W., Inc. ("Nat. W.") and Old Squaw

Fisheries, Inc. ("Old Squaw") (collectively, the "Seafreeze Plaintiffs") and Plaintiff Responsible

Offshore Development Alliance ("Alliance") brought the above-captioned lawsuits challenging

actions taken by several federal agencies and associated officials in the approval of an offshore-

wind energy project to be constructed and operated by Intervenor-Defendant Vineyard Wind 1

LLC ("Vineyard Wind") in the Outer Continental Shelf off the coast of Martha's Vineyard and

Nantucket, Massachusetts (the "Vineyard Wind Project" or the "Project").[1]

Before the court in a consolidated proceeding are cross-motions for summary judgment in

Seafreeze, 1:22-cv-11091, see Plaintiffs' Motion for Summary Judgment, Doc. No. 66,

Defendants' Motion for Summary Judgment, Doc. No. 72, Vineyard Wind's Motion for

Summary Judgment, Doc. No. 86; and in Responsible, 1:22-cv-11172, see Plaintiff's Motion for

Summary Judgment, Doc. No. 52, Defendants' Motion for Summary Judgment, Doc. No. 59,

Vineyard Wind's Motion for Summary Judgment, Doc. No. 73. For the reasons that follow,

Plaintiffs' Motions for Summary Judgment are DENIED and Defendants' and Vineyard Wind's

Motions for Summary Judgment are GRANTED.

---

[1] Seafreeze Shoreside, Inc., et al. v. The United States Dept. of the Interior, et al., 1:22-cv-11091,
and Responsible Offshore Development Alliance v. United States Dept. of the Interior, et al.,
1:22-cv-11172, are referred to herein by their respective case numbers.

Two other challenges to the Project were filed in this District and are now on appeal. See Melone
v. Coit, et al., 1:21-cv-11171-IT, appeal docketed, No. 23-1736 (1st Cir. Sept. 8, 2023);
Nantucket Residents Against Turbines et al. v. U.S. Bureau of Ocean Energy Mgmt., 1:21-cv-
11390-IT, appeal docketed, No. 23-1501 (1st Cir. June 13, 2023), (together "the Related
Actions").

## I.    Background

### A.    Procedural Background

The Procedural Background is set forth in detail in the court's <u>Memorandum and Order</u>, 1:22-cv-11091, Doc. No. 137; 1:22-cv-11172, Doc. No. 104, denying Plaintiffs' <u>Motions to Strike Documents from and Supplement the Administrative Record</u>, 1:22-cv-11091, Doc. No. 56; 1:22-cv-11172, Doc. No. 43, and is incorporated by reference herein.

### B.    Background Concerning the Project

The Background Concerning the Project is also set forth in detail in the court's <u>Memorandum and Order</u>, 1:22-cv-11091, Doc. No. 137; 1:22-cv-11172, Doc. No. 104, and is incorporated by reference herein. The Background Concerning the Project is derived from the Administrative Record common to the pending challenges and the Related Actions.[2]

The following further background concerning the Project is also drawn from the Administrative Record, is specific to the pending challenges, and was not at issue in the Related Actions.

In considering Vineyard Wind's application for a permit under Section 404 of the Clean Water Act ("Section 404 Permit") pertaining to the discharge of dredged and fill materials that would occur along a 23.3 mile long corridor as part of Vineyard Wind's installation of the wind energy facility, electronic service platforms, connections between the wind turbine generators,

---

[2] Certified Indices of the Administrative Record and addenda were docketed electronically, <u>see</u> 1:22-cv-11091, Federal Defendants' Notices, Doc. Nos. 26, 30, 34, 36; 1:22-cv-11172, Federal Defendants' Notices, Doc. Nos. 17, 23; portions of the Administrative Record reflected in the parties briefing are docketed electronically as part of the parties' <u>Joint Appendices</u> filed in connection with the cross-motions for summary judgment, 1:22-cv-11091, Doc. Nos. 104, 105; 1:22-cv-11172, Doc. Nos. 97, 98.

service platforms, and export cables, the Army Corps of Engineers ("Corps") considered the practicability of the following alternatives to the proposed Vineyard Wind Project: (a) one no-action alternative; (b) a largely land-based alternative; (c) alternatives that would bring the cable on shore in a different location; (d) two off-site alternatives in other zones of the ocean; and (e) seven different on-site alternatives identified by Bureau of Ocean Energy Management ("BOEM") in the Environmental Impact Statement ("Final EIS"). Joint Record of Decision ("Joint ROD"), BOEM_0076799 at -6830-31.

The Corps stated that in order to consider an alternative "practicable," the alternative "must be available, achieve the overall project purpose (as defined by USACE) and be feasible when considering cost, logistics, and existing technology." Id.

In issuing the Section 404 Permit to Vineyard Wind, the Corps imposed certain "Special Conditions" on Vineyard Wind as the permittee, including compliance with all "mandatory terms and conditions to implement the reasonable and prudent measures that are associated with 'incidental take' that is also specified in the [Biological Opinion ('BiOp')]." The Permit further specified that the Permit is conditional on Vineyard Wind's "compliance with all of the mandatory terms and conditions associated with incidental take of the attached [BiOp], and any future [BiOp] that replaces it, which terms and conditions are incorporated by reference into this [P]ermit." Dep't of Army Permit, USACE_AR_012635 at -36.

### C.    Plaintiffs' Pending Claims

In reviewing the pending motions, the court considers the following claims asserted by Plaintiffs.

*1.   Claims under the Administrative Procedure Act ("APA") for Violations of the Endangered Species Act*

Plaintiffs allege that Defendant National Marine Fisheries Service ("NMFS") violated Section 7 of the Endangered Species Act ("ESA"), 16 U.S.C. § 1536, and attendant regulations by failing during the 2020 biological consultation process (i) to consider the cumulative effects of the proposed Project to endangered species or their habitat (1:22-cv-11091, 9th Claim for Relief), or (ii) to inform BOEM of alternatives to the proposed Project that would avoid harming endangered species (1:22-cv-11091, 10th Claim for Relief), and that Defendants violated the ESA and its implementing regulations by approving the Vineyard Wind Construction Operations Plan ("COP") and issuing the Section 404 Permit without a valid BiOp (1:22-cv-11172, Count 3).[3]

*2.   Claims under the APA for Violations of the Clean Water Act*

Next, Plaintiffs allege that the Corps violated the Clean Water Act ("CWA"), 33 U.S.C. § 1251, et seq., and attendant regulations in issuing the Section 404 Permit pertaining to the dredge and fill activities associated with the Project by (i) failing to review practicable

---

[3] The Seafreeze Plaintiffs' ESA claims set forth in their 6th, 7th, 8th, 11th, 12th, 13th, 14th, 15th, and 16th Claims for Relief, 1:22-cv-11091, Complaint, Doc. No. 1, and portions of the Alliance's Count 3 asserting Defendants violated the ESA by (i) approving minimal mitigation measures to protect the safety of endangered species, and (ii) failing to rely on the best scientific and commercial data available, 1:22-cv-11172, Complaint, Doc. No. 1, are waived where neither the Seafreeze Plaintiffs nor the Alliance briefed these claims. And although Seafreeze Shoreside and the Alliance submitted 60-day notice of intent to sue letters as required under the ESA to commence a citizen-suit, 16 U.S.C. § 1540(g)(2)(A)(i), those letters did not assert any violations pertaining to the 2021 BiOp. Accordingly, Plaintiffs' ESA challenges to the BiOp are limited to the 2020 BiOp.

alternatives to the Project outside of the Lease Area[4] (1:22-cv-11091, 17th Claim for Relief; 1:22-cv-11172, Counts 2.2, 2.3), and (ii) failing to consider the cumulative effects of multiple similar projects in issuing the Section 404 Permit (1:22-cv-11172, Count 2.4).[5]

       3.     *Claims under the APA for Violations of the Marine Mammal Protection Act*

Next, Plaintiffs allege that NMFS violated the Marine Mammal Protection Act ("MMPA"), 16 U.S.C. § 1371, and attendant regulations in issuing the Incidental Harassment Authorization ("IHA") (i) by failing to provide evidence that the Project will only affect "small numbers," have a "negligible impact" on marine mammal species, or be completed within one year of issuance of the IHA (1:22-cv-11091, 22nd Claim for Relief), and (ii) by improperly relying on defects in the Corps' CWA review, rendering the issuance of the IHA arbitrary and capricious (1:22-cv-11172, Count 5).[6]

       4.     *Claims under the APA for Violations of the National Environmental Protection Act*

Next, Plaintiffs allege that Defendants violated various provisions of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332, and attendant regulations throughout the Project review process by:

---

[4] The Lease Area covers the 166,886 acres of the Outer Continental Shelf leased by BOEM to Vineyard Wind on April 1, 2015. See 1:22-cv-11172, Mem. & Order 5, Doc. No. 104.

[5] The Seafreeze Plaintiffs' CWA claims set forth in their 18th, 19th, and 20th Claims for Relief, 1:22-cv-11091, Complaint, Doc. No. 1, and the Alliance's CWA claims set forth in Counts 2.1, 2.5, and 2.6, 1:22-cv-11172, Complaint, Doc. No. 1, are also waived where neither the Seafreeze Plaintiffs nor the Alliance briefed these claims.

[6] The Seafreeze Plaintiffs' MMPA claim set forth in their 21st Claim for Relief, 1:22-cv-11091, Complaint, Doc. No. 1, is also waived where neither the Seafreeze Plaintiffs nor the Alliance briefed this claim.

(i)     defining the purpose of the Action in connection with the Vineyard Wind COP too narrowly (1:22-cv-11091, 23rd Claim for Relief; 1:22-cv-11172, Count 4.4);

(ii)    failing to properly consider a range of alternatives to the COP (1:22-cv-11091, 24th Claim for Relief; 1:22-cv-11172, Count 4.1);

(iii)   failing to comply with requirements for analyzing cumulative impacts of the Project (1:22-cv-11091, 25th Claim for Relief; 1:22-cv-11172, Count 4.2);

(iv)   failing to take reasonable steps considering the lack of information relevant to reasonably foreseeable significant adverse impacts (1:22-cv-11091, 26th Claim for Relief);

(v)    limiting the scope of the Final EIS to the Vineyard Wind Project Area (1:22-cv-11091, 27th Claim for Relief);

(vi)   failing to make diligent efforts to involve the public in the NEPA process (1:22-cv-11091, 28th Claim for Relief);

(vii)  inadequately addressing and disclosing comments submitted by the public (1:22-cv-11091, 29th, 30th Claims for Relief; 1:22-cv-11172, Count 4.5);

(viii) failing to prepare an EIS prior to issuing the Lease (1:22-cv-11091, 31st Claim for Relief; 1:22-cv-11172, Count 4.6);

(ix)   improperly segmenting the NEPA analysis (1:22-cv-11091, 32nd Claim for Relief; 1:22-cv-11172, Count 4.6);

(x)    relying on outdated NEPA regulations (1:22-cv-11091, 33rd Claim for Relief; 1:22-cv-11172, Count 4.7);

(xi)   withdrawing the EIS and reinitiating it without supplementing to account for design changes (1:22-cv-11172, Count 4.3);

(xii)  failing to consider the impacts of climate change (1:22-cv-11172, Count 4.8).

5.     *Claims under the APA for Violations of the Outer Continental Shelf Lands Act*

Finally, Plaintiffs have asserted that Defendants have violated the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1337, in connection with the issuance of the Vineyard Wind Lease and review of the Vineyard Wind COP by (i) adopting and applying the "Smart from the Start" Initiative to the leasing process in violation of 43 U.S.C. § 1337(p)(4)'s requirement that BOEM consider a set list of criteria (1:22-cv-11091, 1st, 2nd, and 3rd Claims for Relief); (ii) resuming review of the COP after Vineyard Wind withdrew and resubmitted it in

January 2021 (1:22-cv-11091, 4th Claim for Relief); and (iii) adopting and approving the COP without considering and providing for the factors set forth in 43 U.S.C. § 1337(p)(4) (1:22-cv-11091, 5th Claim for Relief; 1:22-cv-11172, Counts 1.1, 1.2, 1.7).[7]

## II.     Standard of Review

Under Federal Rules of Civil Procedure 56(a), summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is material when, under the governing substantive law, it could affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Baker v. St. Paul Travelers, Inc., 670 F.3d 119, 125 (1st Cir. 2012). A dispute is genuine if a reasonable jury could return a verdict for the non-moving party. Anderson, 477 U.S. at 248.

The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party establishes the absence of a genuine dispute of material fact, the burden shifts to the non-moving party to set forth facts demonstrating that a genuine dispute of material fact remains. Anderson, 477 U.S. at 250.

The non-moving party cannot oppose a properly supported summary judgment motion by "rest[ing] upon the mere allegations or denials of [the] pleading[s]." Id. at 248. Disputes over facts "that are irrelevant or unnecessary" will not preclude summary judgment. Id. When

---

[7] The Alliance's OCSLA claims set forth in Counts 1.3, 1.4, 1.5, 1.6, 1.8, 1:22-cv-11172, Complaint, Doc. No. 1, are also waived where neither the Seafreeze Plaintiffs nor the Alliance briefed these claims.

The Alliance has conceded its claim under the Jones Act. 1:22-cv-11172, Hearing Tr. 7:4-10, Doc. No. 101.

reviewing a motion for summary judgment, the court must take all properly supported evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." Anderson, 477 U.S. at 255.

The fact that the parties have filed cross motions does not alter these general standards; rather the court reviews each party's motion independently, viewing the facts and drawing inferences as required by the applicable standard, and determines, for each side, the appropriate ruling. See Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996) (noting that cross-motions for summary judgment do not "alter the basic Rule 56 standard" but rather require the court "to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed").

A summary judgment motion has a "special twist in the administrative law context." Boston Redevelopment Auth. v. Nat. Park Serv., 838 F.3d 42, 47 (1st Cir. 2016) (quotations omitted). In an APA action, a motion for summary judgment serves as "a vehicle to tee up a case for judicial review and, thus, an inquiring court must review an agency action not to determine whether a dispute of fact remains but, rather, to determine whether the agency action was arbitrary and capricious." Id. (citing cases); see also 5 U.S.C. § 706(2)(A) ("The reviewing court shall…hold unlawful and set aside agency action…found to be…arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]").

Because the APA affords great deference to agency decision-making and agency actions are presumed valid, "judicial review [under the APA], even at the summary judgment stage, is

narrow." Assoc'd Fisheries of Maine, Inc. v. Daley, 127 F.3d 104, 109 (1st Cir. 1997) (citing Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415-16 (1971)). Courts should "uphold an agency determination if it is 'supported by any rational view of the record.'" Marasco & Nesselbush, LLP v. Collins, 6 F.4th 150, 172 (1st Cir. 2021) (quoting Atieh v. Riordan, 797 F.3d 135, 138 (1st Cir. 2015)). Even where an inquiring court disagrees with the agency's conclusions, the court cannot "'substitute its judgment for that of the agency.'" Boston Redevelopment Auth., 838 F.3d at 47 (quoting Assoc'd Fisheries, 127 F.3d at 109). Rather, an agency's action should only be vacated where the agency "has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Nat'l Ass'n of Home Builders v. Defs. of Wildlife, 551 U.S. 644, 658 (2007) (quotations omitted).

### III.   Standing

Defendants challenge Plaintiffs' standing to bring claims under NEPA while Vineyard Wind challenges Plaintiffs' standing to bring claims under NEPA, ESA, and MMPA.[8] The court considers first the evidence in the record relating to Plaintiffs' standing, and then whether Plaintiffs have standing to bring their claims under each of the challenged statutes, addressing constitutional issues first and then statutory issues.

---

[8] Vineyard Wind also challenged the Seafreeze Plaintiffs' standing to bring a claim under the CWA but withdrew that argument at the summary judgment hearing. 1.22-cv-11091, Hearing Tr. 13:5-16, Doc. No. 112.

### A. Evidence Relating to Plaintiffs' Standing[9]

#### 1. *Old Squaw, Heritage Fisheries, and Nat. W.*

Seafreeze Plaintiffs Old Squaw, Heritage Fisheries, and Nat. W. (the "Commercial Fishing Entities") are each commercial fishing companies that engage in trawl fishing[10] for squid.

##### a. Evidence Offered as to Economic Injury

Declarant David Aripotch, the owner and president of Old Squaw and captain of its boat, the F/V Caitlin & Mairead, states that the F/V Caitlin & Mairead trawl fishes in the Atlantic Ocean off the coast of Massachusetts to the coast of North Carolina. 1:22-cv-11091, Aripotch Decl. ¶¶ 2, 5, 11, Doc. No. 66-1. Aripotch states that the F/V Caitlin & Mairead typically takes

---

[9] Vineyard Wind opposes numerous statements in Plaintiffs' <u>Statement of Undisputed Material Facts</u>, 1:22-cv-11091, Doc. No. 66. <u>See</u> Vineyard Wind Resp. to Seafreeze Pls.' Statement of Undisp. Material Facts, Doc. No. 88. First, Vineyard Wind opposes many statements supported only by affidavits. <u>See</u> 1:22-cv-11091, Intervenor's Opening Mem. 28-31, Doc. No. 87 (disputing the admissibility of statements such as those concerning Seafreeze Shoreside's interests, goals, and purported injuries). Where Fed. R. Civ. P. 56(c)(4) permits affidavits or declarations "made on personal knowledge [that] set out facts that would be admissible in evidence, and [that] show that the affiant or declarant is competent to testify on the matters stated," the court considers the evidentiary weight of these submissions under this standard for purposes of standing, as discussed <u>infra</u>. Second, Vineyard Wind objects to Plaintiffs' numerous citations outside of the Administrative Record where Plaintiffs have not offered those materials through a motion to supplement the Record. <u>Id.</u> at 31-33. Here, the court does not consider statements relying on materials outside of the Administrative Record where Plaintiffs have not addressed these in any motion to supplement the Record or otherwise offered a basis for the court to consider extra-record material. Finally, Vineyard Wind asserts numerous statements of fact should be struck where Plaintiffs mischaracterize the Administrative Record. The court looks directly to the Administrative Record, as discussed in its <u>Memorandum and Order</u>, 1:22-cv-11172, Doc. No. 137, rather than the parties' characterizations of the Administrative Record.

[10] Trawl fishing involves pulling a net towed by steel wires and spread open by steel doors to harvest squid and other fish at the ocean bottom. 1:22-cv-11091, Decl. of David Aripotch ("Aripotch Decl.") ¶ 10, Doc. No. 66-1; 1:22-cv-11091, Decl. of Thomas E. Williams, Sr. ("Williams Sr. Decl.") ¶ 15, Doc. No. 66-2.

25-40 trips per year to the Lease Area for squid. Id. at ¶¶ 8-9. Aripotch states further that, in a

typical year, Old Squaw generates $175,000-$350,000 in annual revenues from fishing

expeditions for squid in the Lease Area and that this accounts for roughly 30% of Old Squaw's

revenue in a given year. Id. at ¶ 12. Aripotch states that Old Squaw will lose this revenue if

construction and operation of the Project go forward as contemplated by the COP. Id. at ¶ 19.

Aripotch states that the spacing of the Vineyard Wind turbines "will not allow for safe

transit lanes in the Vineyard Wind area for the F/V Caitlin & Mairead" because one nautical mile

of distance "is not enough room to risk getting through[.]" Id. at ¶ 14. Aripotch also states that

the wind turbines, when operational, will interfere with marine radar. Id. at ¶ 15. Aripotch

contends that commercial fishing will become untenable for his boat in the Lease Area because

trawl fishing gear will become entangled. Id.[11] Finally, Aripotch states that the F/V Caitlin &

Mairead will be unable to fish in the Wind Energy Area during the Project's construction

because of the safety risks associated with certain construction activities, such as the installation

of cables or installation of armoring with boulders, and that those safety risks will remain after

the construction is complete and the Project is operational. Id. at ¶¶ 16-17.

Aripotch states that the risks posed to the F/V Caitlin & Mairead will also disrupt and

displace squid in the Area and impact the marine ecosystem in ways that will further impact Old

Squaw's ability to fish in the Lease Area. Id. at ¶ 20.[12] Aripotch states that, because of the Lease

---

[11] Aripotch relies on the Final EIS Vol. 1, BOEM_0068434 at -717, -18, -22, --224, -225, which
states that entanglement is a possibility that could impact fishing businesses.

[12] Additionally, Aripotch states that it is his understanding that the Vineyard Wind Project will
result in environmental and ecological harms to numerous marine species. Id. at ¶¶ 29-30.
Aripotch's declaration does not show, however, that he is competent to testify to this assertion.

issuance and COP approval, Old Squaw will no longer be able to fish for squid in the Lease Area and will lose approximately 30% of its revenue as a result. Id. at ¶ 19.

Declarant Thomas E. Williams, Sr., the owner and President of Heritage Fisheries and Nat. W., states that, in a typical year, Heritage Fisheries, which owns and operates the F/V Heritage, generates $290,000 in annual revenues from trawl fishing for squid in the Lease Area, accounting for approximately 30% of Heritage Fisheries total annual revenues in any given year. 1:22-cv-11091, Williams Sr. Decl. ¶¶ 2, 4-5, 17, Doc. No. 66-2. Williams states further that Nat. W., which owns and operates the F/V Tradition, generates roughly $490,000 in annual revenues from trawl fishing for squid in the Lease Area, accounting for approximately 65% of Nat. W.'s total annual revenues in any given year. Id. at ¶¶ 5, 18. Like Aripotch, Williams states that his companies will be unable to engage in trawl fishing in the Lease Area because (i) the spacing of the turbines will not allow for safe passage, (ii) the turbines will interfere with vessel radar, making passage more dangerous for his companies' boats, and (iii) protections around cables and foundations will cause gear to become tangled. Id. at ¶¶ 20, 23. Williams states that the Vineyard Wind Project will cause both Heritage Fisheries and Nat. W. to lose out on the annual revenues attributable to fishing in the Lease Area. Id. at ¶ 22. [13]

---

[13] Williams also contends that the construction activities and operation of the turbines will affect the water quality in the Lease Area and beyond, which will displace not only squid, but other marine life, affecting the entire ecosystem and further impacting Heritage Fisheries and Nat. W.'s abilities to fish in the Lease Area. Id. at ¶ 24. Williams states this "impact" constitutes pollution of the waters and degradation of all living things in the waters. Id. Williams' declaration does not show, however, that he is competent to testify to these assertions.

Vineyard Wind disputes Plaintiffs' representations regarding the frequency and duration of fishing trips by Plaintiffs Old Squaw, Heritage Fisheries, and Nat. W. See 1:22-cv-11091, Intervenor's Opening Mem. 3 n.1, Doc. No. 87. Vineyard Wind offers the expert opinion of R. Douglass Scott, PhD., P. Eng., a Principal with W.F. Baird & Associates Ltd., reflecting, based on Automatic Identification System ("AIS") tracking data, that the total time between January 2016 and 2022 spent in the Lease Area by Old Squaw's vessel (the F/V Caitlin & Mairead) was 21.2 hours, by Heritage Fisheries' vessel (the F/V Heritage) was 0.4 hours, and by Nat. W.'s vessel (the F/V Tradition) was 6.2 hours, for a total time of 27.7 hours over six years. See 1:22-cv-11091, Vineyard Wind Resp. to Seafreeze Pls.' Statement of Undisp. Material Facts ¶¶ 100-102, Doc. No. 88; 1:22-cv-11091, Decl. of R. Douglas Scott in Supp. of Intervenor's Cross-Mot. for Summ. J. and in Opp'n to Pls. Mot. for Summ. J., Doc. No. 86-1.[14]

Defendants also dispute that the Project will result in the cessation of commercial fishing in the Lease Area. 1:22-cv-11091, Fed. Defs.' Resp. to Seafreeze Pls.' Statement of Undisp. Material Facts ¶¶ 9-11, Doc. No. 76 (citing BOEM Info. Mem. dated May 21, 2021, BOEM_0076922 at -942-44 (reflecting that "the navigational risk assessment prepared for the Project shows that it is technically feasible to navigate and maneuver fishing vessels and mobile gear through the WDA.") and Final EIS, Vol. 1 BOEM_0068434 at -68718 (discussing impacts in the WDA that may impact fishing activities) and BOEM_0068743-44 (acknowledging concerns from commercial fishing interests about the ability to safely navigate the WDA but

---

[14] Plaintiffs dispute that AIS data is an accurate reflection of their fishing activities in the Lease Area where none of the Plaintiffs' vessels are required to carry or use AIS, and, instead, voluntarily use AIS, but typically not when fishing. See 1:22-cv-11091, Third Decl. of David Aripotch ¶¶ 4-6, Doc. No. 90-3; 1:22-cv-11091, Second Decl. of Thomas E. Williams, Sr. ¶¶ 8-9, Doc. No. 90-4.

noting, "fishing vessels, including those involved in line, trawl, and drag fishing, would be able to work in the area; however vessel operators would need to take the [wind turbine generators] and [electrical service platforms] into account as they set their courses[.]"). Vineyard Wind states that the Lease Area was selected to minimize conflicts with commercial fishing and because it does not have high relative revenue as compared to nearby waters. See 1:22-cv-11091, Vineyard Wind Resp. to Seafreeze Pls.' Statement of Undisp. Material Facts ¶¶ 9-11, Doc. No. 88 (citing Final EIS, Vol. 1 for proposition that, during the leasing process, and in response to public comments, BOEM identified "high value fishing areas…and removed [them] prior to leasing." Final EIS Vol. 1, BOEM_0068434 at -725).

In sum, there is a dispute of material facts as to the extent of any economic harm that the Commercial Fishing Entities may suffer. For purposes of Defendants' and Intervenor's Motions for Summary Judgment, however, and considering the evidence in the light most favorable to the Commercial Fishing Entities, the court finds that the Commercial Fishing Entities have demonstrated that they trawl fish in the Lease Area and may lose an unquantified sum of the revenue attributable to their trawl-fishing activities in the Lease Area.

b.  Evidence Offered as to Non-Economic Injury

Aripotch states that, in addition to economic interests in the Lease Area, he also has environmental and aesthetic interests in the Lease Area. He states that the Project will impact the aesthetic and spiritual pleasures he derives from fishing in the Vineyard Wind Lease Area. 1:22-cv-11091, Aripotch Decl. ¶ 21, Doc. No. 66-1. In particular, while engaged in commercial fishing in the Vineyard Wind Lease Area, Aripotch tries to bring his camera to capture the wildlife. Id. at ¶ 25. He observes right whales and other marine life. Id. He plans to continue

fishing in the Lease Area, and observing marine mammals, "through the foreseeable future if the Vineyard Wind lease and COP are vacated." Id. at ¶ 28.[15]

Williams states that the impact the Vineyard Wind Project will have on the Vineyard Wind Lease Area will harm not only his business but also the aesthetic and emotional pleasures he derives from fishing. 1:22-cv-11091, Williams Sr. Decl. ¶ 25, 28, Doc. No. 66-2.[16] Williams' sons, who serve as captains of the F/V Heritage and the F/V Tradition, each likewise states that he takes pleasure in observing marine life, including right whales, while fishing in the Lease Area. 1:22-cv-11091, Decl. of Thomas H. Williams ¶ 25, Doc. No. 66-3; see 1:22-cv-11091, Decl. of Aaron Williams ¶ 27, Doc. No. 66-4.

Defendants dispute that statements of individual owners' aesthetic and emotional interests can be imputed to the Plaintiff corporations. See 1:22-cv-11091, Fed. Defs.' Opening Mem. 8, Doc. No. 73. Defendants also assert that the record directly conflicts these individuals' assertions where (i) NMFS has concluded there will be no adverse impacts to right whales other than temporary harassment of a small number of right whales due to exposure to pile driving noises, and (ii) that the Corps considered the Project's effects on food and fiber production as part of its public interest review and determined that the Project would have no effect on the food

---

[15] Aripotch also states that he fears the Project will destroy the area that his family, and many others, depend on for their food supply. Id. at ¶ 24. Aripotch's affidavit does not show that he is competent to testify as to the alleged destruction of the area.

[16] Williams also states that it is his understanding that the impacts of the Project "will result in a sizeable overall decrease in the food supply" that will negatively affect food availability for all Americans, including his family. 1:22-cv-11091, Williams Sr. Decl. ¶ 28, Doc. No. 66-2. Again, Williams' affidavit does not show that he is competent to testify to these assertions.

supply. 1:22-cv-11091, Fed. Defs.' Resp. to Seafreeze Pls.' Statement of Undisp. Material Facts ¶¶ 167, 120, Doc. No. 76.

The court concludes the Commercial Fishing Entities have not demonstrated any non-economic injury where the competent evidence proffered relates to the interests of their owners and not to the Commercial Fishing Entities themselves.

2. *Seafreeze Shoreside*

Plaintiff Seafreeze Shoreside is a seafood dealer located in Narragansett, Rhode Island. 1:22-cv-11091, Decl. of Arthur Ventrone ("Ventrone Decl.") ¶ 4, Doc. No. 66-7; see also 1:22-cv-11091, Decl. of Meghan Lapp ("Lapp Decl.") ¶ 3, Doc. No. 66-8.

a. Evidence Offered as to Economic Injury

Declarant Arthur Ventrone, Seafreeze Shoreside's Treasurer, states that Seafreeze Shoreside purchases, sells, and processes fish product, primarily squid. 1:22-cv-11091, Ventrone Decl. ¶ 2, 4, Doc. No. 66-7. Ventrone states that Seafreeze Shoreside generates substantial revenue from squid seafood product brought in by commercial fishermen from the Lease Area and that, while revenues vary annually, catches from the Lease Area are "a consistently high percentage of [Seafreeze Shoreside's] total annual revenues year after year." Id. at ¶ 10. Ventrone states that, in 2016, 19% of Seafreeze Shoreside's total revenue, or $1.7 million, was attributable to catches in the "Vineyard Wind area." Id. Ventrone states that it is his understanding that commercial fishing in the Lease Area will "become untenable" as a result of the Vineyard Wind Project, and that, as a result, Seafreeze Shoreside will process less squid, and will experience a "substantial loss of revenues." Id. at ¶¶ 8-11. Ventrone also states that it is his understanding that squid will be displaced from the Lease Area as a result of the Project's impact

to squid habitat, and that, even if commercial fishermen could continue fishing in the Area, the catch would be "severely reduced or nonexistent." Id. at ¶ 9.[17]

Declarant Meghan Lapp, Seafreeze Shoreside's Fisheries Liaison and Assistant General Manager, states that the pile driving and operational noise from the Project will negatively impact the habitats longfin squid and other species, and thus impact Seafreeze Shoreside. 1:22-cv-11091, Lapp Decl. ¶¶ 2, 45-50, Doc. No. 66-8.

Defendants dispute that the construction and operation of the Vineyard Wind Project will result in the cessation of commercial fishing in the Vineyard Wind Lease Area. 1:22-cv-11091, Fed. Defs.' Resp. to Seafreeze Pls.' Statement of Undisp. Material Facts ¶ 6, Doc. No. 76 (citing BOEM Info. Mem. dated May 21, 2021, BOEM_0076922 at -942-44, Final EIS, Vol. 1 BOEM_0068434 at -718 and -743-44). Defendants also dispute that the Project will have adverse impacts on the squid habitat where Plaintiffs' only support for this proposition are the statements of employee declarants, who Defendants contend offer opinions and understanding in lieu of expertise, and Seafreeze Shoreside's own comments in the Administrative Record. See id. at ¶ 166.

Vineyard Wind disputes that Seafreeze Shoreside derives substantial revenue from the Lease Area, stating that the Lease Area was selected to minimize conflicts with commercial fishing and because it does not have high relative revenue as compared to nearby waters. See 1:22-cv-11091, Vineyard Wind Resp. to Seafreeze Pls.' Statement of Undisp. Material Facts ¶ 6,

---

[17] Although Ventrone has not demonstrated that he is competent to testify as to any reduction in commercial fishing in the Lease Area, the Aripotch and Williams Sr. affidavits detailed above regarding their anticipated reduction in trawling for squid, are sufficient to allow the court to consider Ventrone's further statement that Seafreeze Shoreside will process less squid.

Doc. No. 88 (citing Final EIS, Vol. 1 for proposition that, during the leasing process, and in response to public comments, BOEM identified "high value fishing areas…and removed [them] prior to leasing." Final EIS Vol. 1, BOEM_0068434 at -725).

As above, there is a dispute of material facts as to the extent of any economic harm that Seafreeze Shoreside may suffer. For purposes of Defendants' and Intervenor's Motions for Summary Judgment, however, and considering the evidence in the light most favorable to Seafreeze Shoreside, the court finds that Seafreeze Shoreside has demonstrated that its suppliers trawl fish in the Lease Area and that Seafreeze Shoreside may lose an unquantified sum of the revenue attributable to the loss of its suppliers' trawl-fishing activities in the Lease Area.

      b.  Evidence offered as to Non-Economic Injury

Lapp states that "Seafreeze [Shoreside] has a keen interest in protecting the purity and cleanliness" of the Outer Continental Shelf, not only for economic reasons, but also because "environmental degradation" from the Vineyard Wind Project would take away "from Seafreeze [Shoreside] employees' aesthetic, psychological, emotional, and spiritual pleasures of working as part of a fishing community reliant on those waters." 1:22-cv-11091, Lapp Decl. ¶ 52, Doc. No. 66-8.

Vineyard Wind disputes that Plaintiffs have asserted any of its own legal rights and interests. See 1:22-cv-11091, Intervenor's Opening Mem. 4-5, Doc. No. 87.

As with the Commercial Fishing Entities, Seafreeze Shoreside has not shown that Seafreeze Shoreside, as opposed to its employees, have suffered any non-economic injuries where it has offered no evidence to that effect.

3.     *LICFA, Sector XIII, and the Alliance*

Seafreeze Plaintiffs LICFA and Sector XIII, and Responsible Plaintiff Alliance (collectively, the "Associations"), are associations representing commercial fishing interests.

a.   Evidence Offered as to Associations' Membership and Purposes

LICFA represents over 150 fishing businesses, boats, and fishermen from multiple ports on Long Island, New York. 1:22-cv-11091, Decl. of Bonnie Brady ("Brady Decl.") ¶ 3, Doc. No. 66-6. LICFA and its members "support extensive cooperative scientific research to better understand the marine environment and fisheries management." Id. at ¶ 4.

Sector XIII is a private organization of commercial fishermen that monitors compliance with fishing permits and supports the commercial fishing industry along the Atlantic Coast. 1:22-cv-11091, Decl. of John Haran ("Haran Decl.") ¶ 3, Doc. No. 66-5.

Plaintiff Alliance is a not-for-profit trade association headquartered in Washington, D.C., comprised of fishing associations and fishing companies, whose members own and operate more than 120 vessels and conduct business in more than 30 fisheries throughout the country. 1:22-cv-11172, Joint SOF ¶ 1, Doc. No. 99; 1:22-cv-11172, Decl. of Anne Hawkins ("Hawkins Decl.") ¶ 2, Doc. No. 53-1. One of the Alliance's members is Town Dock, which is one of the largest producers of squid in the United States. 1:22-cv-11172, Decl. of Katie Almeida ("Almeida Decl.") ¶¶ 1-2, Doc. No. 77-2. The Alliance is committed to improving the compatibility of new offshore development with its members' fishing-related businesses. 1:22-cv-11172, Hawkins Decl. ¶ 2, Doc. No. 53-1. Hawkins states that Defendants' approval of the Vineyard Wind Project has "frustrated the very purpose for which the Alliance was formed[.]" Id. at ¶ 8.

b.   Evidence offered as to Economic Injury

Each association offers as injury the economic injury of its members, primarily as detailed above. See 1:22-cv-11091, Brady Decl. ¶¶ 6, 19-22, Doc. No. 66-6 (the presence and good health of numerous species of marine life in the Lease Area is vital to LICFA members); 1:22-cv-11091, Second Decl. of David Aripotch ("2d Aripotch Decl.") ¶ 4, Doc. No. 90-1 (Aripotch and Old Squaw are members of LICFA and LICFA represents Aripotch's "economic . . . interests as a commercial fisherman"); see also 1:22-cv-11091, Second Decl. of Bonnie Brady ("2d Brady Decl.") ¶ 4, Doc. No. 90-2 ("LICFA, as an association of commercial fishermen, represents the economic . . . interests of David Aripotch in his capacity as a member of LICFA."); 1:22-cv-11091, Haran Decl. ¶¶ 3, 6, Doc. No. 66-5 (approximately 38 of Sector XIII's members operate their commercial fishing businesses in the Lease Area and the presence and good health of numerous species of fish and other marine life in the Lease Area are vital to the members of Sector XIII, who depend on the Lease Area for a substantial portion of their revenues); id. at ¶¶ 7, 20 (Plaintiffs Heritage Fisheries and Nat. W. are members of Sector XIII and Heritage Fisheries, Nat. W., and similarly situated Sector XIII members will experience "substantial economic adverse impacts" as a result of the Vineyard Wind Project); id. at ¶ 11 (stating that the Vineyard Wind Project would force Sector XIII members who operate trawl vessels to fish and travel outside of the "project area," thereby increasing vessel traffic and hazardous conditions outside of the Lease Area); id. at ¶ 18 (stating that the Vineyard Wind Project will preclude members from fishing in the Lease Area, due to (i) the risk of entanglement of trawl fishing gear, (ii) reduced navigational capabilities because of radar interference, and (iii) increased risk of collision when navigating through Project transit lanes); 1:22-cv-11172, Second Decl. of Anne Hawkins ("2d Hawkins Decl.") ¶¶ 4-7, Doc. No. 77-1 (Old Squaw, Sector XIII,

LICFA, and Seafreeze Shoreside are members of the Alliance and will be harmed in the ways identified by the Seafreeze Plaintiffs' declarants); see also 1:22-cv-11172, Almeida Decl. ¶¶ 1-2, 4-5, Doc. No. 77-2 (Alliance member Town Dock is dependent on longfin squid, the Lease Area is "on top of and adjacent to one of [Town Dock's] most productive spring and summer longfin squid grounds," Town Dock's vessels may be unable to tow their trawling gear through the Lease Area safely and efficiently, and the noise from the Project will negatively impact the longfin squid population, and ultimately, Town Dock's business) (citing letter offered as part of Town Dock's comments on an adjacent wind project which references a Woods Hole Oceanographic Institute study).

As discussed above, Defendants dispute that the Vineyard Wind Project will result in the cessation of fishing activities in the Lease Area. Vineyard Wind disputes that members of the Associations asserting "substantial" losses in revenue will experience such impacts where AIS data reflects that LICFA member Old Squaw and Sector XIII members Heritage Fisheries andNat. W. fished in the Lease Area for a collective 27.7 hours over six years.

Vineyard Wind also disputes that Alliance member Town Dock may have difficulty navigating through the Lease Area with gear where it previously submitted comments reflecting that Town Dock's boats will continue to work in the wind energy areas with one nautical mile of spacing between the turbines. See 1:22-cv-11172, Intervenor's Reply 4 n.2, Doc. No. 93.

As above, there is a dispute of material facts as to the extent of any economic harm that the Associations' members may suffer. For purposes of Defendants' and Intervenor's Motions for Summary Judgment and considering the evidence in the light most favorable to the Associations, the court finds that the Associations have demonstrated that their members may

lose an unquantified sum of the revenue attributable to the loss of their or their suppliers' trawl-fishing activities in the Lease Area.

        c.  *Evidence Offered as to Non-Economic Injury*

Each association also offers as injury the non-economic injury of its members, primarily as detailed above. See 1:22-cv-11091, 2d Aripotch Decl. ¶ 4, Doc. No. 90-1 (LICFA represents Aripotch's "environmental interests as a commercial fisherman"); see also 1:22-cv-11091, 2d Brady Decl. ¶ 4, Doc. No. 90-2 ("LICFA, as an association of commercial fishermen, represents the . . . environmental interests of David Aripotch in his capacity as a member of LICFA."). Whether that non-economic injury may be asserted by the Associations is discussed further below.

**B.**    **Constitutional Standing**

Vineyard Wind challenges Plaintiffs' standing to bring their NEPA, ESA, and MMPA claims as a constitutional issue, and Defendants and Vineyard Wind also challenge the Associations' standing. The court considers the challenges to standing under NEPA and MMPA as a zone-of-interest question, which is addressed below. Here, the court considers first legal principles concerning constitutional standing generally, then questions of associational standing, and then Plaintiffs' standing under ESA.

        *1.*  *Applicable Law*

The doctrine of standing is rooted in Article III of the Constitution, which confines federal courts to the adjudication of actual "cases" and "controversies." See U.S. Const. Art. III, § 2, cl. 1; Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992). Standing consists of three elements: "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial

decision." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016), as revised (May 24, 2016) (citing

Defs. of Wildlife, 504 U.S. at 560-61). Plaintiffs' injury must be "'concrete, particularized, and

actual or imminent; fairly traceable to the challenged action; and redressable by a favorable court

ruling.'" Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409 (2013) (quoting Monsanto Co. v.

Geertson Seed Farms, 561 U.S. 139, 149 (2010)).

To establish the first element of standing, an injury-in-fact, a plaintiff must demonstrate

"an invasion of a legally protected interest" that is "concrete and particularized" and "actual or

imminent, not conjectural or hypothetical." Defs. of Wildlife, 504 U.S. at 560 (quotations

omitted). "The particularization element of the injury-in-fact inquiry reflects the commonsense

notion that the party asserting standing must not only allege injurious conduct attributable to the

defendant but also must allege that he, himself, is among the persons injured by that conduct."

Hochendoner v. Genzyme Corp., 823 F.3d 724, 731-32 (1st Cir. 2016).

Moreover, standing is "ordinarily substantially more difficult to establish," where the

plaintiff is not the object of the action. Defs. of Wildlife, 504 U.S. at 562 (quotations omitted);

compare Maine Lobstermen Assoc. v. Nat. Marine Fish. Serv., 70 F.4th 582, 592-93 (D.C. Cir.

June 16, 2023) (concluding that the plaintiff lobstermen have standing to challenge a biological

opinion considering NMFS' fishery licensing activities where they were the "object of the

action" and the biological opinion had "virtually determinative effect"). "The standing inquiry is

claim-specific: a plaintiff must have standing to bring each and every claim that she asserts."

Katz v. Pershing, LLC, 672 F.3d 64, 71 (1st Cir. 2012) (citing Pagán v. Calderón, 448 F.3d 16,

26 (1st Cir. 2006)).

Because standing is not a "mere pleading requirement[] but rather an indispensable part

of the plaintiff's case," standing must be supported "with the manner and degree of evidence

required at the successive stages of the litigation." <u>Defs. of Wildlife</u>, 504 U.S. at 561; <u>see also</u>

<u>People to End Homelessness v. Develco Singles Apartments Assoc.</u>, 339 F.3d 1, 8 (1st Cir.

2003). While at the pleadings stage, "general factual allegations of injury" may suffice, and at

summary judgment, such allegations must be supported by affidavits which will be taken to be

true, where standing remains a controverted issue at trial, the specific facts establishing standing

"must be 'supported adequately by the evidence adduced at trial.'" <u>Id.</u> (quoting <u>Gladstone</u>

<u>Realtors v. Village of Bellwood</u>, 441 U.S. 91, 114, 115 n.31 (1979)).

       2.   *Associational Standing*

An association cannot establish standing to sue on behalf of its members unless (i) "at

least one of [its] members possesses standing to sue in his or her own right," <u>United States v.</u>

<u>AVX Corp.</u>, 962 F.2d 108, 116 (1st Cir. 1992), (ii) "the interests at stake are germane to the

organization's purpose," and (iii) "neither the claim asserted nor the relief requested requires

individual members' participation in the lawsuit." <u>Friends of the Earth, Inc. v. Laidlaw Envtl.</u>

<u>Servs. (TOC), Inc.</u>, 528 U.S. 167, 169 (2000).

Here, despite an initial challenge,[18] there is no real dispute that the Associations may

assert the economic injuries of its commercial fishing members.

---

[18] Defendants and Vineyard Wind initially asserted that the Alliance lacked standing to bring
claims on behalf of its members where it had not identified any members with Article III
standing. Defendants and Vineyard Wind withdrew this argument after the Alliance provided
additional declarations identifying members who operate fishing vessels in the Vineyard Wind
project area. <u>See</u> 1:22-cv-11172, Fed. Defs.' Reply, Doc. No. 92; 1:22-cv-11172, Intervenor's
Reply 1, Doc. No. 93.

Defendants and Vineyard Wind also asserted that the Alliance lacked standing to bring claims on
behalf of itself as a nonprofit trade organization. Where the Alliance has standing to raise the
economic claims of its members and does not assert claims distinct from those asserted on behalf

Plaintiffs argue that Seafreeze Plaintiff LICFA can also bring claims of noneconomic injury on behalf of LICFA member David Aripotch. 1:22-cv-11091, Pls.' Opp'n 12-14, Doc. No. 90. Defendants and Vineyard Wind challenge LICFA's standing to assert the environmental injuries of its members where it has not demonstrated environmental issues are germane to its purpose. 1:22-cv-11091, Fed. Defs.' Opening Mem. 8, Doc. No. 73; Fed. Defs.' Reply 2, Doc. No. 93; Intervenor's Opening Mem. 6-7, Doc. No. 87.

Here, LICFA has not demonstrated that the interests at stake–Aripotch's interests in observing right whales and marine life–are germane to LICFA's purpose of supporting fisheries management. See Friends of the Earth, 528 U.S. at 169. Accordingly, LIFCA does not have associational standing to assert any of Aripotch's injuries based on the aesthetic and spiritual pleasures he derives from fishing.

### 3. ESA (Seafreeze, 9th, 10th Claims for Relief; Responsible Count 3)

Plaintiffs assert that Defendants violated the ESA, where (i) NMFS failed to consider the cumulative effects of the Project on endangered species or their habitat, 1:22-cv-11091, Complaint, 9th Claim for Relief, Doc. No. 1; (ii) NMFS failed to inform BOEM of alternatives to the approved Project that would avoid harming endangered species, id., 10th Claim for Relief; and (iii) Defendants violated the ESA by approving the COP and Corps' pollutant discharge permit without a valid biological opinion in place, 1:22-cv-11172, Complaint, Count 3, Doc. No. 1.

---

of its members, the court need not address whether the Alliance has standing based on its status as a nonprofit trade organization. See Horne v. Flores, 557 U.S. 433, 446-47 (2009).

The citizen-suit provision of the ESA grants "any person" the authority to commence a civil suit to enforce a violation of any provision of the ESA. 16 U.S.C. § 1540 (g)(1). But this "authorization of remarkable breadth," does not obviate Plaintiffs' obligations under Article III of the Constitution to establish standing. Bennett v. Spear, 520 U.S. 154, 162-164 (1997).

Taking Plaintiffs' claims in turn, the Seafreeze Plaintiffs allege that NMFS violated its obligations under Section 7 of the ESA and attendant regulations in issuing the 2020 BiOp without (i) considering the cumulative effects of the Project on endangered species, and (ii) without informing BOEM of alternatives that would avoid harming endangered species. Vineyard Wind asserts that Plaintiffs lack standing to bring claims against the superseded Biological Opinion where they have not demonstrated any injury flowing from it, let alone established causation or redressability. 1:22-cv-11091, Intervenor's Opening Mem. 8, Doc. No. 87. As discussed above, considering the evidence in the light most favorable to the Plaintiffs, Plaintiffs or their members may lose some revenue if the Commercial Fishing Entities (or Seafreeze Shoreside's suppliers) reduce their trawling for squid as a result of the construction and operation of the Project but they have shown no noneconomic harm. Plaintiffs have not demonstrated their particularized injury is in any way connected to the Project's impact on any endangered species. They also have not shown that they are the object of any action taken under the ESA consultation process, nor that they are the object of any other challenged agency action under the ESA connected to the Project. Nor do they have a demonstrated interest in the direct agency action related to the ESA.[19]

---

[19] Defendants argue that if the Seafreeze Plaintiffs have standing to assert their 9th and 10th Claims for Relief challenging NMFS' actions as part of the 2020 BiOp process, such challenge would still be moot. See 1:22-cv-11091, Fed. Defs.' Reply 38-39, Doc. No. 93. The court agrees

Similarly, although the Alliance alleges that both BOEM and the Corps permitted actions without satisfying the requirements of the ESA, see 1:22-cv-11172, Plaintiff's Opposition 24-25, Doc. No. 77, the Alliance has only offered evidence to support that their members may lose some revenue as a result of the construction and operation of the Project.

The relationship between the unquantified economic harm Plaintiffs will suffer as a result of the Project's possible physical impacts on Plaintiffs' preferred trawl fishing area, and the agency actions Plaintiffs are challenging—which are general procedural aspects of the 2020 biological consultation process undertaken pursuant the ESA—is too attenuated to support either that Plaintiffs have demonstrated an appropriately particularized injury-in-fact or causation under Article III's standing requirements.

"Establishing causation in the context of a procedural injury requires a showing of two causal links: one connecting the omitted [procedural step] to some substantive government decision that may have been wrongly decided because of the lack of [that procedural requirement] and one connecting that substantive decision to the plaintiff's particularized injury."

---

where Plaintiffs challenge procedural defects in the 2020 BiOp, and seek declaratory and injunctive relief, but do not raise those challenges to the operative 2021 BiOp. Church of Scientology of Cal. v. United States, 506 U.S. 9, 12 (1992) (courts cannot "'declare principles or rules of law which cannot affect the matter in issue in the case before it'" (quoting Mills v. Green 159 U.S. 651, 653 (1895)); Rio Grande Silvery Minnow v. Bureau of Reclamation, 601 F.3d 1096, 1114 (10th Cir. 2010) (concluding that environmental challenge was moot where complaint did not challenge superseding biological opinion). Defendants likewise challenges the Alliance's remaining ESA claim as moot where the Alliance likewise seeks declaratory relief in conjunction with its challenge that BOEM and the Corps improperly proceeded with approval of the COP and issuance of the Section 404 Permit without a valid biological opinion given the agency issued a superseding biological opinion shortly thereafter, which Plaintiffs do not challenge. The court agrees with Defendants as to the Alliance's remaining ESA claim as well. Accordingly, if the mootness inquiry should occur first, the court lacks jurisdiction to decide Plaintiffs' pending ESA claims where they are moot.

See Ctr. for Bio. Div. v. EPA, 861 F.3d 174, 184 (D.C. Cir. 2017) (quotations omitted). An agency's procedural omission is necessary but not sufficient to establish standing. Cf. Ctr. for Bio. Div., 861 F.3d at 183-86 (holding association had established standing where it demonstrated that the EPA's failure to conduct an "effects determination" or ESA Section 7 consultation created a demonstrable risk to the endangered species in which the association's member established a demonstrable interest). Instead, a plaintiff must also show the procedural step was connected to the substantive result.

Here, Plaintiffs have not shown their alleged procedural deficiencies were connected to (i) their alleged injuries or (ii) any substantive result, where they challenge only decisions undertaken during the 2020 biological consultation process and not the 2021 BiOp from which all agency actions flowed.[20]

Accordingly, where Plaintiffs lack standing to assert the remaining ESA claims, Plaintiffs' Motions are denied and Defendants' and Vineyard Wind's Motions are granted.

––––––––––––––––––––

[20] The Alliance's claims suffer from additional defects that would prevent consideration on the merits. First, the Alliance's claim requires the court to accept the unsupported fact that the 2020 BiOp was "inadequate," and thus, could not be relied upon for any purpose, resulting in BOEM and the Corps adopting actions without having conducted consultation as required under ESA Section 7. See 1:22-cv-11172, Pl.'s Opp'n 24-25, Doc. No. 77. But the Record demonstrates instead that (1) the 2020 BiOp was not deemed inadequate, invalid, or otherwise unreliable for any purpose, (2) reinitation of consultation was limited to discrete issues, (3) BOEM approved the COP on July 15, 2021, under numerous express conditions, including any terms and conditions and reasonable and prudent measures stemming from the reinitiated consultation, see COP Approval Letter, BOEM_077150 at -7152; see also 1:22-cv-11172, Memorandum and Order 15-19, Doc. No. 104, and (4) the Corps also imposed conditions on its approval, including adherence to the then-in-effect biological opinion. See 2021 BiOp, BOEM_0077276 at -7282; Joint ROD, BOEM_ 0076799 at -6844. Accordingly, the Alliance has not pointed to some procedural requirement that was left unsatisfied where BOEM approved the COP and the Corps issued a Section 404 Permit pending the results of a reinitiated biological consultation.

### C.     Zone of Interest

#### *1.     Relevant Law*

For Plaintiffs to establish standing under the APA, they must demonstrate they have been "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702; <u>see also</u> <u>CSL Plasma Inc. v. U.S. Customs and Border Prot.</u>, 33 F.4th 584, 588 (D.C. Cir. 2022). The "zone of interests" test is "a limitation on the cause of action for judicial review conferred by the [APA.]" <u>Lexmark Int'l., Inc. v. Static Control Components, Inc.</u>, 572 U.S. 118, 129 (2014). As such, a court "ask[s] whether [plaintiff] has a cause of action under the statute." <u>Id.</u> at 128. "'The 'zone of interest' test is a guide for deciding whether, in view of Congress' evident intent to make agency action presumptively reviewable, a particular plaintiff should be heard to complain of a particular agency decision.'" <u>Nulankeyutmonen Nkihtaqmikon v. Impson</u>, 503 F.3d 18, 29 (1st Cir. 2007) (quoting <u>Clarke v. Sec. Indus. Ass'n</u>, 479 U.S. 388, 399 (1987)). "[T]he test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." <u>Clarke</u>, 479 U.S. at 399.

#### *2.     National Environmental Policy Act (Seafreeze, 23rd, 24th, 25th, 26th, 27th, 28th, 29th, 30th, 31st, 32nd, 33rd Claims for Relief, Responsible, Count 4)*

Defendants and Vineyard Wind assert that the NEPA claims cannot survive where Plaintiffs' only asserted interests are economic. <u>See</u> 1:22-cv-11091, Fed. Defs.' Reply 1-3, Doc. No. 93; 1:22-cv-11172, Fed. Defs.' Reply 2-3, Doc. No. 92; 1:22-cv-11091, Intervenor's Reply, Doc. No. 94; 1:22-cv-11172, Intervenor Reply 2-4, Doc. No. 92. NEPA was enacted "to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321; <u>see also</u> <u>Nev. Land Action Ass'n v. U.S. Forest Serv.</u>, 8 F.3d 713, 716 (9th Cir. 1993). Numerous courts have thus concluded that a

plaintiff who asserts purely economic injuries does not come within NEPA's zone of interests. Nev. Land Action Ass'n, 8 F.3d at 716; see also Gunpowder Riverkeeper v. FERC, 807 F.3d 267, 274 (D.C. Cir. 2015); Am. Waterways Operators v. U.S. Coast Guard, 613 F. Supp. 3d 475, 486-87 (D. Mass. 2020) (collecting cases).

Such is the case here for the Commercial Fishing Entities and Seafreeze Shoreside, who each only asserts economic injuries. Similarly, where each of the Plaintiff Associations predicate injuries on the economic impact of the Project to their members, the Plaintiff Associations likewise lack statutory standing for their NEPA claims.

Plaintiffs argue that they have stated environmental injuries that will have economic impact, including that the Project will make Old Squaw Fisheries unable to fish in the Lease Area, and that this is sufficient to come within NEPA's zone of interests. 1:22-cv-11091, Pls.' Opp'n 3-4, Doc. No. 90. They contend that Defendants rely on case law involving purely economic injuries, see 1:22-cv-11091, Pls.' Opp'n 3-4, Doc. No. 90 (discussing Am. Waterways Operators, 613 F. Supp. 3d at 486-87 and Gunpowder Riverkeeper, 807 F.3d at 274), and that such cases are inapplicable here, where Plaintiffs have asserted environmental harms that will cause economic injury, id. (citing Monsanto, 561 U.S. at 155). However, the plaintiff farmers in Monsanto based their standing on a claim that an environmental harm (a potential genetic mutation from the defendant's products) could harm their alfalfa crop and ultimately impact to their livelihoods. The Court left undisturbed the district court's unchallenged conclusion that plaintiffs fell within NEPA's zone of interests because the risk the genetically modified gene at issue would "infect conventional and organic alfalfa is a significant environmental effect within the meaning of NEPA." Monsanto, 561 U.S. at 155.

Here, by contrast, Plaintiffs have not put forth competent evidence as to an environmental injury, or even an environmental harm that would impact their fishing. Instead, where the gist of their claim is that the physical impediment the Project poses will limit their trawling, Plaintiffs' argument fails.

Accordingly, the court denies the Seafreeze and Responsible Plaintiffs' Motions and grants Defendants and Intervenor's Motions as to Plaintiffs' NEPA claims.

3. *Marine Mammal Protection Act (Seafreeze, 22nd Claim for Relief; Responsible Count 5)*

Vineyard Wind challenges Plaintiffs' ability to bring claims challenging the Incidental Harassment Authorization permit issued by NMFS under the MMPA where Plaintiffs have not asserted any environmental injuries. The MMPA was adopted by Congress to promote marine mammal conservation. See 16 U.S.C. § 1361; City of Sausalito v. O'Neill, 386 F.3d 1186, 1202-03 (9th Cir. 2004).

Here, Plaintiffs assert violations of the APA and MMPA pertaining to the issuance of the IHA to Vineyard Wind for taking by harassment of right whales. But Plaintiffs have not asserted any cognizable interest in right whales, or any marine mammals for that matter. While the test for prudential standing is not "especially demanding," Lexmark, 572 U.S. at 130 (quotations omitted), Plaintiffs have not demonstrated any interests that fall within the most generous reading of the zone of interests for the MMPA. Accordingly, Plaintiffs' claims fall outside of the zone of interests of the MMPA and cannot proceed. Thus, as to Plaintiffs' MMPA claims, the court denies the Seafreeze and Responsible Plaintiffs' Motions for Summary Judgment and grants Defendants and Intervenor's Motions.

IV.   **Plaintiffs' Clean Water Act Claims (Seafreeze, 17th Claim for Relief; Responsible, Count 2)**

Plaintiffs assert that the Corps' issuance of Section 404 Permit under the CWA was arbitrary and capricious where it violated CWA regulations.[21] Both complaints allege that the Corps' failed to analyze alternatives to the Project. 1:22-cv-11172, Compl. Counts 2.2, 2.3, Doc. No. 1; 1:22-cv-11091, Compl. 17th Claim for Relief, Doc. No. 1. The Alliance additionally claims that the Corps failed to consider the cumulative impact of the Project and future similar Projects. 1:22-cv-11172, Compl. Counts 2.4, Doc. No. 1; 1:22-cv-11172, Pl.'s Opening Mem. 27-33, Doc. No. 53.[22]

A.   **Practicable Alternatives – (Responsible, Counts 2.2, 2.3, Seafreeze, 17th Claim for Relief[23])**

The Alliance claims that in issuing the Section 404 Permit, Defendants violated their own regulations concerning practicable alternatives by failing to analyze less damaging alternatives to the Vineyard Wind Project. 1:22-cv-11172, Pl.'s Opening Mem. 28-29, Doc. No. 53.

Section § 230.10(a) prohibits (except in circumstances not at issue here) the discharge of dredged or fill materials "if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not

---

[21] Section 404 Permits allow for the discharge of dredged or fill materials into navigable waters at specified disposal sites. 33 U.S.C. § 1344.

[22] The Parties debate whether Plaintiffs waived their argument that the Section 404 Permit was flawed where the notice and Permit application reflected a corridor length of 23.3 miles, not the actual 39.4 mile length of the corridor. 1:22-cv-11172, Fed. Defs.' Opening Mem. 33-34, Doc. No. 60; 1:22-cv-11172, Pl.'s Opening Mem. 24-25, Doc. No. 53. However, where that alleged error was raised by the Alliance only in its summary judgment briefing, and not in its <u>Complaint</u>, the claim is not properly before the court.

[23] The Seafreeze Plaintiffs do not independently brief this issue, instead incorporating the Alliance's briefing by reference.

have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a). Defendants

assert that the Corps considered various other alternatives, "including: (a) the no-action

alternative; (b) a largely land-based alternative; (c) alternatives that would bring the cable on

shore in a different location; (d) two off-site alternatives in other zones of the ocean; and (e)

seven different on-site alternatives." 1:22-cv-11172, Fed. Defs.' Opening Mem. 39, Doc. No. 60

(citing USACE AR 011451-52, 011471-73). The Alliance acknowledges that the Corps did

consider other alternatives and it does not argue that any of these alternatives should have been

selected. 1:22-cv-11172, Pl.'s Opp'n 23, Doc. No. 77.

 Instead, the Alliance argues that the Corps' analysis violated its regulations. Id. at 24. The

Alliance's arguments do not withstand scrutiny. First, the Alliance contends that there is a three-

step analysis that the Corps must conduct: it must assess off-site alternatives; then, if none are

available, it must try to modify the project to minimize impacts; finally, if the project cannot be

modified to avoid impacts, it must determine mitigation measures. 1:22-cv-11172, Pl.'s Opening

Mem. 29, Doc. No. 53 (citing 40 C.F.R. §§ 230.10(a)(2)). But the cited regulation says no such

thing.

 Then the Alliance contends that 40 C.F.R. § 230.10(a)(3) requires "the Corps to presume

that practicable alternatives exist[.]" 1:22-cv-11172, Pl.'s Opening Mem. 29, Doc. No. 53. The

Alliance reasons that the Project "is not water dependent" because it does not require "access or

proximity to . . . the special aquatic site in question to fulfill its basic purpose," and argues that

"when a project does not require any access or proximity to an aquatic site," the Corps must

"rebut the presumption that there are less practicable alternatives with less adverse

environmental impact." Id. (citing 40 C.F.R. §§ 230.10(a)(3)). But as Defendants point out, the

Alliance's argument relies on a misreading of the regulations, including failing to recognize that

§ 230.10(a)(3)'s presumption applies only to "special aquatic sites,"[24] and that where the Vineyard Wind Project will not be placed in a "special aquatic site," the presumption is inapplicable, and the Alliance's claim must fail. 1:22-cv-11172, Fed. Defs.' Opening Mem. 37-38, Doc. No. 60.

Consequently, Plaintiffs have failed to demonstrate how the regulation purportedly requiring consideration of alternatives and a presumption that practicable alternatives exist was violated here. Nor have they made other arguments, independent of the cited regulation, that would have obligated Defendants to consider other alternatives beyond what was done.

As a result, Plaintiffs' claims that Defendants failed to consider practicable alternatives fails.

### B.  Cumulative Impacts (Responsible, Count 2.4)

The Alliance claims that the Corps failed to consider the cumulative impacts of the Vineyard Wind Project and other future projects under 40 C.F.R. § 230.11(g),[25] where discussion of cumulative impacts from this Project and similar future projects is absent from the Joint ROD. 1:22-cv-11172, Pl.'s Opening Mem. 31-32, Doc. No. 53. The Alliance argues further that the Corps cannot rely on the EIS for its cumulative effects analysis, on the ground that the Final EIS is also deficient and fails to provide this discussion. Id. at 32.

---

[24] As summarized by Defendants, "[s]pecial aquatic sites are sanctuaries, refuges, wetlands, mud flats, vegetated shallows, coral reefs and riffle pools." 1:22-cv-11172, Fed. Defs.' Opening Mem. 38, Doc. No. 60 (citing 40 C.F.R. §§ 230.40 to 230.45; 40 C.F.R. § 230.3(m)).

[25] Under 40 C.F.R. § 230.11(g)(2), "cumulative effects attributable to the discharge of dredged or fill material in the waters of the United States should be predicted to the extent reasonable and practical. The permitting authority shall collect information and solicit information from other sources about the cumulative impacts on the aquatic ecosystem."

Defendants respond first that, under 40 C.F.R. § 230.11(g), the Corps' required cumulative impact analysis is limited to the 23.3 miles of cable corridor[26] covered by the CWA permit. Where the regulations at issue apply only to the length of corridor permitted under the CWA regulations (i.e. the 23.3 mile corridor), Defendants are correct.

Defendants argue next, that the Alliance has not explained how future projects would cause impacts along the 23.3 mile corridor that Defendants failed to consider, and that the Corps complied with § 230.11(g) in considering cumulative impacts to the 23.3 mile corridor. Defendants detail that the Corps both relied on cumulative impacts analysis performed as part of the NEPA review and independently considered cumulative impacts that other wind projects in the area would cause. 1:22-cv-11172, Fed. Defs.' Opening Mem. 42-44, Doc. No. 60 (citing USACE AR 011471 ("reasonably foreseeable activities within the larger overall wind lease area were considered to account for potential cumulative effects.")); Fed. Defs.' Reply 11, Doc. No. 92. Where the Alliance has not pointed to (i) authority suggesting that the Corps cannot rely on analysis performed during NEPA review or (ii) specific cumulative impacts not considered as part of the NEPA or CWA review, Defendants' arguments are well-taken.

At its core, the Alliance is contending that the Corps should have done more to satisfy its own regulations. The Alliance must meet a high bar to challenge an agency's interpretation of its own regulations. See Nat'l Ass'n of Home Builders v. Defs. of Wildlife, 551 U.S. 644, 658

---

[26] There are also two disputes concerning this figure: first, Plaintiffs appear to challenge impacts beyond the 23.3 miles considered under the CWA. Where those challenges are not based on any agency action or lack of action (i.e. Plaintiffs are not challenging the Rivers and Harbors Permit, nor are they arguing the CWA considered an overly narrow area) they fail. Second, Plaintiffs raise, for the first time, that in two public notices, the Corps improperly omitted the total corridor length. This argument is entirely without merit as the Corps detailed the area to be considered under the CWA, and other documents connected to the Project review detailed total figures.

(2007) (vacatur is proper only where the agency "has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."). The Alliance has failed to make this showing.

Accordingly, Plaintiffs' Motions for Summary Judgment as to the CWA claims are denied and Defendants' and Vineyard Wind's Motions are granted where certain claims were waived, and as to those remaining claims, Plaintiffs have not shown show any actions on the part of Defendants were arbitrary, capricious, or otherwise unlawful.

## V.     Plaintiffs' Outer Continental Shelf Lands Act Claims[27]

### A.     Smart from the Start (Seafreeze, 1st, 2nd, and 3rd Claims for Relief)

#### 1.   Background

On November 23, 2010, the Department of Interior issued a press release which announced the "Smart from the Start" Initiative, designed to "speed offshore wind energy development." 1:22-cv-11091, Joint SOF ¶ 18, Doc. No. 106 (citing U.S. Dep't of Interior Press Release). In the press release, BOEM announced that it was "proposing a revision to its regulations that will simplify the leasing process of offshore wind in situations where there is only one qualified and interested developer." Id. at 19. On May 16, 2011, BOEM adopted a final rule pertaining to non-competitive leases on the Outer Continental Shelf that may utilize pre-

_____

[27] In their summary judgment briefing, the Seafreeze Plaintiffs assert for the first time that BOEM violated OCSLA in approving the Vineyard Wind Site Assessment Plan. Where this claim is absent from the Complaints, it is not properly before the court, and Plaintiffs' Motions for Summary Judgment fail as to that previously unasserted claim.

existing facilities. 76 Fed. Reg. 28,178 (May 16, 2011). On February 6, 2012, in addition to publishing a Call for Information and Nominations for wind energy projects on the Outer Continental Shelf, BOEM published a notice concerning ongoing efforts to develop wind energy consistent with the "Smart from the Start" Initiative. 77 Fed. Reg. 5830 (Feb. 6, 2012).

### 2. *Plaintiffs' Challenge*

The Seafreeze Plaintiffs allege the "Smart from the Start" Initiative was a change in regulatory policy which violates the APA and OCSLA for various reasons, including that (1) the Initiative was not promulgated through notice-and-comment rulemaking, and (2) the subsequent application of the Initiative was impermissible, because of the lack of notice-and-comment at various stages of the Vineyard Wind review process.[28]

Defendants respond that the "Smart from the Start" Initiative–which Plaintiffs define as a "policy" adopted in 2010 and 2011 press releases–is not a reviewable agency action. They argue further that, in any event, even if the 2011 press release and initiative could be challenged as an agency action, such challenge would be time barred. 1:22-cv-11091, Fed. Defs.' Opening Mem. 8-9, Doc. No. 73; 1:22-cv-11091, Fed. Defs.' Reply 21, Doc. No. 93. Vineyard Wind additionally asserts that (i) Plaintiffs' Complaint ¶ 55, 1:22-cv-11091, Doc. No. 1, challenges only 76 Fed. Reg. 28,178, a regulation pertaining to non-competitive leasing (which the process for OCS-A 0501 was not), and (ii) nothing in the Record demonstrates that the "Smart from the Start" Initiative was applied to the relevant Environmental Assessment or the EIS prepared in

---

[28] The Seafreeze Plaintiffs also brought a claim pertaining to the "Smart from the Start" Initiative under the APA and NEPA. See 1:22-cv-11091, Compl. 24th Claim for Relief, ¶¶ 286-293, Doc. No. 1. Where Plaintiffs lack standing to bring claims under NEPA, the court does not reach this claim.

connection with the Vineyard Wind Project. 1:22-cv-11091, Intervenor's Reply 7-8, Doc. No. 94.[29] The court need not reach whether the "Smart from the Start" Initiative was a final agency action where Plaintiffs' challenges are time barred.

Under 28 U.S.C. § 2401(a), "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." Here, the "Smart from the Start" Initiative was announced in 2010; a final rule pertaining to non-competitive leaves was issued in 2011; and BOEM published a notice concerning ongoing efforts to develop wind energy consistent with the "Smart from the Start" Initiative in 2012. The two actions here were filed more than nine years later, in December 2021 and January 2022.

Plaintiffs contend the statute of limitations does not apply to *ultra vires* actions. 1:22-cv-11091, Pls.' Opening Mem. 19-20, Doc. No. 67 (citing La. Pub. Serv. Comm'n v. FCC, 476 U.S. 355, 374 (1986)). To the extent Plaintiffs are arguing that there is no statute of limitations applicable to such actions, they are incorrect. Louisiana Public Service Commission does not instruct otherwise.

Next, Plaintiffs contend their challenge is not time barred where it "'arises in response to application of the [agency action] to the challenger[.]'" 1:22-cv-11091, Pls.' Opp'n 33-34, Doc. No. 90 (quoting Rodriguez v. United States, 852 F.3d 67, 82 (1st Cir. 2017)). The statute of limitations to challenge illegal agency actions may be tolled until it is applied to a challenger.

_____

[29] Vineyard Wind also challenges the Seafreeze Plaintiffs' standing to bring claims concerning the "Smart from the Start" Initiative. 1:22-cv-11091, Intervenor's Reply 7-8, Doc. No. 94. Where the Seafreeze Plaintiffs have asserted economic injuries caused by the application of the "Smart from the Start" Initiative to BOEM's subsequent leasing and approval decisions under OCSLA, the court considers the statute of limitations defense first.

See Aguayo v. Jewell, 827 F.3d 1213, 1226 (9th Cir. 2016). However, Plaintiffs have not demonstrated that the "Smart from the Start" Initiative was applied to any aspect of the Vineyard Wind Project, let alone that it was applied to Plaintiffs. Although Plaintiffs contend BOEM's issuance of the Vineyard Wind Lease, publication of the Final EIS, issuance of the ROD, and approval of the COP were each "later" applications of the "Smart from the Start" Initiative, some of which they contend make their challenge timely, Plaintiffs offer no evidence to demonstrate the "Smart from the Start" Initiative was applied in any of those phases of the Project review process. Where they have not offered evidence that the "Smart from the Start" Initiative was applied to the Vineyard Wind Project, their tolling argument fails.

Accordingly, the Seafreeze Plaintiffs' challenge to the "Smart from the Start" Initiative is time-barred.[30] As to the Seafreeze Plaintiffs' First, Second,[31] and Third Claims for Relief, the Seafreeze Plaintiffs' Motion for Summary Judgment is denied and Defendants' and Vineyard Wind's Motions for Summary Judgment are granted.

### B.  Violations of 43 U.S.C. § 1337(p)(4)

Both the Seafreeze Plaintiffs and the Alliance assert that BOEM violated OCSLA in numerous phases of the Vineyard Wind Project by failing to ensure it met the majority of the twelve goals enumerated under § 1337(p)(4). 1:22-cv-11091, Pls.' Opening Mem. 25-26, Doc.

_____

[30] Although Plaintiffs assert that their claims challenging the application of the "Smart from the Start" Initiative implicates the major questions doctrine, where their APA/OCSLA claims pertaining to the "Smart from the Start" Initiative are time-barred, and their NEPA claims have been dismissed for want of standing, the court is without jurisdiction to consider Plaintiffs' further arguments as to these claims.

[31] The Seafreeze Plaintiffs' Second Claim for Relief as it pertains to their claim that BOEM did not consider the requisite factors under 43 U.S.C. § 1337(p)(4) in issuing the Lease is addressed below.

No. 67; 1:22-cv-11172, Pl.'s Opening Mem. 13, Doc. No. 53 (incorporating the Seafreeze Plaintiffs' arguments pertaining to OCSLA by reference). Defendants contend that Plaintiffs' claims are deficient in numerous respects and that, in any event, Defendants' actions are entitled to deference. The court considers each of the challenged actions in turn below.

### 1.  Vineyard Wind Lease (Seafreeze 2nd Claim for Relief)

Plaintiffs contend that BOEM's issuance of the Lease violated OCSLA's substantive requirements under § 1337 and EPA's procedural requirements under 40 C.F.R. § 1501.3(a) where BOEM prepared an Environmental Assessment but failed to prepare an Environmental Impact Statement for the Lease issuance; and BOEM did not otherwise consider the factors enumerated in § 1337 when issuing the Vineyard Wind Lease. 1:22-cv-11091, Pls.' Opening Mem. 19-26, Doc. No. 67.

Defendants assert that challenges to the issuance of the Vineyard Wind Lease and the Environmental Assessment BOEM prepared in connection with the Lease issuance are time barred. The court agrees. Under 28 U.S.C. § 2401(a), except in the case of contract disputes not at issue here, "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." The Lease was effective April 1, 2015. The first of these actions was not commenced until December 15, 2021. As discussed _supra_, Plaintiffs' sole argument that the action is not time barred–that actions which are "_ultra vires_" can be challenged at any time – has no legal support. Accordingly, the Seafreeze Plaintiffs' Motion for Summary Judgment is denied and Defendants' and Vineyard Wind's Motions for Summary Judgment are granted as to the Seafreeze Plaintiffs' challenges to the issuance of the Vineyard Wind Lease as violating the OCSLA.

2.  *Approval of the COP (Seafreeze, 5th Claim for Relief; Responsible, Count 1.1, 1.2, and 1.7)*

Plaintiffs argue that, as a matter of statutory construction, 43 U.S.C. § 1337(p)(4) imposes certain non-negotiable requirements that Defendants failed to provide for in consideration of the Vineyard Wind COP. 1:22-cv-11091, Pls.' Opening Mem. 25-27, Doc. No. 67; 1:22-cv-11172, Pl.'s Opening Mem. 13-15, Doc. No. 53 (adopting the Seafreeze Plaintiffs' arguments); Pl.'s Opp'n 17-19, Doc. No. 77 . Defendants respond that § 1337 commits discretion to the Secretary of the Interior to ensure these criteria are appropriately balanced, and that, as a result, the Secretary's determinations are entitled to deference, and, in any event, that Defendants complied with OCSLA in approving the COP. 1:22-cv-11091, Fed. Defs.' Opening Mem. 35-36, Doc. No. 73.

Under OCSLA, the Secretary of the Interior may, in consultation with other agencies, grant leases, easements, or other rights of way on the Outer Continental Shelf for the purpose of renewable energy production. 43 U.S.C. § 1337(p)(1)(c). Section 1337(p)(4), entitled "Requirements," provides:

> The Secretary [of the Interior] shall ensure that any activity under this subsection is carried out in a manner that provides for–
>
> (A)   safety;
>
> (B)   protection of the environment;
>
> (C)   prevention of waste;
>
> (D)   conservation of the natural resources of the outer Continental Shelf;
>
> (E)   coordination with relevant Federal agencies;
>
> (F)   protection of national security interests of the United States;
>
> (G)   protection of correlative rights in the outer Continental Shelf;
>
> (H)   a fair return to the United States for any lease, easement, or right-of-way under this subsection;

> (I)    prevention of interference with reasonable uses (as determined by the Secretary) of the exclusive economic zone, the high seas, and the territorial seas;
>
> (J)    consideration of—
>
> > i.    the location of, and any schedule relating to, a lease, easement, or right-of-way for an area of the outer Continental Shelf; and
> >
> > ii.    any other use of the sea or seabed, including use for a fishery, a sealane, a potential site of a deepwater port, or navigation;
>
> (K)    public notice and comment on any proposal submitted for a lease, easement, or right-of-way under this subsection; and
>
> (L)    oversight, inspection, research, monitoring, and enforcement relating to a lease, easement, or right-of-way under this subsection.

43 U.S.C. § 1337(p)(4).

Plaintiffs argue that where this Section is titled "Requirements" and states that the Secretary "shall ensure" that activity is carried out in a manner that provides for the twelve enumerated grounds, Defendants are required to ensure that each of those criteria are met. Plaintiffs argue that in approving the COP Defendants did not provide for (A) safety, and (I) interference with reasonable uses of the OCS, specifically, fisheries' use.[32] See 1:22-cv-11091, Pls.' Opp'n 20, Doc. No. 90. Plaintiffs rely on Almendarez-Torres v. United States, 523 U.S. 224 (1998) and National Association of Home Builders v. Defs. of Wildlife, 551 U.S. 644 (2007), however, neither Almendarez-Torres nor National Association of Home Builders directs the result Plaintiffs seek.

---

[32] Plaintiffs also asserted challenges as to (B) protection of the environment; (D) conservation of natural resources; and (F) protection of national security. 1:22-cv-11091, Compl. 5th Claim for Relief, Doc. No. 1; 1:22-cv-11172, Compl. Count 1, Doc. No. 1. However, Plaintiffs have not established standing as to these challenges. Specifically, as discussed supra, Plaintiffs offer no evidence to support their standing to bring claims on behalf of marine species, natural resources, or national security issues.

First, it is true that "the title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute." Almendarez-Torres, 523 U.S. at 234 (internal citations omitted). But consideration of the section heading does not resolve the dispute here which centers on how the agency determines whether each of the enumerated "Requirements" is satisfied, not whether they are requirements at all.

Second, although Plaintiffs are correct that "shall" should be construed as mandatory, Plaintiffs are incorrect that the word mandates their preferred outcome here. While National Association of Home Builders certainly dictates that "shall" means the statutory directive is not discretionary, it also recognizes that, in considering whether the enumerated factors have been satisfied in the statute at issue, the agency must necessarily exercise some discretion. 511 U.S. at 671 ("While the EPA may exercise some judgment in determining whether a State has demonstrated that it has the authority to carry out § 402(b)'s enumerated statutory criteria, the statute clearly does not grant it the discretion to add another entirely separate prerequisite to that list."). The Secretary still retains some discretion in considering whether the enumerated statutory criteria have been satisfied, even where the statute does not state so expressly.

Such is the case here. Plaintiffs advocate that each enumerated criterion must be satisfied to its absolute maximum, without the discretion functionally necessary for the Secretary to determine what each criterion requires, both generally and as to a given proposal, and how to ensure each criterion is met, and not to the detriment of the other criteria.

Commonwealth of Massachusetts v. Andrus, 594 F.2d 872 (1st Cir. 1979), cuts directly against Plaintiffs' argument (despite their contention otherwise). In Andrus, the First Circuit considered the following language:

> [T]his subchapter shall be construed in such a manner that the character of the
> waters above the outer Continental Shelf as high seas and the right to
> navigation and fishing therein shall not be affected.

43 U.S.C. § 1332(2). The plaintiffs in <u>Andrus</u> argued that this language "imposes a duty on the

Secretary to see that mining and drilling are conducted absolutely without harm to fisheries." 594

F.2d at 888. However, prior interpretations of the provision concluded that it was "directed at the

legal right to fish rather than at prohibiting physical impediments." <u>Id.</u> at 889. Against this

backdrop, the First Circuit concluded that Section 1332(2) placed on the Secretary a duty to see

that offshore drilling activities were conducted "without unreasonable risk to the fisheries." <u>Id.</u>

Moreover, the First Circuit recognized in <u>Andrus</u> that Congress knew that oil and gas

development would have an impact on fisheries, but that "the concept of balance rules out a

policy based on sacrificing one interest to the other." <u>Id.</u> at 889. Balance is similarly required

here, where Congress has recognized the importance of leasing on the Outer Continental Shelf in

support of energy projects, and, specifically enumerated twelve factors to be provided for,

including the "prevention of interference with reasonable uses (as determined by the Secretary)

of the exclusive economic zone, the high seas, and the territorial seas[.]" 43 U.S.C.

§ 1337(p)(4)(I).

Plaintiffs contend that <u>Andrus</u> rejected the wholesale destruction of a fishery, which they

claim is the case here, 1:22-cv-11091, Pls.' Opp'n 22, Doc. No. 90 (citing Joint ROD,

BOEM_0076837 reflecting that the area will "likely…be abandoned by commercial fisheries"),

but, as the court held in its <u>Memorandum and Order</u>, 1:22-cv-11091, Doc. No. 137, on Plaintiffs'

motions to strike, the language on which Plaintiffs rely for the proposition that the Area will be

abandoned is a mere clerical error in the Administrative Record that has since been corrected by

the Corps. Where Plaintiffs do not offer other evidence of the complete destruction of fisheries in the OCS, their argument fails.

Beyond their statutory challenge, Plaintiffs contend that the Secretary, in fact, did not provide for safety or prevention of interference with reasonable uses as required by 43 U.S.C. § 1337(p)(4) in approving the COP. However, where Plaintiffs point only to the impact to fishing operations as reflected in since-corrected misstatements to the Record that the court has since concluded were clerical errors, Plaintiffs' challenges to the COP approval as arbitrary and capricious and in violation of OCSLA are entirely without merit.

Accordingly, as to Plaintiffs' challenge to the approval of the COP as violating OCSLA, Plaintiffs' <u>Motions for Summary Judgment</u> are denied and Defendants' and Vineyard Wind's <u>Motions for Summary Judgment</u> are granted.

### 3. *Temporary Withdrawal and Resumption of COP Review (Seafreeze Plaintiffs' 4th Claim for Relief)*

Plaintiffs alleges that BOEM lacked authority to restart review of the COP after suspending it at Vineyard Wind's request, and that BOEM's decision to restart review was *ultra vires*. 1:22-cv-11091, Pls.' Opening Mem. 33-34, Doc. No. 67. Plaintiffs further contend that, once BOEM resumed review of the COP, BOEM did not independently confirm Vineyard Wind's technical review of the newly selected turbines, and BOEM failed to provide a notice-and-comment period for the resumed review process, as required under NEPA and OCSLA. <u>Id.</u> Defendants respond that the decisions to suspend and resume review were lawful. 1:22-cv-11091, Fed. Defs.' Opening Mem. 17-18, Doc. No. 73. Defendants further note that the requisite notice-and-comment periods were previously satisfied under both NEPA and OCSLA, and Vineyard Wind's technical review of the newly proposed turbines reflected that the turbine fit within the parameters and design envelope previously considered in the Supplemental Draft EIS

so no substantive re-review was required by the agencies. 1:22-cv-11091, Fed. Defs.' Opening Mem. 17-18, Doc. No. 73 (citing BOEM_0067698-701, 0067703-04; BOEM_0067665).

The court finds Plaintiffs' arguments unpersuasive where Plaintiffs offer no authority (i) to suggest that resumption of review was subject to notice and comment, or (ii) that BOEM was without authority to suspend review and resume it. Nor have Plaintiffs shown that, even if there were some technical violation, how that violation was anything beyond harmless error where the changes made by Vineyard Wind were within the parameters already contemplated and reviewed as part of the NEPA process. See 1:22-cv-11091, Joint SOF ¶ 50, Doc. No. 106. Accordingly, Plaintiffs' Motion for Summary Judgment is denied, and Defendants' and Vineyard Wind's Motions are granted, as to the Seafreeze Plaintiffs' 4th Claim for Relief.

## VI.    Conclusion

For the foregoing reasons, Plaintiffs have not shown that Defendants acted arbitrarily, capriciously, or otherwise unlawfully. Accordingly, Defendants and Vineyard Wind's Motions for Summary Judgment, 1:22-cv-11091, Doc. Nos. 72, 86; 1:22-cv-11172, Doc. Nos. 59, 73, are GRANTED and Plaintiffs' Motions for Summary Judgment, 1:22-cv-11091, Doc. No. 66; 1:22-cv-11172, Doc. No. 52, are DENIED.

IT IS SO ORDERED

October 12, 2023                                         /s/ Indira Talwani
                                                        United States District Judge